# EXHIBIT "3"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**Case No.: 4:25-cv-05034**

GUILLERMO VAZQUEZ in his capacity as
Administrator of AFSCME Local 1550, and
AMERICAN FEDERATION OF STATE,
COUNTY & MUNICIPAL EMPLOYEES,
AFL-CIO,

Plaintiffs,

vs.

CYNTHIA COLE, KAREN DUGAR, SONJA
ROSS, ALVERNISE BOYD, and NATIONAL
ORGANIZATION FOR STATE COUNTY
MUNICIPAL EMPLOYEES 1550
ASSOCIATION,

Defendants.
_______________________________________/

**PLAINTIFFS' NOTICE OF COMPLETION OF SUBSTITUTED SERVICE ON DEFENDANT CYNTHIA COLE**

**PLEASE TAKE NOTICE,** that Plaintiffs, Guillermo Vazquez in his capacity as Administrator of AFSCME Local 1550, and American Federation of State, County & Municipal Employees, AFL-CIO ("Plaintiffs"), in accordance with the Court's Order entered at ECF No. 45, have completed substituted service on Defendant, Cynthia Cole ("Cole"), via the following methods:

1. Email at an email address Cynthia Cole used to communicate with Plaintiffs' agents as recently as August 2025;

2. Regular and certified mail, return receipt requested at both Cynthia Cole's last known home address and the registered address for her employer, Defendant National Organization for State County Municipal Employees 1550 Association ("NOFSCME");

3. Posting the process on the door of Cynthia Cole's last known home address in a plastic protector sleeve; and

4. Publication.

Plaintiffs more fully outline the steps taken to complete substituted service on Cole in the accompanying Declaration of Elan Kirshenbaum, attached hereto as Exhibit "1".

Plaintiffs respectfully request that the Court deem Cole to have been served in accordance with its Order at ECF No. 45.

Dated: Uniondale, New York
July 20, 2026

Max Gershenoff (Attorney-in-Charge)(*Southern District of Texas Federal ID No. 3939464*)
Barry I. Levy (Southern District of Texas Federal ID No. 3939606)
Elan Kirshenbaum (*Southern District of Texas Federal ID No. 3941555*)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
Phone: (516) 357-3000
Facsimile: (516) 357-3333
Max.Gershenoff@rivkin.com
Barry.Levy@rivkin.com
Elan.Kirshenbaum@rivkin.com

*Counsel for Plaintiffs Guillermo Vazquez in his capacity as Administrator of AFSCME Local 1550, and American Federation of State, County & Municipal Employees, AFL-CIO*

**CERTIFICATE OF SERVICE**

Pursuant to Local Rule 5.3 and Federal Rule of Civil Procedure 5(b), I certify that on July 20, 2026, I mailed and e-mailed copies of the foregoing document to the *pro se* defendants who have appeared in this Action.

[signature]

Attorney

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**Case No.: 4:25-cv-05034**

GUILLERMO VAZQUEZ in his capacity as Administrator of AFSCME Local 1550, and AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO,

Plaintiffs,

vs.

CYNTHIA COLE, KAREN DUGAR, SONJA ROSS, ALVERNISE BOYD, and NATIONAL ORGANIZATION FOR STATE COUNTY MUNICIPAL EMPLOYEES 1550 ASSOCIATION,

Defendants.
________________________________________/

**DECLARATION OF ELAN KIRSHENBAUM IN SUPPORT OF PLAINTIFFS' NOTICE OF COMPLETION OF SUBSTITUTED SERVICE ON DEFENDANT CYNTHIA COLE**

Elan Kirshenbaum hereby declares the truth of the following pursuant to 28 U.S.C. § 1746:

1. I am an attorney with Rivkin Radler LLP, counsel for Plaintiffs, Guillermo Vazquez in his capacity as Administrator of AFSCME Local 1550, and American Federation of State, County & Municipal Employees, AFL-CIO ("Plaintiffs").

2. I have personal knowledge of the file and the facts set forth in this declaration, and I would testify as to these facts in a court of law if called upon to do so.

3. I respectfully submit this declaration in support of Plaintiffs' Notice of Completion of Substituted Service on Defendant Cynthia Cole ("Cole").

4. Plaintiffs commenced this action on October 22, 2025. See ECF No. 1.

Case 4:25-cv-05634 Document 49 Filed 07/02/26 in TXSD Page 2 of 13

5. Plaintiffs made numerous good-faith efforts to serve Cole with a true and correct copy of the Summons and Complaint, and even hired a private investigator to try and locate Cole for the purposes of service. However, Plaintiffs could not locate Cole for service.

6. On January 13, 2026, Plaintiffs filed a motion for substituted service against Cole. See ECF No. 39 (the motion was then re-filed on the docket by the Clerk on March 17, 2026; see ECF No. 42).

7. The Court granted the motion on May 14, 2026. See ECF No. 45.

8. In its Order granting Plaintiffs' motion for substituted service, the Court directed Plaintiffs to serve Cole via four methods: (a) Email at an email address Cynthia Cole used to communicate with Plaintiffs' agents as recently as August 2025; (b) Regular and certified mail, return receipt requested at both Cynthia Cole's last known home address and the registered address for her employer, Defendant National Organization for State County Municipal Employees 1550 Association ("NOFSCME"); (c) Posting the process on the door of Cynthia Cole's last known home address in a plastic protector sleeve; and (d) Publication. See id.

9. On May 21, 2026, Plaintiffs sent an email to Cynthia Cole at four email addresses they had on file for Cole: (a) ccole1550@gmail.com; (b) alexbailey1550@gmail.com; (c) ccole1550@swbell.net; and (d) coleamillion21@aol.com. Plaintiffs' email to Cole indicated that the Court had issued an Order permitting substituted service, included a copy of the Order, and included a copy of the Summons and Complaint. A copy of Plaintiffs' email to Cole, including the PDF attachments sent to Cole with the email, is attached hereto as Exhibit "1".

10. That same day, Plaintiffs sent a letter to Cole via regular and certified mail, return receipt requested, at both Cynthia Cole's last known home address – 20119 York Way Drive, Katy, TX 77450 – and the registered address for her employer, Defendant NOFSCME – United States

Corporation Agents, Inc., 10601 Clarence Dr., Suite 250, Frisco, TX 75033. Like Plaintiffs' email, the letter informed Cole that that the Court had issued an Order permitting substituted service, included a copy of the Order, and included a copy of the Summons and Complaint. A copy of Plaintiffs' letter to Cole, along with proofs of mailing by regular mail and by certified mail, return receipt requested, is attached hereto as Exhibit "2".

11. On May 23, 2026, Plaintiffs arranged for a process server to post the process on the door of Cynthia Cole's last known home address – 20119 York Way Drive, Katy, TX 77450 – in a plastic protector sleeve. A copy of the Affidavit of Service is attached hereto as Exhibit "3".

12. Finally, Plaintiffs published a legal notice of a Citation by Publication in the Houston Chronicle, which ran in the paper on four consecutive Sundays: 6/14/2026; 6/21/2026; 6/28/2026; and 7/5/2026. A copy of the legal notice as it appeared in the Houston Chronicle on each of the Sundays (including a scan of each week's advertisement), along with a fully executed Affidavit of Publication, is attached hereto as Exhibit "4".

13. Plaintiffs have fully complied with the Court's Order at ECF No. 45, and substituted service on Cynthia Cole has now been completed.

I declare under the penalties of perjury that the foregoing is true and correct.

Executed on July 20, 2026.

Elan Kirshenbaum

# EXHIBIT "1"

**From:** Elan Kirshenbaum
**Sent:** Thursday, May 21, 2026 4:13 PM
**To:** ccole1550@gmail.com; alexbailey1550@gmail.com; ccole1550@swbell.net; coleamillion21@aol.com
**Cc:** Max Gershenoff; Sandra Wilches
**Subject:** Vazquez et al v. Cole et al (Case # 4:25-cv-05034) - Substituted Service on Cynthia Cole
**Attachments:** Vazquez et al v. Cole et al - Order Granting Substituted Service on Cynthia Cole.pdf; Vazquez et al v. Cole et al (Case # 4-25-cv-05034) - Complaint.pdf; Vazquez et al v. Cole et al (Case # 4-25-cv-05034) - Summons (Cynthia Cole).pdf

**Importance:** High

Dear Ms. Cole,

Please be advised that our office represents Plaintiffs Guillermo Vazquez, in his capacity as Administrator of AFSCME Local 1550, and American Federation of State, County & Municipal Employees, AFL-CIO in connection with the above-referenced matter.

Pursuant to the attached Court Order granting our motion for substituted service, please allow this email to serve as the first form of service of our Summons and Complaint, also attached above. We will be following up with serving you with the Summons and Complaint via regular and certified mail, return receipt requested, at both your last known home address and the registered agent for Defendant National Organization for State County Municipal Employees 1550 Association ("NOFSCME"); by posting the process on the door of your last known home address in a plastic protector sleeve; and via publication in a local Hoston newspaper, with an ad that runs for four consecutive weeks.

Please feel free to reach out should you have any questions or concerns.

United States District Court
Southern District of Texas
**ENTERED**
May 15, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**Case No.: 4:25-cv-05034**

GUILLERMO VAZQUEZ in his capacity as Administrator of AFSCME Local 1550, and AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO,

Plaintiffs,

vs.

CYNTHIA COLE, KAREN DUGAR, SONJA ROSS, ALVERNISE BOYD, and NATIONAL ORGANIZATION FOR STATE COUNTY MUNICIPAL EMPLOYEES 1550 ASSOCIATION,

Defendants.
_______________________________________/

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUBSTITUTED SERVICE ON DEFENDANT CYNTHIA COLE**

**THIS CAUSE,** before the Court on Plaintiffs' motion (the "Motion") for substituted service on Defendant Cynthia Cole:

The Court has reviewed the Motion and it is hereby

**ORDERED** and **ADJUDGED** that:

1. The Motion is **GRANTED**.

2. Plaintiffs are hereby authorized to serve Defendant Cynthia Cole via:

    a. Email at an email address Cynthia Cole used to communicate with Plaintiffs' agents as recently as August 2025;

    b. Regular and certified mail, return receipt requested at both Cynthia Cole's last known home address and the registered address for her employer, Defendant National Organization for State County Municipal

Employees 1550 Association ("NOFSCME");

c. Posting the process on the door of Cynthia Cole's last known home address in a plastic protector sleeve; and

d. Publication.

**DONE** and **ORDERED** in Chambers in Houston, Texas, this 15th day of May, 2026.

ANDREW S. HANEN
DISTRICT COURT JUDGE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**Case No.: ___________________**

GUILLERMO VAZQUEZ in his capacity as Administrator of AFSCME Local 1550, and AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO,

Plaintiffs,

vs.

CYNTHIA COLE, KAREN DUGAR, SONJA ROSS, ALVERNISE BOYD, and NATIONAL ORGANIZATION FOR STATE COUNTY MUNICIPAL EMPLOYEES 1550 ASSOCIATION,

Defendants.
_______________________________________/

**COMPLAINT**

Plaintiffs Guillermo Vazquez, in his capacity as Administrator of AFSCME Local 1550 (“Vazquez”), and American Federation of State, County & Municipal Employees, AFL-CIO (“AFSCME”) (collectively “Plaintiffs”), sue Defendants and allege as follows:

1. This action seeks to recover more than $450,000.00 that Defendants obtained through a pattern of deliberate and wrongful activity, including repeated acts of embezzlement and conversion of union assets in violation of 29 U.S.C. § 501(c), mail fraud, bank fraud, and breaches of fiduciary duty in violation of 29 U.S.C. § 501(a).

2. Defendants’ fraudulent and unlawful scheme began no later than 2021 and has continued uninterrupted since that time.

3. As a result of Defendants' scheme, Plaintiffs have incurred damages of more than $450,000.00.

## THE PARTIES

### I. Plaintiffs

4. Plaintiff Vazquez currently is the Administrator (trustee) of AFSCME Local 1550 ("Local 1550"), an unincorporated association and local union affiliate of AFSCME with its headquarters located at 5700 NW Central Drive, Suite 320, Houston, Texas 77092. Plaintiff Vazquez sues in his fiduciary capacity as Local 1550's Administrator.

5. Pursuant to and as authorized by the AFSCME Constitution, Plaintiff Vazquez was appointed by AFSCME's President as Administrator of Local 1550 on or about September 9, 2025, once Plaintiffs became aware of Defendants' fraudulent and unlawful scheme.

6. Pursuant to the AFSCME Constitution, Plaintiff Vazquez, as Administrator of Local 1550, has the right to take possession of all the funds, properties, books and other assets of Local 1550 to be held in trust for the benefit of Local 1550 and to be expended only to the extent necessary for the proper conduct of the affairs of Local 1550 and in the best interest of its members. Plaintiff Vazquez, as Administrator of Local 1550, has the authority to institute all necessary action to recover money or other property of Local 1550. Plaintiff Vazquez sues in his fiduciary capacity as Local 1550's Administrator.

7. Plaintiff AFSCME is a national labor organization and unincorporated association with its headquarters located at 1625 L Street NW, Washington, D.C. 20036. AFSCME represents both public and private sector workers, including but not limited to public service workers in Texas and across the United States.

## II. Defendants

8. Defendant Cynthia Cole ("Cole") resides in and is a citizen of Texas. At all relevant times, Cole was the Executive Director of Local 1550.

9. Upon information and belief based on publicly available information, Defendant Karen Dugar ("Dugar") resides in and is a citizen of either Washington or Texas. At all relevant times, Dugar was the Assistant Executive Director of Local 1550.

10. Defendant Sonja Ross ("Ross") resides in and is a citizen of Texas. At all relevant times, Ross was the President of Local 1550.

11. Defendant Alvernise Boyd ("Boyd") resides in and is a citizen of Texas. At all relevant times, Boyd was the Secretary-Treasurer of Local 1550.

12. Defendant National Organization for State County Municipal Employees 1550 Association ("NOFSCME") is a Texas non-profit corporation that purports to operate from 14205 N. Mopac Expressway, Suite 570, Austin, Texas 78728.

## JURISDICTION AND VENUE

13. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiffs' claims in this action under 29 U.S.C. § 501 (the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA")) and 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

14. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

15. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Texas is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

16. Since at least 2021, and continuing to the present day, Defendants devised and implemented a scheme whereby they caused hundreds of thousands of dollars of union funds that rightfully belonged to Plaintiffs to be embezzled, converted, stolen, and used for the benefit of Defendants, rather than for the benefit of Plaintiffs and their union members.

### I. AFSCME and Local 1550

17. AFSCME is the largest trade union of public service employees in the United States, representing approximately 1,400,000 public service employees and retirees in the public and private sectors across the United States.

18. AFSCME operates through approximately 3,400 local union affiliates across the United States, including Local 1550. Many of these local union affiliates are themselves organized into approximately 58 regional councils, however Local 1550 is directly affiliated with AFSCME without affiliation with a council.

19. Among other things, AFSCME coordinates the union's actions on major national issues such as labor rights, privatization, fair taxes, and health care. AFSCME also provides resources to councils and local union affiliates for organizing, bargaining, labor-management relations, political action, and education, and administers union member benefits.

20. AFSCME local union affiliates, including Local 1550, are responsible for – among other things – representing and/or advocating for their members in the workplace and administering themselves with fiscal responsibility and in accordance with sound accounting and fiduciary practices.

## II. Defendants' Fraudulent and Unlawful Scheme

21. In her capacity as Executive Director of Local 1550, Cole served as Local 1550's chief administrative and executive officer.

22. Among other things, Cole was responsible for carrying out the policies of Local 1550, including submitting an annual budget, overall oversight of Local 1550's daily operations, including its finances, and its compliance with legal and regulatory requirements.

23. Cole was also responsible for supervising Local 1550's staff, including Dugar, whom Cole designated as Assistant Executive Director of Local 1550.

24. In her capacity as Assistant Executive Director of Local 1550, Dugar was also responsible for the implementation of policies, coordination of programs and projects, oversight of Local 1550's daily operations, and its compliance with fiscal, legal, and regulatory requirements.

25. Dugar's responsibilities included oversight of Local 1550's finances, including budget development and monitoring, and ensuring accurate financial reporting, accountability, and transparency.

26. Among other things, Dugar was responsible for working with Boyd – Local 1550's Secretary-Treasurer – to maintain accurate financial records, to prepare accurate financial statements for Local 1550, and to expend funds only as approved by the Loal 1550 membership.

27. In her capacity as Secretary-Treasurer for Local 1550, Boyd was responsible for receiving and giving receipt for all Local 1550 funds, including member dues; for ensuring that all Local 1550 checks were prepared and signed for authorized union purposes; for keeping accurate records of Local 1550 receipts and disbursements; for preparing and submitting accurate monthly financial operating statements and transaction reports to the union membership; and for ensuring

annual audits of Local 1550 finances and reports to union membership regarding the results of those audits.

28. In her capacity as President of Local 1550, Ross was responsible for – among other things – authorizing and countersigning all checks drawn against Local 1550's funds, and ensuring that such checks were drawn for legitimate union purposes and properly authorized by the Local 1550 membership.

29. Ross was also responsible for presiding over all Local 1550 meetings, including meetings of Local 1550's executive board, which in turn was responsible for approving all union expenditures, and overseeing Cole's activities in her capacity as Local 1550's Executive Director, Dugar's activities in her capacity as Local 1550's Assistant Executive Director, and Boyd's activities in her capacity as Local 1550's Secretary-Treasurer.

30. In their respective capacities as Local 1550's officers, directors, and agents, Defendants also had an obligation to make accurate reports to AFSCME regarding Local 1550's monthly membership numbers, and to ensure that Local 1550 remitted AFSCME's share of union dues to AFSCME each month based on those accurate reports regarding Local 1550's monthly membership numbers.

31. Notwithstanding their respective duties and responsibilities to Local 1550, AFSCME, and union membership, Cole, Dugar, Boyd, and Ross engaged in a scheme to siphon away union funds and property for their own benefit through a pattern of conversion, embezzlement, mail fraud, bank fraud, and breaches of fiduciary duty.

32. Cole, Dugar, Boyd, and Ross facilitated the defalcation of these union funds by – among other things – causing Dugar, Local 1550's Assistant Executive Director, to systematically submit expense reports which falsely contended Dugar had incurred massive expenses in

connection with Local 1550 business, and which falsely contended that Dugar had paid those expenses out of her own pocket, in untraceable cash.

33. Then, Cole, Dugar, Boyd, and Ross caused Local 1550 to issue checks to Dugar – ostensibly as "reimbursement" for expenses Dugar had never legitimately incurred on behalf of Local 1550, and for supposed cash "payments" Dugar had never in fact made on behalf of Local 1550. Such checks bore the signatures of Boyd and/or Ross.

34. For example, during the four-year period from 2022-2025, Dugar – whose Assistant Executive Director salary at the time was between $75,000.00 and $79,000.00 per year – supposedly made more than $364,000.00 in untraceable cash payments out of her own pocket to a purported vendor called Compudata Services/Products ("Compudata"), ostensibly for office supplies and other materials to be used in Local 1550's business.

35. Then, Cole, Dugar, Boyd, and Ross caused Local 1550 to issue checks to Dugar, supposedly as "reimbursement" for her supposed cash outlays to Compudata on behalf of Local 1550.

36. Specifically, in 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to issue checks to Dugar in the total amount of $98,304.25, supposedly as "reimbursement" for cash payments Dugar had made to Compudata in furtherance of union business.

37. In 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to issue checks to Dugar in the total amount of $81,275.93, again supposedly as "reimbursement" for cash payments Dugar had made to Compudata in furtherance of union business.

38. In 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to issue checks to Dugar in the total amount of $121,751.78, again supposedly as "reimbursement" for cash payments Dugar had made to Compudata in furtherance of union business.

39. In 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to issue checks to Dugar in the total amount of $63,429.36, once again supposedly as "reimbursement" for cash payments Dugar had made to Compudata in furtherance of union business.

40. Upon information and belief, however, Compudata was not a genuine vendor for Local 1550, Compudata did not provide goods or services worth more than $364,000.00 to Local 1550 over the course of 2022-2025, and Dugar did not pay Compudata more than $364,000.00 in cash over the course of 2022-2025.

41. Instead, Cole, Dugar, Boyd, and Ross caused Dugar to submit false reimbursement claims to Local 1550, and caused Local 1550 to reimburse the false claims, in order to siphon off funds in Local 1550's bank account for their own purposes, that were originally intended to be used for the benefit of union members.

42. For example, the putative Compudata invoices Dugar submitted to Local 1550, which purported to reflect the office supplies and other materials provided by Compudata in exchange for Dugar's supposed cash payments, did not contain any invoice numbers for tracking purposes by either Local 1550 or Compudata.

43. What is more, the putative Compudata invoices did not contain any telephone numbers or e-mail addresses for Compudata.

44. Furthermore, though the purported Compudata invoices listed two supposed addresses for Compudata – one at 4106 Fannin Street, Houston, Texas 77004, and another at 15950 Dallas Parkway, Dallas, Texas 75248 – it does not appear as if any entity named Compudata operated any office supply or similar business at either of these locations during the pertinent period.

Case 4:25-cv-03534 Document 4-2 Filed 10/27/25 in TXSD Page 20 of 114

45. Moreover, the putative Compudata receipts that Dugar submitted to Local 1550 – which purported to reflect her cash payments to Compudata for office supplies and other materials to be used in furtherance of union business – listed a third supposed address for Compudata, namely 10904 Scarsdale Boulevard, without any reference to city or state.

46. Upon information and belief based on database searches, the only "10904 Scarsdale Boulevard" address in Texas is 10904 Scarsdale Boulevard, Houston, Texas 77089, and no business called Compudata has operated from that address.

47. In keeping with the fact that Dugar did not legitimately make the cash payments to Compudata for which she sought "reimbursement" from Local 1550, her supposed monthly cash payments to Compudata in many cases approached or even substantially exceeded her monthly take-home pay. For example:

(i) In February 2025, Dugar supposedly made more than $5,700.00 in cash payments to Compudata out of her own pocket, for which she sought and obtained "reimbursement" from Local 1550.

(ii) In March 2025, Dugar supposedly made more than $10,400.00 in cash payments to Compudata out of her own pocket, for which she sought and obtained "reimbursement" from Local 1550.

(iii) In April 2025, Dugar supposedly made more than $10,300.00 in cash payments to Compudata out of her own pocket, for which she sought and obtained "reimbursement" from Local 1550.

(iv) In May 2025, Dugar supposedly made more than $9,100.00 in cash payments to Compudata out of her own pocket, for which she sought and obtained "reimbursement" from Local 1550.

(v) In June 2025, Dugar supposedly made more than $7,300.00 in cash payments to Compudata out of her own pocket, for which she sought and obtained "reimbursement" from Local 1550.

48. Upon information and belief as set forth herein, after causing Local 1550 to "reimburse" Dugar for untraceable and illusory cash "expenses", Cole, Dugar, Boyd, and Ross caused the "reimbursements" to be distributed between and among themselves.

49. Without the agreement of each of Cole, Dugar, Boyd, and Ross, Dugar could not have successfully obtained "reimbursement" from Local 1550 for illusory and non-credible cash expenditures.

50. For instance, Cole, Dugar, Boyd, and Ross – each of whom was responsible for financial oversight over Local 1550 – had to agree not to retain a certified public accountant to conduct annual audits of Local 1550's finances, as required by the Local 1550 Constitution. Cole, Dugar, Boyd, and Ross also had to agree not to report the results of any such audits to the union membership, as also required by the Local 1550 Constitution.

51. Cole, Dugar, Boyd, and Ross agreed not to engage an accountant to conduct annual audits of Local 1550's finances or to report the results of such audits to union membership because – had they done so – it would have revealed and put an end to the fraudulent and unlawful scheme and breaches of fiduciary duty described herein.

52. Pursuant to the AFSCME Constitution and the Local 1550 Constitution, Local 1550 – like all AFSCME local union affiliates – is required to submit a report each month to AFSCME that accurately specifies the number of its members.

53. Upon authorization by union members, members' employers may directly deduct the members' monthly union dues from their pay and remit them to Local 1550.

54. Then, pursuant to the AFSCME Constitution and the Local 1550 Constitution, Local 1550 – like all AFSCME local union affiliates – is required to remit AFSCME's share of

union dues to AFSCME each month (in this case, approximately 30 percent) based on the number of Local 1550's members. These remittances are known as the "per capita tax".

55. In their respective capacities as Local 1550's officers, directors, and agents, Defendants had an obligation to make accurate reports to AFSCME regarding Local 1550's monthly membership numbers, and the amount of monthly per capita tax payments that were due from Local 1550 to AFSCME.

56. Even so, in order to create a pool of union funds in Local 1550's bank accounts that they could illicitly siphon off for their own purposes, and to conceal and perpetuate their fraudulent and unlawful scheme, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit falsified monthly membership reports to AFSCME via the mail on a monthly basis for over four years, all of which substantially underreported Local 1550's true membership numbers.

57. Then, based upon the falsified monthly membership reports, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME checks for per capita tax payments each month that grossly understated the actual dues receipts, and consequently, per capita taxes that were due to AFSCME based on Local 1550's true monthly membership, and at the same time falsely represented that the checks fully and completely paid the per capita taxes that were due and owing.

58. For example:

(i) On or around April 28, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,450. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,581.18.

(ii) On or around May 16, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,443. At or around the same time, Cole, Dugar, Boyd, and Ross caused

Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,418.45.

(iii) On or around June 24, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,426. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,177.90.

(iv) On or around July 16, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,444. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,432.60.

(v) On or around August 13, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,434. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,291.10.

(vi) On or around September 10, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,428. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,206.20.

(vii) On or around October 15, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,415. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,022.25.

(viii) On or around November 19, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely

represented that Local 1550's membership count was only 805, when in fact, it was at least 1,412. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,979.80.

(ix) On or around December 17, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,414. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,008.10.

(x) On or around January 27, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,405. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,880.75.

(xi) On or around February 18, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,394. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,732.18.

(xii) On or around March 15, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,397. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,767.35.

(xiii) On or around April 22, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,397. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,193.88.

(xiv) On or around May 16, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,382. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,969.90.

(xv) On or around June 17, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,368. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,774.83.

(xvi) On or around July 11, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,361. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,666.45.

(xvii) On or around August 25, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,351. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,529.18.

(xviii) On or around September 20, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,348. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,485.83.

(xix) On or around October 20, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,325. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that

the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,146.25.

(xx) On or around November 22, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,321. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,088.45.

(xxi) On or around December 21, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,316. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,023.43.

(xxii) On or around January 13, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,337. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,326.88.

(xxiii) On or around February 16, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,335. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,297.98.

(xxiv) On or around March 17, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,332. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,254.63.

(xxv) On or around April 18, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was

at least 1,296. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,317.85.

(xxvi) On or around May 17, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,282. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,101.80.

(xxvii) On or around June 16, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,284. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,131.60.

(xxviii) On or around July 19, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,306. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,464.37.

(xxix) On or around August 18, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,280. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,072.00.

(xxx) On or around September 22, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,284. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,131.60.

(xxxi) On or around October 18, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,277. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,034.75.

(xxxii) On or around November 17, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,288. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,198.65.

(xxxiii) On or around December 21, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,291. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,243.35.

(xxxiv) On or around January 18, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,302. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,407.25.

(xxxv) On or around February 21, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,310. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,526.45.

(xxxvi) On or around March 19, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,299. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that

the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,355.10.

(xxxvii) On or around April 19, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550’s membership count was only 805, when in fact, it was at least 1,298. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $12,517.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,191.68.

(xxxviii) On or around May 10, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550’s membership count was only 805, when in fact, it was at least 1,278. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $12,517.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,880.68.

(xxxix) On or around June 14, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550’s membership count was only 805, when in fact, it was at least 1,274. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $12,517.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,810.70.

(xl) On or around July 17, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550’s membership count was only 805, when in fact, it was at least 1,272. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $12,517.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,779.60.

(xli) On or around August 29, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550’s membership count was only 805, when in fact, it was at least 1,268. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $12,517.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,717.40.

(xlii) On or around September 30, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550’s membership count was only 805, when in fact, it was

at least 1,266. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $12,517.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,686.30.

(xliii) On or around October 31, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550’s membership count was only 700, when in fact, it was at least 1,271. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $10,885.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,764.05.

(xliv) On or around November 26, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550’s membership count was only 700, when in fact, it was at least 1,271. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $10,885.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,764.05.

(xlv) On or around January 10, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550’s membership count was only 700, when in fact, it was at least 1,266. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $10,885.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,686.30.

(xlvi) On or around March 4, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550’s membership count was only 700, when in fact, it was at least 1,258. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $10,885.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,569.68.

(xlvii) On or around March 27, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550’s membership count was only 700, when in fact, it was at least 1,223. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $10,885.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,025.43.

(xlviii) On or around April 30, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 700, when in fact, it was at least 1,248. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $10,885.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,406.40.

(xlix) On or around May 16, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 700, when in fact, it was at least 1,240. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,235.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,902.00.

(l) On or around June 18, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 700, when in fact, it was at least 1,228. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,235.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,717.43.

(li) On or around July 9, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 700, when in fact, it was at least 1,225. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,235.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,669.28.

59. Overall, as a result of Cole, Dugar, Boyd, and Ross's falsified monthly membership reports and misrepresentations regarding Local 1550's per capita tax payments, Local 1550 failed to pay more than $450,000.00 in per capita taxes that were due and owing to AFSCME.

60. By causing Local 1550 to systematically misrepresent its true monthly membership numbers to AFSCME, and by causing Local 1550 to systematically underpay the per capita tax due to AFSCME, Cole, Dugar, Boyd, and Ross caused Local 1550 to collect a large amount of money – derived from union member dues – which they could utilize in their illicit scheme without

the knowledge of AFSCME and without fulfilling Local 1550's obligation to AFSCME. Defendants proceeded to siphon away these amounts for their own benefit, including through the fraudulent "reimbursements" to Dugar that are described herein.

61. Without the agreement of each of Cole, Dugar, Boyd, and Ross – who together were responsible for Local 1550's operations, financial management, and reporting – Local 1550 could not have systematically falsified its monthly membership numbers to AFSCME over a period of more than four years. Nor, by extension, could Local 1550 have accumulated the large amount of funds that Defendants proceeded to siphon away through their fraudulent and unlawful defalcation scheme.

62. By April 2025, Cole, Dugar, Boyd, and Ross were growing concerned that their scheme would be discovered, and Cole and Dugar – in particular – were growing concerned that discovery of the scheme would lead to the termination of their salaried positions as Local 1550's Executive Director and Assistant Executive Director.

63. Accordingly, on or about April 10, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to enter into purported five-year employment agreements with Cole and Dugar. The purported agreements actually were shams intended to provide Cole, Dugar, Boyd, and Ross with leverage to settle any claims against them in the event that their scheme was discovered, and to enable Cole, Dugar, Boyd, and Ross to continue mulcting away union money for their own benefit in the event that discovery of their scheme resulted in the termination of their union positions and offices.

64. For instance, Cole and Dugar's <u>previous</u> employment agreements with Local 1550 had provided, in the event of termination, for severance pay through the life of the agreements, unless the termination was for "reasons related to gross misconduct and/or malfeasance."

65. By contrast, Cole and Dugar's purported April 10, 2025, employment agreements – which were signed by both Ross and Boyd on behalf of Local 1550, pursuant to Cole, Dugar, Boyd, and Ross's corrupt agreement – substantially changed the severance provisions that appeared in Cole and Dugar's previous employment agreements. Instead of providing for severance unless the termination was for "reasons related to gross misconduct and/or malfeasance," the purported April 10, 2025, five-year employment agreements provided for severance through the life of the agreements unless the termination was for "reasons related to physical violence, harassment, discrimination, [and/or] serious breaches of health and safety regulations."

66. In other words, the April 10, 2025, "employment agreements" purported to permit up to five years of severance pay to Cole and Dugar – even in the event of gross misconduct such as the fraudulent and unlawful activities and breaches of fiduciary duty described herein – so long as the misconduct did not involve physical violence, harassment, discrimination, or serious breaches of health and safety regulations.

67. In or around July 2025, as part of an assessment by AFSCME of the capacity of its affiliates in the Houston area to participate in organizing activity, AFSCME grew concerned regarding Local 1550's operations, and provided Cole, Dugar, Boyd, Ross, and Local 1550 with notice that AFSCME intended to conduct its own audit of Local 1550's finances and operations.

68. Between July 2025 and the present, Cole, Dugar, Boyd, and Ross then proceeded to take additional steps to conceal and perpetuate their falsification of Local 1550's membership numbers, underpayment of per capita tax, and defalcation of union funds.

69. For example, Boyd refused to respond to repeated requests from AFSCME's auditor seeking information regarding Local 1550's finances.

70. Furthermore, in or around August 2025, AFSCME's auditors visited Local 1550 to conduct an on-site audit. Cole, Dugar, Boyd, and Ross refused to provide many records and information necessary to complete the audit.

71. Rather, in response to information and document requests from AFSCME's auditors, Cole and Dugar provided evasive and incomplete replies, and failed and refused to produce various categories of documents requested by the auditor.

72. For instance, Local 1550 – at Cole, Dugar, Boyd, and Ross's direction – failed to provide a complete set of Local 1550 bank records that was requested by AFSCME's auditor, in a further attempt to prevent discovery of Defendants' defalcation scheme. They also refused to provide a membership list or roster.

73. When AFSCME's auditor requested the records of a particular Local 1550 savings account that had recently contained more than $48,000.00, Dugar failed to comply with the request at all, and Cole – who was responsible for oversight over Local 1550's finances – falsely contended that she lacked knowledge of the account.

74. Following Vazquez's appointment as Administrator of Local 1550 in September 2025, Defendants have continued to fail and refuse to comply with Plaintiffs' requests for complete records of Local 1550's financial accounts, and have caused Local 1550 to fail to comply with Plaintiffs' requests for such records.

75. Cole, Dugar, Boyd, and Ross engaged in this conduct to prevent Plaintiffs from discovering other evidence of Defendants' fraudulent and unlawful activities, defalcation, conversion, and breaches of fiduciary duty. This conduct included changing the access codes to Local 1550's office in order to prevent Vazquez's access to Local 1550's books and records.

76. Cole, Dugar, Boyd, and Ross also engaged in this conduct in order to buy time in which to transfer large amounts of funds from Local 1550's bank accounts – which they knew would ultimately be uncovered and reviewed by AFSCME's auditor and Vazquez – to other accounts under their exclusive control that would be more difficult for Plaintiffs to identify and audit.

77. For instance, on or about September 9, 2025 – at or around the time when Vazquez was being appointed as Local 1550's Administrator, and at a time when Cole, Dugar, Boyd, and Ross were trying to prevent Plaintiffs and AFSCME's auditor from identifying all of Local 1550's financial accounts – Cole, Dugar, Boyd, and Ross caused Local 1550 to open up a new bank account at Bank of America, and placed that newly-opened bank account under their exclusive control.

78. Upon information and belief based on communications with Bank of America personnel and a review of the partial set of Local 1550 financial records that Plaintiffs were able to obtain, Cole, Dugar, Boyd, and Ross then caused large sums of money to be transferred from Local 1550's existing bank accounts to the newly-opened Bank of America account, and then proceeded to cause those large sums of money to be transferred out of the newly-opened Bank of America account to another account or accounts under Defendants' exclusive control.

79. What is more, in July 2025 – immediately after AFSCME provided Cole, Dugar, Boyd, Ross, and Local 1550 with notice that Plaintiff intended to audit Local 1550's finances and operations – Defendants caused NOFSCME to be incorporated in Texas, ostensibly in order to operate NOFSCME as a union in place of AFSCME and Local 1550.

80. Toward that end, and pursuant to Defendants' agreement, Dugar signed NOFSCME's July 28, 2025, certificate of formation.

81. Then, Ross – using a Local 1550 membership list without authorization to do so – sent a letter to Local 1550's union membership purporting to unilaterally "disaffiliate" Local 1550 from AFSCME and reconstitute the membership into the newly-formed NOFSCME.

82. Ross's July 2025 letter to Local 1550's union membership urged the members to disregard any contact from AFSCME, and to contact Cole or Dugar with any questions.

83. In fact, NOFSCME is not and never was a legitimate labor organization, and none of the Defendants ever had any legally cognizable authority to either unilaterally "disaffiliate" Local 1550 from AFSCME, or to unilaterally reconstitute AFSCME and Local 1550's union membership into NOFSCME.

84. Rather, Defendants set up NOFSCME as a sham labor organization in July 2025 because: (i) they knew that AFSCME's forthcoming audit of Local 1550 would uncover their fraudulent and unlawful scheme and breaches of fiduciary duty, and would terminate their ability to continue siphoning off union member dues payments from Local 1550's accounts; and (ii) Defendants wanted to create a new vehicle that they could use in order to continue siphoning off union member dues for their own benefit.

85. Toward that end, in or around September 2025, Dugar, pursuant to Defendants' agreement, began contacting the employers of Local 1550's members, which – as the members' employers – were responsible for deducting union dues from the members' paychecks and transferring them to Local 1550 each month.

86. Dugar instructed the employers to stop transmitting monthly union dues payments to Local 1550's bank account, and instead to re-route union member dues payments to a new bank account that Defendants had set up in the name of NOFSCME. During these communications,

Dugar concealed from the employers that the new account was held by NOFSCME, rather than by Local 1550.

87. Then, on or about September 8, 2025, Ross – pursuant to Defendants' agreement – sent a letter to Local 1550 members' employers, in which she, too, instructed the employers to stop transmitting monthly union dues payments to Local 1550's bank account, and instead to re-route union member dues payments to a new bank account that Defendants had set up in the name of NOFSCME.

88. In an attempt to confuse the employers and hoodwink them into transferring their employees' union dues to the sham NOFSCME "union", Defendants made sure to include the number "1550" in NOFSCME's corporate name – i.e., "National Organization for State County Municipal Employees 1550 Association" – which was displayed on Ross's September 8, 2025, letter to the employers.

89. Defendants included the number "1550" in NOFSCME's corporate name in a calculated attempt to create the appearance that NOFSCME and Local 1550 were one and the same, and in a calculated attempt to cause employers to transfer union membership dues to the sham NOFSCME "union".

90. Defendants took these actions so that they could continue their fraudulent and unlawful scheme of stealing membership dues money for their own benefit.

91. At no time did Defendants disclose to the employers that NOFSCME was not a genuine labor organization, and had never been selected by their employees.

92. Cole, Dugar, Boyd, and Ross were legally and ethically obligated to act honestly and with integrity in connection with their performance of their duties as Local 1550's officers and directors.

93. Likewise, NOFSCME was legally and ethically obligated to act honestly and with integrity in its capacity as a purported labor union.

94. Even so, as set forth herein, Defendants knowingly misrepresented and concealed facts related to their fraudulent and unlawful scheme and breaches of fiduciary duty in an effort to prevent discovery of the scheme and breaches of fiduciary duty.

95. Based upon Defendants' material misrepresentations and other affirmative acts to conceal their scheme and breaches of fiduciary duty from Plaintiffs, Plaintiffs did not discover and could not reasonably have discovered that its damages were attributable to Defendants' actions until shortly before they filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Cole, Dugar, Boyd, and Ross**
**(Violation of 29 U.S.C. § 501)**

96. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

97. As officers, directors, and agents of Local 1550, Cole, Dugar, Boyd, and Ross had a fiduciary duty to AFSCME, to Local 1550 which is AFSCME's local affiliate, and to union members.

98. Federal law provides that "[t]he officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person . . . to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or

acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization." See 29 U.S.C. § 501(a).

99. As set forth herein, Cole, Dugar, Boyd, and Ross breached their fiduciary duties to AFSCME, Local 1550, and their union members, by abusing their positions at Local 1550 to: (i) siphon away union funds for Defendants' own purposes and benefit; (ii) systematically underreport Local 1550's membership in order to facilitate underpayment of per capita tax; (iii) conceal their illicit actions from Plaintiffs and union membership; and (iv) create NOFSCME as a sham labor organization and urge AFSCME and Local 1550 members' employers to transfer member dues to NOFSCME, without any lawful authorization.

100. Plaintiffs have been injured as the result of Cole, Dugar, Boyd, and Ross's violations of 29 U.S.C. § 501(a) in an amount to be determined at trial, but no less than $450,000.00, and seek damages, disgorgement and an accounting of all profits derived by Defendants as a result of Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty.

**SECOND CAUSE OF ACTION**
**Against Cole, Dugar, Boyd, and Ross**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

101. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

102. Local 1550 is an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

103. Cole, Dugar, Boyd, and Ross knowingly conducted and/or participated in, directly or indirectly, the conduct of Local 1550's affairs through a pattern of racketeering activity,

including: (i) repeated violations of the Labor-Management and Reporting Disclosure Act of 1959, 29 U.S.C. § 501(c), by embezzling, stealing, and unlawfully converting union funds for their own use and for NOFSCME’s use on a continuous basis for over four years; (ii) repeated violations of the bank fraud statute, 18 U.S.C. § 1344(2), by fraudulently drawing funds from Local 1550’s accounts and the unauthorized transfer of funds to accounts outside of Local 1550’s custody and control; (iii) repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, by causing the mails to be used on a continuous basis for over four years to systematically misrepresent Local 1550’s membership numbers in furtherance of their fraudulent and unlawful scheme; and (iv) repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, by causing the mails to be used on a continuous basis for over four years to systematically misrepresent the amount of per capita tax payments that were due from Local 1550 to AFSCME, and then to misrepresent to AFSCME and Local 1550 members’ employers that they were required to begin transferring union dues to the NOFSCME bank account, rather than to Local 1550’s bank account, again in furtherance of Defendants’ fraudulent and unlawful scheme.

104. As set forth herein, the predicate acts of racketeering activity were the regular way in which Cole, Dugar, Boyd, and Ross operated Local 1550. Furthermore, the intricate planning required to carry out and conceal the predicate acts implies a threat of continued criminal activity, as does the fact that Cole, Dugar, Boyd, and Ross continue to attempt to profit through their fraudulent and unlawful activities through the present day.

105. Plaintiffs justifiably relied upon Defendants’ misrepresentations and concealment of the true facts, considering that Defendants had a duty to act honestly and with integrity in connection with their union roles, and – as union officers and directors – they were in relationships of trust and confidence with AFSCME, Local 1550, and their union members.

106. Plaintiffs and their union members have been injured in their business and property by reason of the above-described conduct in that Cole, Dugar, Boyd, and Ross's actions have deprived Plaintiff and its members of more than $450,000.00 in union member dues, and have interfered with Plaintiffs' ability to represent and provide services to union members.

107. By reason of its injury, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Cole, Dugar, Boyd, Ross, and NOFSCME**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

108. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

109. Local 1550 is an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

110. Cole, Dugar, Boyd, Ross, and NOFSCME are employed by, or associated with, the Local 1550 enterprise.

111. Cole, Dugar, Boyd, Ross, and NOFSCME knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Local 1550's affairs through a pattern of racketeering activity consisting of: (i) repeated violations of the Labor-Management and Reporting Disclosure Act of 1959, 29 U.S.C. § 501(c), by embezzling, stealing, and unlawfully converting union funds for their own use and for NOFSCME's use on a continuous basis for over four years; (ii) repeated violations of the bank fraud statute, 18 U.S.C. § 1344(2), by fraudulently drawing funds from Local 1550's accounts and the unauthorized transfer of funds to accounts outside of Local 1550's custody and control; (iii) repeated violations of the federal mail

fraud statute, 18 U.S.C. § 1341, by causing the mails to be used on a continuous basis for over four years to systematically misrepresent Local 1550's membership numbers in furtherance of their fraudulent and unlawful scheme; and (iv) repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, by causing the mails to be used on a continuous basis for over four years to systematically misrepresent the amount of per capita tax payments that were due from Local 1550 to AFSCME, and then to misrepresent to AFSCME and Local 1550 members' employers that they were required to begin transferring union dues to the NOFSCME bank account, rather than to Local 1550's bank account, again in furtherance of Defendants' fraudulent and unlawful scheme.

112. Cole, Dugar, Boyd, Ross, and NOFSCME knew of, agreed to, and acted in furtherance of the fraudulent and unlawful scheme described herein.

113. Plaintiffs justifiably relied upon Defendants' misrepresentations and concealment of the true facts, considering that Defendants had a duty to act honestly and with integrity in connection with their union roles, and – as union officers and directors – they were in relationships of trust and confidence with AFSCME, Local 1550, and their union members.

114. Plaintiffs and their union members have been injured in their business and property by reason of the above-described conduct in that Cole, Dugar, Boyd, Ross, and NOFSCME's actions have deprived Plaintiffs and their members of more than $450,000.00 in union member dues, and have interfered with Plaintiffs' ability to represent and provide services to union members.

115. By reason of its injury, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

<u>**FOURTH CAUSE OF ACTION**</u>
**Against Cole, Dugar, Boyd, and Ross**
**(Breach of Fiduciary Duty)**

116. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

117. Cole, Dugar, Boyd, and Ross owed fiduciary duties to AFSCME, to Local 1550 which is AFSCME's local union affiliate, and to union members under Texas state law, because – as union officers and directors – they were in relationships of trust and confidence with AFSCME, Local 1550, and their union members.

118. Cole, Dugar, Boyd, and Ross breached their fiduciary duties, putting their own interests ahead of the interests of AFSCME, Local 1550, and their union members, and using their positions to their own advantage and to the detriment of AFSCME, Local 1550, and their union members, by: (i) siphoning away union funds for Defendants' own purposes and benefit; (ii) systematically underreporting Local 1550's membership in order to facilitate underpayment of per capita tax; (iii) concealing their illicit actions from Plaintiffs and union membership; and (iv) creating NOFSCME as a sham labor organization and urging Plaintiffs' members' employers to transfer member dues to NOFSCME, without any lawful authorization.

119. Plaintiffs have been injured as the result of Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty in an amount to be determined at trial, but no less than $450,000.00, and seek damages and an accounting of all profits derived by Defendants as a result of Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty.

**FIFTH CAUSE OF ACTION**
**Against NOFSCME**
**(Knowing Participation in Breach of Fiduciary Duty)**

120. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

121. Cole, Dugar, Boyd, and Ross owed fiduciary duties to AFSCME, to Local 1550 which is AFSCME's local union affiliate, and to union members under Texas state law, because – as union officers and directors – they were in relationships of trust and confidence with AFSCME, Local 1550, and to their union members.

122. NOFSCME knew of the fiduciary relationships between Cole, Dugar, Boyd, and Ross, and AFSCME, Local 1550, and their union members, considering that Cole, Dugar, Boyd, and Ross were parties to the fiduciary relationships and it was Cole, Dugar, Boyd, and Ross that caused NOFSCME to be incorporated and who then controlled NOFSCME.

123. Cole, Dugar, Boyd, and Ross breached their fiduciary duties, putting their own interests ahead of the interests of AFSCME, Local 1550, and their union members, and using their positions to their own advantage and to the detriment of AFSCME, Local 1550, and their union members, by: (i) siphoning away union funds for Defendants' own purposes and benefit; (ii) systematically underreporting Local 1550's membership in order to facilitate underpayment of per capita tax; (iii) concealing their illicit actions from Plaintiffs and union membership; and (iv) creating NOFSCME as a sham labor organization and urge Plaintiffs' members' employers to transfer member dues to NOFSCME, without any lawful authorization.

124. NOFSCME participated in and was aware that it was participating in Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty, considering that NOFSCME was incorporated and operated for the purpose of facilitating Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty,

and considering that NOFSCME received funds that Cole, Dugar, Boyd, and Ross siphoned away from Local 1550's bank accounts through their breaches of fiduciary duty.

125. Plaintiffs have been injured as the result of NOFSCME's knowing participation in Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty in an amount to be determined at trial, but no less than $450,000.00, and seek damages and an accounting of all profits derived by Defendants as a result of Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty.

**SIXTH CAUSE OF ACTION**
**Against Cole, Dugar, Boyd, and Ross**
**(Common Law Fraud)**

126. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

127. Cole, Dugar, Boyd, and Ross intentionally and knowingly made false and fraudulent statements of material fact to Plaintiffs, and concealed material facts from Plaintiffs, by: (i) causing falsified monthly membership reports to be transmitted through Local 1550 to AFSCME on a monthly basis for over four years; (ii) misrepresenting the amount of per capita tax due to AFSCME on a monthly basis for over four years; and (iii) concealing and failing to disclose the true monthly membership counts for Local 1550 and the true amount of per capita tax due to AFSCME on a monthly basis for over four years, despite their duties as union officers, directors, and agents to disclose the true figures to Plaintiffs.

128. Then, based upon the falsified monthly membership reports, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME checks for per capita tax payments each month that grossly underpaid the actual per capita taxes that were due to AFSCME based on Local 1550's true monthly membership, and at the same time, falsely represented that the checks fully and completely paid the per capita taxes that were due and owing.

129. Cole, Dugar, Boyd, and Ross also intentionally and knowingly concealed material facts from Plaintiffs, by concealing and failing to disclose the whereabouts of union funds belonging to Plaintiffs and its union members, despite their duty and obligation to do so.

130. Cole, Dugar, Boyd, and Ross knew that they were causing false representations of material fact to be made to Plaintiffs and knew that they were concealing material facts from Plaintiffs. Even so, Cole, Dugar, Boyd, and Ross caused the above-described false and fraudulent statements to be made to Plaintiffs, and also concealed material facts from Plaintiffs, in a calculated effort to defraud Plaintiffs out of more than $450,000.00 per capita tax payments and other union funds so that they could use the money for their own benefit.

131. Plaintiffs justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, have been injured in their business and property by reason of the above-described conduct.

132. Cole, Dugar, Boyd, and Ross's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

133. Accordingly, Plaintiffs are entitled to compensatory and punitive damages in an amount exceeding $450,000.00, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**<u>SEVENTH CAUSE OF ACTION</u>**
**Against Cole, Dugar, Boyd, Ross, and NOFSCME**
**(Money Had and Received)**

134. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

135. As set forth herein, Cole, Dugar, Boyd, Ross, and NOFSCME have engaged in improper, unlawful, unjust, and inequitable acts, all to the harm and detriment of Plaintiffs.

136. Through their improper, unlawful, unjust, and inequitable acts, Cole, Dugar, Boyd, Ross, and NOFSCME obtained money – including union member dues and Local 1550 funds – that in equity and good conscience belong to Plaintiffs.

137. Cole, Dugar, Boyd, Ross, and NOFSCME have been enriched at Plaintiffs' expense by this money, which constituted a benefit that Cole, Dugar, Boyd, Ross, and NOFSCME voluntarily accepted, notwithstanding their improper, unlawful, unjust, and inequitable scheme.

138. Cole, Dugar, Boyd, Ross, and NOFSCME's retention of these union funds violates fundamental principles of justice, equity, and good conscience.

139. By reason of the above, Cole, Dugar, Boyd, Ross, and NOFSCME have been unjustly enriched in an amount to be determined at trial, but in no event less than $450,000.00.

## <u>EIGHTH CAUSE OF ACTION</u>
## Against Cole, Dugar, Boyd, Ross, and NOFSCME
## (Tortious Interference with Existing Contractual Relations)

140. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

141. Plaintiffs have been and are parties to formalized labor-management relationships with AFSCME and Local 1550 union members' employers, including Harris County, Texas, the Harris County Hospital District (Harris Health System), the Houston Independent School District, and the City of Pasadena, Texas.

142. In addition, the AFSCME Constitution constitutes a contract between AFSCME and Local 1550.

143. These arrangements and contracts require AFSCME and Local 1550 union members' employers upon authorization from members to deduct union dues from their employees' paychecks and transfer the dues to Local 1550, and require Local 1550 to transfer the required per capita tax payments to AFSCME each month based on Local 1550's accurate reporting of its monthly membership numbers.

144. Cole, Dugar, Boyd, Ross, and NOFSCME knew of these agreements, inasmuch as Cole, Dugar, Boyd, and Ross were officers and directors of Local 1550, the AFSCME local union affiliate for the AFSCME members covered by these agreements, and inasmuch as Cole, Dugar, Boyd, and Ross caused NOFSCME to be incorporated and to operate.

145. Cole, Dugar, Boyd, Ross, and NOFSCME willfully interfered with these contracts by falsifying Local 1550's monthly membership reports to AFSCME, by causing Local 1550 to systematically underpay the required per capita tax, by concealing these wrongful actions, and by contacting AFSCME and Local 1550 union members' employers to falsely represent that NOFSCME represented the members, and to falsely represent that the employers should transfer union dues payments to NOFSCME rather than to Local 1550.

146. Cole, Dugar, Boyd, Ross, and NOFSCME's willful and intentional conduct harmed Plaintiffs and their members by, among other things, proximately causing Plaintiffs to incur damages in excess of $450,000.00, depriving Plaintiffs and their members of the benefits they were entitled to receive under the contracts, and causing Local 1550 and member employers to breach their respective obligations under the contracts.

**NINTH CAUSE OF ACTION**
**Against Cole, Dugar, Boyd, Ross, and NOFSCME**
**(Civil Conspiracy)**

147. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

148. Cole, Dugar, Boyd, Ross, and NOFSCME agreed to, and did, carry out a course of conduct with the intent and purpose of committing mail fraud, bank fraud, breaches of fiduciary duty, common law fraud, and tortious interference, and to profit through such wrongful acts by obtaining union funds to which they were not entitled.

149. Plaintiffs and their members were damaged by Cole, Dugar, Boyd, Ross, and NOFSCME's tortious and wrongful acts, inasmuch as Cole, Dugar, Boyd, Ross, and NOFSCME obtained more than $450,000.00 in funds belonging to Plaintiffs, and interfered with Plaintiffs' representation of union members.

**WHEREFORE,** Plaintiffs Guillermo Vazquez in his capacity as Administrator of Local 1550, and American Federation of State, County and Municipal Employees, AFL-CIO demand that a Judgment be entered in their favor for the following relief, as well as such other and further relief as to the Court may seem just and proper:

A. Compensatory damages in an amount to be determined at trial, but in excess of $450,000.00, plus interest;

B. Treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c);

C. Punitive damages; and

D. An accounting of all profits derived by Defendants through their fraudulent and unlawful activities and breaches of fiduciary duty.

Dated: Uniondale, New York
October 22, 2025

/s/ Max Gershenoff

Barry I. Levy
Max Gershenoff
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
Phone: (516) 357-3000
Barry.Levy@rivkin.com
Max.Gershenoff@rivkin.com
*Counsel for Plaintiff American Federation of State, County and Municipal Employees, AFL-CIO*

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

GUILLERMO VAZQUEZ in his capacity as Administrator of AFSCME Local 1550, and AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO

**(b)** County of Residence of First Listed Plaintiff: Harris County, TX
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Rivkin Radler LLP, 926 RXR Plaza, Uniondale, NY 11556
(516) 357-3000

## DEFENDANTS

CYNTHIA COLE, KAREN DUGAR, SONJA ROSS, ALVERNISE BOYD, and NATIONAL ORGANIZATION FOR STATE COUNTY MUNICIPAL EMPLOYEES 1550 ASSOCIATION

County of Residence of First Listed Defendant: ______
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☒ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
29 U.S.C. § 501; 18 U.S.C. § 1961 et seq.

Brief description of cause:
Violations of LMRDA by local union and officers, along with civil RICO, embezzlement, conversion, mail fraud, bank fraud, breach of fiduciary duty.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $** $450,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*: JUDGE ______ DOCKET NUMBER ______

DATE: October 22, 2025

SIGNATURE OF ATTORNEY OF RECORD: /s/ Max Gershenoff, Esq.

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

| | | |
|---|---|---|
| GUILLERMO VAZQUEZ in his capacity as Administrator of AFSCME Local 1550, and AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO,<br>*Plaintiff(s)*<br>v.<br>CYNTHIA COLE, KAREN DUGAR, SONJA ROSS, ALVERNISE BOYD, and NATIONAL ORGANIZATION FOR STATE COUNTY MUNICIPAL EMPLOYEES 1550 ASSOCIATION,<br>*Defendant(s)* | ) | Civil Action No. 4:25-cv-05034 |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)* Cynthia Cole
20119 York Way Drive
Katy, TX 77450

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Max Gershenoff, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, NY 11556
(516) 357-3000

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Nathan Ochsner, Clerk of Court*

Date: October 23, 2025

*s/ Stephanie Gonzalez*
*Signature of Clerk or Deputy Clerk*

Civil Action No. 4:25-cv-05034

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________________

was received by me on *(date)* ____________________ .

❒ I personally served the summons on the individual at *(place)* ______________________________

______________________________ on *(date)* ____________________ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* ____________________

______________________________ , a person of suitable age and discretion who resides there,

on *(date)* ____________________ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* ______________________________ , who is

designated by law to accept service of process on behalf of *(name of organization)* ____________________

______________________________ on *(date)* ____________________ ; or

❒ I returned the summons unexecuted because ______________________________ ; or

❒ Other *(specify)*:

My fees are $ __________ for travel and $ __________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc:

# EXHIBIT “2”

RIVKIN RADLER LLP
ATTORNEYS AT LAW

WWW.RIVKINRADLER.COM

926 RXR Plaza
Uniondale, NY 11556-0926
T 516.357.3000 F 516.357.3333

ELAN KIRSHENBAUM
(516) 357-3053
Elan.Kirshenbaum@rivkin.com

May 21, 2026

**VIA REGULAR AND CERTIFIED MAIL**
Cynthia Cole
20119 York Way Drive
Katy, TX 77450

National Organization for State County Municipal Employees 1550 Association
United States Corporation Agents, Inc.
10601 Clarence Dr., Suite 250
Frisco, TX 75033

Re: *Vazquez, et al. v. Cole, et al.*
Case No.: 4:25-cv-05034
RR File No.: 000317-00019

Dear Ms. Cole,

Please be advised that our firm represents Plaintiffs Guillermo Vazquez, in his capacity as Administrator of AFSCME Local 1550, and American Federation of State, County & Municipal Employees, AFL-CIO in the above-referenced matter, where you have been named as a defendant.

Pursuant to the attached Court Order granting our motion for substituted service, please allow this letter to serve as the second form of service of our Summons and Complaint, also attached with this letter. We have also sent you a copy of the Court Order, Summons, and Complaint in an email dated May 21, 2026, at 4:13 PM Eastern. Additionally, we will be following up with serving you with the Summons and Complaint by posting the process on the door of your last known home address in a plastic protector sleeve, and via publication in a local Hoston newspaper, with an ad that runs for four consecutive weeks.

Very truly yours,

RIVKIN RADLER LLP

Elan Kirshenbaum, Esq.

Attachment: Court Order Granting Motion for Substituted Service; Summons; Complaint

cc: **VIA ELECTRONIC MAIL**
Max Gershenoff, Esq. (max.gershenoff@rivkin.com)

United States District Court
Southern District of Texas
**ENTERED**
May 15, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**Case No.: 4:25-cv-05034**

GUILLERMO VAZQUEZ in his capacity as Administrator of AFSCME Local 1550, and AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO,

Plaintiffs,

vs.

CYNTHIA COLE, KAREN DUGAR, SONJA ROSS, ALVERNISE BOYD, and NATIONAL ORGANIZATION FOR STATE COUNTY MUNICIPAL EMPLOYEES 1550 ASSOCIATION,

Defendants.
_______________________________________/

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUBSTITUTED SERVICE ON DEFENDANT CYNTHIA COLE**

**THIS CAUSE,** before the Court on Plaintiffs' motion (the "Motion") for substituted service on Defendant Cynthia Cole:

The Court has reviewed the Motion and it is hereby

**ORDERED** and **ADJUDGED** that:

1. The Motion is **GRANTED**.

2. Plaintiffs are hereby authorized to serve Defendant Cynthia Cole via:

   a. Email at an email address Cynthia Cole used to communicate with Plaintiffs' agents as recently as August 2025;

   b. Regular and certified mail, return receipt requested at both Cynthia Cole's last known home address and the registered address for her employer, Defendant National Organization for State County Municipal

Employees 1550 Association ("NOFSCME");

c. Posting the process on the door of Cynthia Cole's last known home address in a plastic protector sleeve; and

d. Publication.

**DONE** and **ORDERED** in Chambers in Houston, Texas, this 15th day of May, 2026.

ANDREW S. HANEN
DISTRICT COURT JUDGE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**Case No.: ___________________**

GUILLERMO VAZQUEZ in his capacity as
Administrator of AFSCME Local 1550, and
AMERICAN FEDERATION OF STATE,
COUNTY & MUNICIPAL EMPLOYEES,
AFL-CIO,

Plaintiffs,

vs.

CYNTHIA COLE, KAREN DUGAR, SONJA
ROSS, ALVERNISE BOYD, and NATIONAL
ORGANIZATION FOR STATE COUNTY
MUNICIPAL EMPLOYEES 1550
ASSOCIATION,

Defendants.
______________________________________/

**COMPLAINT**

Plaintiffs Guillermo Vazquez, in his capacity as Administrator of AFSCME Local 1550 ("Vazquez"), and American Federation of State, County & Municipal Employees, AFL-CIO ("AFSCME") (collectively "Plaintiffs"), sue Defendants and allege as follows:

1. This action seeks to recover more than $450,000.00 that Defendants obtained through a pattern of deliberate and wrongful activity, including repeated acts of embezzlement and conversion of union assets in violation of 29 U.S.C. § 501(c), mail fraud, bank fraud, and breaches of fiduciary duty in violation of 29 U.S.C. § 501(a).

2. Defendants' fraudulent and unlawful scheme began no later than 2021 and has continued uninterrupted since that time.

3. As a result of Defendants' scheme, Plaintiffs have incurred damages of more than $450,000.00.

## THE PARTIES

### I. Plaintiffs

4. Plaintiff Vazquez currently is the Administrator (trustee) of AFSCME Local 1550 ("Local 1550"), an unincorporated association and local union affiliate of AFSCME with its headquarters located at 5700 NW Central Drive, Suite 320, Houston, Texas 77092. Plaintiff Vazquez sues in his fiduciary capacity as Local 1550's Administrator.

5. Pursuant to and as authorized by the AFSCME Constitution, Plaintiff Vazquez was appointed by AFSCME's President as Administrator of Local 1550 on or about September 9, 2025, once Plaintiffs became aware of Defendants' fraudulent and unlawful scheme.

6. Pursuant to the AFSCME Constitution, Plaintiff Vazquez, as Administrator of Local 1550, has the right to take possession of all the funds, properties, books and other assets of Local 1550 to be held in trust for the benefit of Local 1550 and to be expended only to the extent necessary for the proper conduct of the affairs of Local 1550 and in the best interest of its members. Plaintiff Vazquez, as Administrator of Local 1550, has the authority to institute all necessary action to recover money or other property of Local 1550. Plaintiff Vazquez sues in his fiduciary capacity as Local 1550's Administrator.

7. Plaintiff AFSCME is a national labor organization and unincorporated association with its headquarters located at 1625 L Street NW, Washington, D.C. 20036. AFSCME represents both public and private sector workers, including but not limited to public service workers in Texas and across the United States.

## II. Defendants

8. Defendant Cynthia Cole ("Cole") resides in and is a citizen of Texas. At all relevant times, Cole was the Executive Director of Local 1550.

9. Upon information and belief based on publicly available information, Defendant Karen Dugar ("Dugar") resides in and is a citizen of either Washington or Texas. At all relevant times, Dugar was the Assistant Executive Director of Local 1550.

10. Defendant Sonja Ross ("Ross") resides in and is a citizen of Texas. At all relevant times, Ross was the President of Local 1550.

11. Defendant Alvernise Boyd ("Boyd") resides in and is a citizen of Texas. At all relevant times, Boyd was the Secretary-Treasurer of Local 1550.

12. Defendant National Organization for State County Municipal Employees 1550 Association ("NOFSCME") is a Texas non-profit corporation that purports to operate from 14205 N. Mopac Expressway, Suite 570, Austin, Texas 78728.

## JURISDICTION AND VENUE

13. Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiffs' claims in this action under 29 U.S.C. § 501 (the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA")) and 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

14. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

15. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Texas is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS**

16. Since at least 2021, and continuing to the present day, Defendants devised and implemented a scheme whereby they caused hundreds of thousands of dollars of union funds that rightfully belonged to Plaintiffs to be embezzled, converted, stolen, and used for the benefit of Defendants, rather than for the benefit of Plaintiffs and their union members.

## I. AFSCME and Local 1550

17. AFSCME is the largest trade union of public service employees in the United States, representing approximately 1,400,000 public service employees and retirees in the public and private sectors across the United States.

18. AFSCME operates through approximately 3,400 local union affiliates across the United States, including Local 1550. Many of these local union affiliates are themselves organized into approximately 58 regional councils, however Local 1550 is directly affiliated with AFSCME without affiliation with a council.

19. Among other things, AFSCME coordinates the union's actions on major national issues such as labor rights, privatization, fair taxes, and health care. AFSCME also provides resources to councils and local union affiliates for organizing, bargaining, labor-management relations, political action, and education, and administers union member benefits.

20. AFSCME local union affiliates, including Local 1550, are responsible for – among other things – representing and/or advocating for their members in the workplace and administering themselves with fiscal responsibility and in accordance with sound accounting and fiduciary practices.

## II. Defendants' Fraudulent and Unlawful Scheme

21. In her capacity as Executive Director of Local 1550, Cole served as Local 1550's chief administrative and executive officer.

22. Among other things, Cole was responsible for carrying out the policies of Local 1550, including submitting an annual budget, overall oversight of Local 1550's daily operations, including its finances, and its compliance with legal and regulatory requirements.

23. Cole was also responsible for supervising Local 1550's staff, including Dugar, whom Cole designated as Assistant Executive Director of Local 1550.

24. In her capacity as Assistant Executive Director of Local 1550, Dugar was also responsible for the implementation of policies, coordination of programs and projects, oversight of Local 1550's daily operations, and its compliance with fiscal, legal, and regulatory requirements.

25. Dugar's responsibilities included oversight of Local 1550's finances, including budget development and monitoring, and ensuring accurate financial reporting, accountability, and transparency.

26. Among other things, Dugar was responsible for working with Boyd – Local 1550's Secretary-Treasurer – to maintain accurate financial records, to prepare accurate financial statements for Local 1550, and to expend funds only as approved by the Loal 1550 membership.

27. In her capacity as Secretary-Treasurer for Local 1550, Boyd was responsible for receiving and giving receipt for all Local 1550 funds, including member dues; for ensuring that all Local 1550 checks were prepared and signed for authorized union purposes; for keeping accurate records of Local 1550 receipts and disbursements; for preparing and submitting accurate monthly financial operating statements and transaction reports to the union membership; and for ensuring

annual audits of Local 1550 finances and reports to union membership regarding the results of those audits.

28. In her capacity as President of Local 1550, Ross was responsible for – among other things – authorizing and countersigning all checks drawn against Local 1550's funds, and ensuring that such checks were drawn for legitimate union purposes and properly authorized by the Local 1550 membership.

29. Ross was also responsible for presiding over all Local 1550 meetings, including meetings of Local 1550's executive board, which in turn was responsible for approving all union expenditures, and overseeing Cole's activities in her capacity as Local 1550's Executive Director, Dugar's activities in her capacity as Local 1550's Assistant Executive Director, and Boyd's activities in her capacity as Local 1550's Secretary-Treasurer.

30. In their respective capacities as Local 1550's officers, directors, and agents, Defendants also had an obligation to make accurate reports to AFSCME regarding Local 1550's monthly membership numbers, and to ensure that Local 1550 remitted AFSCME's share of union dues to AFSCME each month based on those accurate reports regarding Local 1550's monthly membership numbers.

31. Notwithstanding their respective duties and responsibilities to Local 1550, AFSCME, and union membership, Cole, Dugar, Boyd, and Ross engaged in a scheme to siphon away union funds and property for their own benefit through a pattern of conversion, embezzlement, mail fraud, bank fraud, and breaches of fiduciary duty.

32. Cole, Dugar, Boyd, and Ross facilitated the defalcation of these union funds by – among other things – causing Dugar, Local 1550's Assistant Executive Director, to systematically submit expense reports which falsely contended Dugar had incurred massive expenses in

connection with Local 1550 business, and which falsely contended that Dugar had paid those expenses out of her own pocket, in untraceable cash.

33. Then, Cole, Dugar, Boyd, and Ross caused Local 1550 to issue checks to Dugar – ostensibly as "reimbursement" for expenses Dugar had never legitimately incurred on behalf of Local 1550, and for supposed cash "payments" Dugar had never in fact made on behalf of Local 1550. Such checks bore the signatures of Boyd and/or Ross.

34. For example, during the four-year period from 2022-2025, Dugar – whose Assistant Executive Director salary at the time was between $75,000.00 and $79,000.00 per year – supposedly made more than $364,000.00 in untraceable cash payments out of her own pocket to a purported vendor called Compudata Services/Products ("Compudata"), ostensibly for office supplies and other materials to be used in Local 1550's business.

35. Then, Cole, Dugar, Boyd, and Ross caused Local 1550 to issue checks to Dugar, supposedly as "reimbursement" for her supposed cash outlays to Compudata on behalf of Local 1550.

36. Specifically, in 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to issue checks to Dugar in the total amount of $98,304.25, supposedly as "reimbursement" for cash payments Dugar had made to Compudata in furtherance of union business.

37. In 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to issue checks to Dugar in the total amount of $81,275.93, again supposedly as "reimbursement" for cash payments Dugar had made to Compudata in furtherance of union business.

38. In 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to issue checks to Dugar in the total amount of $121,751.78, again supposedly as "reimbursement" for cash payments Dugar had made to Compudata in furtherance of union business.

39. In 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to issue checks to Dugar in the total amount of $63,429.36, once again supposedly as "reimbursement" for cash payments Dugar had made to Compudata in furtherance of union business.

40. Upon information and belief, however, Compudata was not a genuine vendor for Local 1550, Compudata did not provide goods or services worth more than $364,000.00 to Local 1550 over the course of 2022-2025, and Dugar did not pay Compudata more than $364,000.00 in cash over the course of 2022-2025.

41. Instead, Cole, Dugar, Boyd, and Ross caused Dugar to submit false reimbursement claims to Local 1550, and caused Local 1550 to reimburse the false claims, in order to siphon off funds in Local 1550's bank account for their own purposes, that were originally intended to be used for the benefit of union members.

42. For example, the putative Compudata invoices Dugar submitted to Local 1550, which purported to reflect the office supplies and other materials provided by Compudata in exchange for Dugar's supposed cash payments, did not contain any invoice numbers for tracking purposes by either Local 1550 or Compudata.

43. What is more, the putative Compudata invoices did not contain any telephone numbers or e-mail addresses for Compudata.

44. Furthermore, though the purported Compudata invoices listed two supposed addresses for Compudata – one at 4106 Fannin Street, Houston, Texas 77004, and another at 15950 Dallas Parkway, Dallas, Texas 75248 – it does not appear as if any entity named Compudata operated any office supply or similar business at either of these locations during the pertinent period.

45. Moreover, the putative Compudata receipts that Dugar submitted to Local 1550 – which purported to reflect her cash payments to Compudata for office supplies and other materials to be used in furtherance of union business – listed a third supposed address for Compudata, namely 10904 Scarsdale Boulevard, without any reference to city or state.

46. Upon information and belief based on database searches, the only "10904 Scarsdale Boulevard" address in Texas is 10904 Scarsdale Boulevard, Houston, Texas 77089, and no business called Compudata has operated from that address.

47. In keeping with the fact that Dugar did not legitimately make the cash payments to Compudata for which she sought "reimbursement" from Local 1550, her supposed monthly cash payments to Compudata in many cases approached or even substantially exceeded her monthly take-home pay. For example:

(i) In February 2025, Dugar supposedly made more than $5,700.00 in cash payments to Compudata out of her own pocket, for which she sought and obtained "reimbursement" from Local 1550.

(ii) In March 2025, Dugar supposedly made more than $10,400.00 in cash payments to Compudata out of her own pocket, for which she sought and obtained "reimbursement" from Local 1550.

(iii) In April 2025, Dugar supposedly made more than $10,300.00 in cash payments to Compudata out of her own pocket, for which she sought and obtained "reimbursement" from Local 1550.

(iv) In May 2025, Dugar supposedly made more than $9,100.00 in cash payments to Compudata out of her own pocket, for which she sought and obtained "reimbursement" from Local 1550.

(v) In June 2025, Dugar supposedly made more than $7,300.00 in cash payments to Compudata out of her own pocket, for which she sought and obtained "reimbursement" from Local 1550.

48. Upon information and belief as set forth herein, after causing Local 1550 to "reimburse" Dugar for untraceable and illusory cash "expenses", Cole, Dugar, Boyd, and Ross caused the "reimbursements" to be distributed between and among themselves.

49. Without the agreement of each of Cole, Dugar, Boyd, and Ross, Dugar could not have successfully obtained "reimbursement" from Local 1550 for illusory and non-credible cash expenditures.

50. For instance, Cole, Dugar, Boyd, and Ross – each of whom was responsible for financial oversight over Local 1550 – had to agree not to retain a certified public accountant to conduct annual audits of Local 1550's finances, as required by the Local 1550 Constitution. Cole, Dugar, Boyd, and Ross also had to agree not to report the results of any such audits to the union membership, as also required by the Local 1550 Constitution.

51. Cole, Dugar, Boyd, and Ross agreed not to engage an accountant to conduct annual audits of Local 1550's finances or to report the results of such audits to union membership because – had they done so – it would have revealed and put an end to the fraudulent and unlawful scheme and breaches of fiduciary duty described herein.

52. Pursuant to the AFSCME Constitution and the Local 1550 Constitution, Local 1550 – like all AFSCME local union affiliates – is required to submit a report each month to AFSCME that accurately specifies the number of its members.

53. Upon authorization by union members, members' employers may directly deduct the members' monthly union dues from their pay and remit them to Local 1550.

54. Then, pursuant to the AFSCME Constitution and the Local 1550 Constitution, Local 1550 – like all AFSCME local union affiliates – is required to remit AFSCME's share of

union dues to AFSCME each month (in this case, approximately 30 percent) based on the number of Local 1550's members. These remittances are known as the "per capita tax".

55. In their respective capacities as Local 1550's officers, directors, and agents, Defendants had an obligation to make accurate reports to AFSCME regarding Local 1550's monthly membership numbers, and the amount of monthly per capita tax payments that were due from Local 1550 to AFSCME.

56. Even so, in order to create a pool of union funds in Local 1550's bank accounts that they could illicitly siphon off for their own purposes, and to conceal and perpetuate their fraudulent and unlawful scheme, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit falsified monthly membership reports to AFSCME via the mail on a monthly basis for over four years, all of which substantially underreported Local 1550's true membership numbers.

57. Then, based upon the falsified monthly membership reports, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME checks for per capita tax payments each month that grossly understated the actual dues receipts, and consequently, per capita taxes that were due to AFSCME based on Local 1550's true monthly membership, and at the same time falsely represented that the checks fully and completely paid the per capita taxes that were due and owing.

58. For example:

(i) On or around April 28, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,450. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,581.18.

(ii) On or around May 16, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,443. At or around the same time, Cole, Dugar, Boyd, and Ross caused

Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,418.45.

(iii) On or around June 24, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,426. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,177.90.

(iv) On or around July 16, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,444. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,432.60.

(v) On or around August 13, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,434. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,291.10.

(vi) On or around September 10, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,428. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,206.20.

(vii) On or around October 15, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,415. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,022.25.

(viii) On or around November 19, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely

represented that Local 1550's membership count was only 805, when in fact, it was at least 1,412. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,979.80.

(ix) On or around December 17, 2021, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,414. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,008.10.

(x) On or around January 27, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,405. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,880.75.

(xi) On or around February 18, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,394. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,732.18.

(xii) On or around March 15, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,397. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,390.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,767.35.

(xiii) On or around April 22, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,397. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,193.88.

(xiv) On or around May 16, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,382. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,969.90.

(xv) On or around June 17, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,368. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,774.83.

(xvi) On or around July 11, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,361. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,666.45.

(xvii) On or around August 25, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,351. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,529.18.

(xviii) On or around September 20, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,348. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,485.83.

(xix) On or around October 20, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,325. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that

the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,146.25.

(xx) On or around November 22, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,321. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,088.45.

(xxi) On or around December 21, 2022, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,316. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,023.43.

(xxii) On or around January 13, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,337. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,326.88.

(xxiii) On or around February 16, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,335. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,297.98.

(xxiv) On or around March 17, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,332. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,632.25, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,254.63.

(xxv) On or around April 18, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was

at least 1,296. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,317.85.

(xxvi) On or around May 17, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,282. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,101.80.

(xxvii) On or around June 16, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,284. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,131.60.

(xxviii) On or around July 19, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,306. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,464.37.

(xxix) On or around August 18, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,280. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,072.00.

(xxx) On or around September 22, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,284. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,131.60.

(xxxi) On or around October 18, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,277. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,034.75.

(xxxii) On or around November 17, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,288. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,198.65.

(xxxiii) On or around December 21, 2023, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,291. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,243.35.

(xxxiv) On or around January 18, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,302. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,407.25.

(xxxv) On or around February 21, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,310. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,526.45.

(xxxvi) On or around March 19, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,299. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,994.50, and to falsely represent that

the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,355.10.

(xxxvii) On or around April 19, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,298. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $12,517.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $20,191.68.

(xxxviii) On or around May 10, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,278. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $12,517.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,880.68.

(xxxix) On or around June 14, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,274. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $12,517.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,810.70.

(xl) On or around July 17, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,272. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $12,517.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,779.60.

(xli) On or around August 29, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was at least 1,268. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $12,517.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,717.40.

(xlii) On or around September 30, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 805, when in fact, it was

at least 1,266. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $12,517.75, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,686.30.

(xliii) On or around October 31, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 700, when in fact, it was at least 1,271. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $10,885.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,764.05.

(xliv) On or around November 26, 2024, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 700, when in fact, it was at least 1,271. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $10,885.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,764.05.

(xlv) On or around January 10, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 700, when in fact, it was at least 1,266. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $10,885.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,686.30.

(xlvi) On or around March 4, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 700, when in fact, it was at least 1,258. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $10,885.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,569.68.

(xlvii) On or around March 27, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 700, when in fact, it was at least 1,223. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $10,885.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,025.43.

(xlviii) On or around April 30, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 700, when in fact, it was at least 1,248. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $10,885.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,406.40.

(xlix) On or around May 16, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 700, when in fact, it was at least 1,240. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,235.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,902.00.

(l) On or around June 18, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 700, when in fact, it was at least 1,228. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,235.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,717.43.

(li) On or around July 9, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to transmit a monthly membership report to AFSCME via the mail, which falsely represented that Local 1550's membership count was only 700, when in fact, it was at least 1,225. At or around the same time, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME a check for $11,235.00, and to falsely represent that the check fully and completely paid the per capita taxes due that month, when in fact, the actual per capita taxes due that month were $19,669.28.

59. Overall, as a result of Cole, Dugar, Boyd, and Ross's falsified monthly membership reports and misrepresentations regarding Local 1550's per capita tax payments, Local 1550 failed to pay more than $450,000.00 in per capita taxes that were due and owing to AFSCME.

60. By causing Local 1550 to systematically misrepresent its true monthly membership numbers to AFSCME, and by causing Local 1550 to systematically underpay the per capita tax due to AFSCME, Cole, Dugar, Boyd, and Ross caused Local 1550 to collect a large amount of money – derived from union member dues – which they could utilize in their illicit scheme without

the knowledge of AFSCME and without fulfilling Local 1550's obligation to AFSCME. Defendants proceeded to siphon away these amounts for their own benefit, including through the fraudulent "reimbursements" to Dugar that are described herein.

61. Without the agreement of each of Cole, Dugar, Boyd, and Ross – who together were responsible for Local 1550's operations, financial management, and reporting – Local 1550 could not have systematically falsified its monthly membership numbers to AFSCME over a period of more than four years. Nor, by extension, could Local 1550 have accumulated the large amount of funds that Defendants proceeded to siphon away through their fraudulent and unlawful defalcation scheme.

62. By April 2025, Cole, Dugar, Boyd, and Ross were growing concerned that their scheme would be discovered, and Cole and Dugar – in particular – were growing concerned that discovery of the scheme would lead to the termination of their salaried positions as Local 1550's Executive Director and Assistant Executive Director.

63. Accordingly, on or about April 10, 2025, Cole, Dugar, Boyd, and Ross caused Local 1550 to enter into purported five-year employment agreements with Cole and Dugar. The purported agreements actually were shams intended to provide Cole, Dugar, Boyd, and Ross with leverage to settle any claims against them in the event that their scheme was discovered, and to enable Cole, Dugar, Boyd, and Ross to continue mulcting away union money for their own benefit in the event that discovery of their scheme resulted in the termination of their union positions and offices.

64. For instance, Cole and Dugar's <u>previous</u> employment agreements with Local 1550 had provided, in the event of termination, for severance pay through the life of the agreements, unless the termination was for "reasons related to gross misconduct and/or malfeasance."

65. By contrast, Cole and Dugar's purported April 10, 2025, employment agreements – which were signed by both Ross and Boyd on behalf of Local 1550, pursuant to Cole, Dugar, Boyd, and Ross's corrupt agreement – substantially changed the severance provisions that appeared in Cole and Dugar's previous employment agreements. Instead of providing for severance unless the termination was for "reasons related to gross misconduct and/or malfeasance," the purported April 10, 2025, five-year employment agreements provided for severance through the life of the agreements unless the termination was for "reasons related to physical violence, harassment, discrimination, [and/or] serious breaches of health and safety regulations."

66. In other words, the April 10, 2025, "employment agreements" purported to permit up to five years of severance pay to Cole and Dugar – even in the event of gross misconduct such as the fraudulent and unlawful activities and breaches of fiduciary duty described herein – so long as the misconduct did not involve physical violence, harassment, discrimination, or serious breaches of health and safety regulations.

67. In or around July 2025, as part of an assessment by AFSCME of the capacity of its affiliates in the Houston area to participate in organizing activity, AFSCME grew concerned regarding Local 1550's operations, and provided Cole, Dugar, Boyd, Ross, and Local 1550 with notice that AFSCME intended to conduct its own audit of Local 1550's finances and operations.

68. Between July 2025 and the present, Cole, Dugar, Boyd, and Ross then proceeded to take additional steps to conceal and perpetuate their falsification of Local 1550's membership numbers, underpayment of per capita tax, and defalcation of union funds.

69. For example, Boyd refused to respond to repeated requests from AFSCME's auditor seeking information regarding Local 1550's finances.

70. Furthermore, in or around August 2025, AFSCME's auditors visited Local 1550 to conduct an on-site audit. Cole, Dugar, Boyd, and Ross refused to provide many records and information necessary to complete the audit.

71. Rather, in response to information and document requests from AFSCME's auditors, Cole and Dugar provided evasive and incomplete replies, and failed and refused to produce various categories of documents requested by the auditor.

72. For instance, Local 1550 – at Cole, Dugar, Boyd, and Ross's direction – failed to provide a complete set of Local 1550 bank records that was requested by AFSCME's auditor, in a further attempt to prevent discovery of Defendants' defalcation scheme. They also refused to provide a membership list or roster.

73. When AFSCME's auditor requested the records of a particular Local 1550 savings account that had recently contained more than $48,000.00, Dugar failed to comply with the request at all, and Cole – who was responsible for oversight over Local 1550's finances – falsely contended that she lacked knowledge of the account.

74. Following Vazquez's appointment as Administrator of Local 1550 in September 2025, Defendants have continued to fail and refuse to comply with Plaintiffs' requests for complete records of Local 1550's financial accounts, and have caused Local 1550 to fail to comply with Plaintiffs' requests for such records.

75. Cole, Dugar, Boyd, and Ross engaged in this conduct to prevent Plaintiffs from discovering other evidence of Defendants' fraudulent and unlawful activities, defalcation, conversion, and breaches of fiduciary duty. This conduct included changing the access codes to Local 1550's office in order to prevent Vazquez's access to Local 1550's books and records.

76. Cole, Dugar, Boyd, and Ross also engaged in this conduct in order to buy time in which to transfer large amounts of funds from Local 1550's bank accounts – which they knew would ultimately be uncovered and reviewed by AFSCME's auditor and Vazquez – to other accounts under their exclusive control that would be more difficult for Plaintiffs to identify and audit.

77. For instance, on or about September 9, 2025 – at or around the time when Vazquez was being appointed as Local 1550's Administrator, and at a time when Cole, Dugar, Boyd, and Ross were trying to prevent Plaintiffs and AFSCME's auditor from identifying all of Local 1550's financial accounts – Cole, Dugar, Boyd, and Ross caused Local 1550 to open up a new bank account at Bank of America, and placed that newly-opened bank account under their exclusive control.

78. Upon information and belief based on communications with Bank of America personnel and a review of the partial set of Local 1550 financial records that Plaintiffs were able to obtain, Cole, Dugar, Boyd, and Ross then caused large sums of money to be transferred from Local 1550's existing bank accounts to the newly-opened Bank of America account, and then proceeded to cause those large sums of money to be transferred out of the newly-opened Bank of America account to another account or accounts under Defendants' exclusive control.

79. What is more, in July 2025 – immediately after AFSCME provided Cole, Dugar, Boyd, Ross, and Local 1550 with notice that Plaintiff intended to audit Local 1550's finances and operations – Defendants caused NOFSCME to be incorporated in Texas, ostensibly in order to operate NOFSCME as a union in place of AFSCME and Local 1550.

80. Toward that end, and pursuant to Defendants' agreement, Dugar signed NOFSCME's July 28, 2025, certificate of formation.

81. Then, Ross – using a Local 1550 membership list without authorization to do so – sent a letter to Local 1550's union membership purporting to unilaterally "disaffiliate" Local 1550 from AFSCME and reconstitute the membership into the newly-formed NOFSCME.

82. Ross's July 2025 letter to Local 1550's union membership urged the members to disregard any contact from AFSCME, and to contact Cole or Dugar with any questions.

83. In fact, NOFSCME is not and never was a legitimate labor organization, and none of the Defendants ever had any legally cognizable authority to either unilaterally "disaffiliate" Local 1550 from AFSCME, or to unilaterally reconstitute AFSCME and Local 1550's union membership into NOFSCME.

84. Rather, Defendants set up NOFSCME as a sham labor organization in July 2025 because: (i) they knew that AFSCME's forthcoming audit of Local 1550 would uncover their fraudulent and unlawful scheme and breaches of fiduciary duty, and would terminate their ability to continue siphoning off union member dues payments from Local 1550's accounts; and (ii) Defendants wanted to create a new vehicle that they could use in order to continue siphoning off union member dues for their own benefit.

85. Toward that end, in or around September 2025, Dugar, pursuant to Defendants' agreement, began contacting the employers of Local 1550's members, which – as the members' employers – were responsible for deducting union dues from the members' paychecks and transferring them to Local 1550 each month.

86. Dugar instructed the employers to stop transmitting monthly union dues payments to Local 1550's bank account, and instead to re-route union member dues payments to a new bank account that Defendants had set up in the name of NOFSCME. During these communications,

Dugar concealed from the employers that the new account was held by NOFSCME, rather than by Local 1550.

87. Then, on or about September 8, 2025, Ross – pursuant to Defendants' agreement – sent a letter to Local 1550 members' employers, in which she, too, instructed the employers to stop transmitting monthly union dues payments to Local 1550's bank account, and instead to re-route union member dues payments to a new bank account that Defendants had set up in the name of NOFSCME.

88. In an attempt to confuse the employers and hoodwink them into transferring their employees' union dues to the sham NOFSCME "union", Defendants made sure to include the number "1550" in NOFSCME's corporate name – i.e., "National Organization for State County Municipal Employees 1550 Association" – which was displayed on Ross's September 8, 2025, letter to the employers.

89. Defendants included the number "1550" in NOFSCME's corporate name in a calculated attempt to create the appearance that NOFSCME and Local 1550 were one and the same, and in a calculated attempt to cause employers to transfer union membership dues to the sham NOFSCME "union".

90. Defendants took these actions so that they could continue their fraudulent and unlawful scheme of stealing membership dues money for their own benefit.

91. At no time did Defendants disclose to the employers that NOFSCME was not a genuine labor organization, and had never been selected by their employees.

92. Cole, Dugar, Boyd, and Ross were legally and ethically obligated to act honestly and with integrity in connection with their performance of their duties as Local 1550's officers and directors.

93. Likewise, NOFSCME was legally and ethically obligated to act honestly and with integrity in its capacity as a purported labor union.

94. Even so, as set forth herein, Defendants knowingly misrepresented and concealed facts related to their fraudulent and unlawful scheme and breaches of fiduciary duty in an effort to prevent discovery of the scheme and breaches of fiduciary duty.

95. Based upon Defendants' material misrepresentations and other affirmative acts to conceal their scheme and breaches of fiduciary duty from Plaintiffs, Plaintiffs did not discover and could not reasonably have discovered that its damages were attributable to Defendants' actions until shortly before they filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Cole, Dugar, Boyd, and Ross**
**(Violation of 29 U.S.C. § 501)**

96. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

97. As officers, directors, and agents of Local 1550, Cole, Dugar, Boyd, and Ross had a fiduciary duty to AFSCME, to Local 1550 which is AFSCME's local affiliate, and to union members.

98. Federal law provides that "[t]he officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person . . . to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or

acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization." See 29 U.S.C. § 501(a).

99. As set forth herein, Cole, Dugar, Boyd, and Ross breached their fiduciary duties to AFSCME, Local 1550, and their union members, by abusing their positions at Local 1550 to: (i) siphon away union funds for Defendants' own purposes and benefit; (ii) systematically underreport Local 1550's membership in order to facilitate underpayment of per capita tax; (iii) conceal their illicit actions from Plaintiffs and union membership; and (iv) create NOFSCME as a sham labor organization and urge AFSCME and Local 1550 members' employers to transfer member dues to NOFSCME, without any lawful authorization.

100. Plaintiffs have been injured as the result of Cole, Dugar, Boyd, and Ross's violations of 29 U.S.C. § 501(a) in an amount to be determined at trial, but no less than $450,000.00, and seek damages, disgorgement and an accounting of all profits derived by Defendants as a result of Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty.

**SECOND CAUSE OF ACTION**
**Against Cole, Dugar, Boyd, and Ross**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

101. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

102. Local 1550 is an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

103. Cole, Dugar, Boyd, and Ross knowingly conducted and/or participated in, directly or indirectly, the conduct of Local 1550's affairs through a pattern of racketeering activity,

including: (i) repeated violations of the Labor-Management and Reporting Disclosure Act of 1959, 29 U.S.C. § 501(c), by embezzling, stealing, and unlawfully converting union funds for their own use and for NOFSCME's use on a continuous basis for over four years; (ii) repeated violations of the bank fraud statute, 18 U.S.C. § 1344(2), by fraudulently drawing funds from Local 1550's accounts and the unauthorized transfer of funds to accounts outside of Local 1550's custody and control; (iii) repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, by causing the mails to be used on a continuous basis for over four years to systematically misrepresent Local 1550's membership numbers in furtherance of their fraudulent and unlawful scheme; and (iv) repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, by causing the mails to be used on a continuous basis for over four years to systematically misrepresent the amount of per capita tax payments that were due from Local 1550 to AFSCME, and then to misrepresent to AFSCME and Local 1550 members' employers that they were required to begin transferring union dues to the NOFSCME bank account, rather than to Local 1550's bank account, again in furtherance of Defendants' fraudulent and unlawful scheme.

104. As set forth herein, the predicate acts of racketeering activity were the regular way in which Cole, Dugar, Boyd, and Ross operated Local 1550. Furthermore, the intricate planning required to carry out and conceal the predicate acts implies a threat of continued criminal activity, as does the fact that Cole, Dugar, Boyd, and Ross continue to attempt to profit through their fraudulent and unlawful activities through the present day.

105. Plaintiffs justifiably relied upon Defendants' misrepresentations and concealment of the true facts, considering that Defendants had a duty to act honestly and with integrity in connection with their union roles, and – as union officers and directors – they were in relationships of trust and confidence with AFSCME, Local 1550, and their union members.

106. Plaintiffs and their union members have been injured in their business and property by reason of the above-described conduct in that Cole, Dugar, Boyd, and Ross's actions have deprived Plaintiff and its members of more than $450,000.00 in union member dues, and have interfered with Plaintiffs' ability to represent and provide services to union members.

107. By reason of its injury, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Cole, Dugar, Boyd, Ross, and NOFSCME**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

108. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

109. Local 1550 is an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

110. Cole, Dugar, Boyd, Ross, and NOFSCME are employed by, or associated with, the Local 1550 enterprise.

111. Cole, Dugar, Boyd, Ross, and NOFSCME knowingly have agreed, combined, and conspired to conduct and/or participate in, directly or indirectly, the conduct of Local 1550's affairs through a pattern of racketeering activity consisting of: (i) repeated violations of the Labor-Management and Reporting Disclosure Act of 1959, 29 U.S.C. § 501(c), by embezzling, stealing, and unlawfully converting union funds for their own use and for NOFSCME's use on a continuous basis for over four years; (ii) repeated violations of the bank fraud statute, 18 U.S.C. § 1344(2), by fraudulently drawing funds from Local 1550's accounts and the unauthorized transfer of funds to accounts outside of Local 1550's custody and control; (iii) repeated violations of the federal mail

fraud statute, 18 U.S.C. § 1341, by causing the mails to be used on a continuous basis for over four years to systematically misrepresent Local 1550's membership numbers in furtherance of their fraudulent and unlawful scheme; and (iv) repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, by causing the mails to be used on a continuous basis for over four years to systematically misrepresent the amount of per capita tax payments that were due from Local 1550 to AFSCME, and then to misrepresent to AFSCME and Local 1550 members' employers that they were required to begin transferring union dues to the NOFSCME bank account, rather than to Local 1550's bank account, again in furtherance of Defendants' fraudulent and unlawful scheme.

112. Cole, Dugar, Boyd, Ross, and NOFSCME knew of, agreed to, and acted in furtherance of the fraudulent and unlawful scheme described herein.

113. Plaintiffs justifiably relied upon Defendants' misrepresentations and concealment of the true facts, considering that Defendants had a duty to act honestly and with integrity in connection with their union roles, and – as union officers and directors – they were in relationships of trust and confidence with AFSCME, Local 1550, and their union members.

114. Plaintiffs and their union members have been injured in their business and property by reason of the above-described conduct in that Cole, Dugar, Boyd, Ross, and NOFSCME's actions have deprived Plaintiffs and their members of more than $450,000.00 in union member dues, and have interfered with Plaintiffs' ability to represent and provide services to union members.

115. By reason of its injury, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Cole, Dugar, Boyd, and Ross**
**(Breach of Fiduciary Duty)**

116. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

117. Cole, Dugar, Boyd, and Ross owed fiduciary duties to AFSCME, to Local 1550 which is AFSCME's local union affiliate, and to union members under Texas state law, because – as union officers and directors – they were in relationships of trust and confidence with AFSCME, Local 1550, and their union members.

118. Cole, Dugar, Boyd, and Ross breached their fiduciary duties, putting their own interests ahead of the interests of AFSCME, Local 1550, and their union members, and using their positions to their own advantage and to the detriment of AFSCME, Local 1550, and their union members, by: (i) siphoning away union funds for Defendants' own purposes and benefit; (ii) systematically underreporting Local 1550's membership in order to facilitate underpayment of per capita tax; (iii) concealing their illicit actions from Plaintiffs and union membership; and (iv) creating NOFSCME as a sham labor organization and urging Plaintiffs' members' employers to transfer member dues to NOFSCME, without any lawful authorization.

119. Plaintiffs have been injured as the result of Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty in an amount to be determined at trial, but no less than $450,000.00, and seek damages and an accounting of all profits derived by Defendants as a result of Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty.

**<u>FIFTH CAUSE OF ACTION</u>**
**Against NOFSCME**
**(Knowing Participation in Breach of Fiduciary Duty)**

120. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

121. Cole, Dugar, Boyd, and Ross owed fiduciary duties to AFSCME, to Local 1550 which is AFSCME's local union affiliate, and to union members under Texas state law, because – as union officers and directors – they were in relationships of trust and confidence with AFSCME, Local 1550, and to their union members.

122. NOFSCME knew of the fiduciary relationships between Cole, Dugar, Boyd, and Ross, and AFSCME, Local 1550, and their union members, considering that Cole, Dugar, Boyd, and Ross were parties to the fiduciary relationships and it was Cole, Dugar, Boyd, and Ross that caused NOFSCME to be incorporated and who then controlled NOFSCME.

123. Cole, Dugar, Boyd, and Ross breached their fiduciary duties, putting their own interests ahead of the interests of AFSCME, Local 1550, and their union members, and using their positions to their own advantage and to the detriment of AFSCME, Local 1550, and their union members, by: (i) siphoning away union funds for Defendants' own purposes and benefit; (ii) systematically underreporting Local 1550's membership in order to facilitate underpayment of per capita tax; (iii) concealing their illicit actions from Plaintiffs and union membership; and (iv) creating NOFSCME as a sham labor organization and urge Plaintiffs' members' employers to transfer member dues to NOFSCME, without any lawful authorization.

124. NOFSCME participated in and was aware that it was participating in Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty, considering that NOFSCME was incorporated and operated for the purpose of facilitating Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty,

and considering that NOFSCME received funds that Cole, Dugar, Boyd, and Ross siphoned away from Local 1550's bank accounts through their breaches of fiduciary duty.

125. Plaintiffs have been injured as the result of NOFSCME's knowing participation in Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty in an amount to be determined at trial, but no less than $450,000.00, and seek damages and an accounting of all profits derived by Defendants as a result of Cole, Dugar, Boyd, and Ross's breaches of fiduciary duty.

**SIXTH CAUSE OF ACTION**
**Against Cole, Dugar, Boyd, and Ross**
**(Common Law Fraud)**

126. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

127. Cole, Dugar, Boyd, and Ross intentionally and knowingly made false and fraudulent statements of material fact to Plaintiffs, and concealed material facts from Plaintiffs, by: (i) causing falsified monthly membership reports to be transmitted through Local 1550 to AFSCME on a monthly basis for over four years; (ii) misrepresenting the amount of per capita tax due to AFSCME on a monthly basis for over four years; and (iii) concealing and failing to disclose the true monthly membership counts for Local 1550 and the true amount of per capita tax due to AFSCME on a monthly basis for over four years, despite their duties as union officers, directors, and agents to disclose the true figures to Plaintiffs.

128. Then, based upon the falsified monthly membership reports, Cole, Dugar, Boyd, and Ross caused Local 1550 to mail AFSCME checks for per capita tax payments each month that grossly underpaid the actual per capita taxes that were due to AFSCME based on Local 1550's true monthly membership, and at the same time, falsely represented that the checks fully and completely paid the per capita taxes that were due and owing.

129. Cole, Dugar, Boyd, and Ross also intentionally and knowingly concealed material facts from Plaintiffs, by concealing and failing to disclose the whereabouts of union funds belonging to Plaintiffs and its union members, despite their duty and obligation to do so.

130. Cole, Dugar, Boyd, and Ross knew that they were causing false representations of material fact to be made to Plaintiffs and knew that they were concealing material facts from Plaintiffs. Even so, Cole, Dugar, Boyd, and Ross caused the above-described false and fraudulent statements to be made to Plaintiffs, and also concealed material facts from Plaintiffs, in a calculated effort to defraud Plaintiffs out of more than $450,000.00 per capita tax payments and other union funds so that they could use the money for their own benefit.

131. Plaintiffs justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result, have been injured in their business and property by reason of the above-described conduct.

132. Cole, Dugar, Boyd, and Ross's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

133. Accordingly, Plaintiffs are entitled to compensatory and punitive damages in an amount exceeding $450,000.00, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**<u>SEVENTH CAUSE OF ACTION</u>**
**Against Cole, Dugar, Boyd, Ross, and NOFSCME**
**(Money Had and Received)**

134. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

135. As set forth herein, Cole, Dugar, Boyd, Ross, and NOFSCME have engaged in improper, unlawful, unjust, and inequitable acts, all to the harm and detriment of Plaintiffs.

136. Through their improper, unlawful, unjust, and inequitable acts, Cole, Dugar, Boyd, Ross, and NOFSCME obtained money – including union member dues and Local 1550 funds – that in equity and good conscience belong to Plaintiffs.

137. Cole, Dugar, Boyd, Ross, and NOFSCME have been enriched at Plaintiffs' expense by this money, which constituted a benefit that Cole, Dugar, Boyd, Ross, and NOFSCME voluntarily accepted, notwithstanding their improper, unlawful, unjust, and inequitable scheme.

138. Cole, Dugar, Boyd, Ross, and NOFSCME's retention of these union funds violates fundamental principles of justice, equity, and good conscience.

139. By reason of the above, Cole, Dugar, Boyd, Ross, and NOFSCME have been unjustly enriched in an amount to be determined at trial, but in no event less than $450,000.00.

## EIGHTH CAUSE OF ACTION
**Against Cole, Dugar, Boyd, Ross, and NOFSCME**
**(Tortious Interference with Existing Contractual Relations)**

140. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

141. Plaintiffs have been and are parties to formalized labor-management relationships with AFSCME and Local 1550 union members' employers, including Harris County, Texas, the Harris County Hospital District (Harris Health System), the Houston Independent School District, and the City of Pasadena, Texas.

142. In addition, the AFSCME Constitution constitutes a contract between AFSCME and Local 1550.

143. These arrangements and contracts require AFSCME and Local 1550 union members' employers upon authorization from members to deduct union dues from their employees' paychecks and transfer the dues to Local 1550, and require Local 1550 to transfer the required per capita tax payments to AFSCME each month based on Local 1550's accurate reporting of its monthly membership numbers.

144. Cole, Dugar, Boyd, Ross, and NOFSCME knew of these agreements, inasmuch as Cole, Dugar, Boyd, and Ross were officers and directors of Local 1550, the AFSCME local union affiliate for the AFSCME members covered by these agreements, and inasmuch as Cole, Dugar, Boyd, and Ross caused NOFSCME to be incorporated and to operate.

145. Cole, Dugar, Boyd, Ross, and NOFSCME willfully interfered with these contracts by falsifying Local 1550's monthly membership reports to AFSCME, by causing Local 1550 to systematically underpay the required per capita tax, by concealing these wrongful actions, and by contacting AFSCME and Local 1550 union members' employers to falsely represent that NOFSCME represented the members, and to falsely represent that the employers should transfer union dues payments to NOFSCME rather than to Local 1550.

146. Cole, Dugar, Boyd, Ross, and NOFSCME's willful and intentional conduct harmed Plaintiffs and their members by, among other things, proximately causing Plaintiffs to incur damages in excess of $450,000.00, depriving Plaintiffs and their members of the benefits they were entitled to receive under the contracts, and causing Local 1550 and member employers to breach their respective obligations under the contracts.

**<u>NINTH CAUSE OF ACTION</u>**
**Against Cole, Dugar, Boyd, Ross, and NOFSCME**
**(Civil Conspiracy)**

147. Plaintiffs incorporate, as though fully set forth herein, each and every allegation in paragraphs 1-95, above.

148. Cole, Dugar, Boyd, Ross, and NOFSCME agreed to, and did, carry out a course of conduct with the intent and purpose of committing mail fraud, bank fraud, breaches of fiduciary duty, common law fraud, and tortious interference, and to profit through such wrongful acts by obtaining union funds to which they were not entitled.

149. Plaintiffs and their members were damaged by Cole, Dugar, Boyd, Ross, and NOFSCME's tortious and wrongful acts, inasmuch as Cole, Dugar, Boyd, Ross, and NOFSCME obtained more than $450,000.00 in funds belonging to Plaintiffs, and interfered with Plaintiffs' representation of union members.

**WHEREFORE,** Plaintiffs Guillermo Vazquez in his capacity as Administrator of Local 1550, and American Federation of State, County and Municipal Employees, AFL-CIO demand that a Judgment be entered in their favor for the following relief, as well as such other and further relief as to the Court may seem just and proper:

A. Compensatory damages in an amount to be determined at trial, but in excess of $450,000.00, plus interest;

B. Treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c);

C. Punitive damages; and

D. An accounting of all profits derived by Defendants through their fraudulent and unlawful activities and breaches of fiduciary duty.

Dated: Uniondale, New York
October 22, 2025

/s/ Max Gershenoff

Barry I. Levy
Max Gershenoff
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
Phone: (516) 357-3000
Barry.Levy@rivkin.com
Max.Gershenoff@rivkin.com
*Counsel for Plaintiff American Federation of State, County and Municipal Employees, AFL-CIO*

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

GUILLERMO VAZQUEZ in his capacity as Administrator of AFSCME Local 1550, and AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO

**(b)** County of Residence of First Listed Plaintiff: Harris County, TX
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Rivkin Radler LLP, 926 RXR Plaza, Uniondale, NY 11556
(516) 357-3000

## DEFENDANTS

CYNTHIA COLE, KAREN DUGAR, SONJA ROSS, ALVERNISE BOYD, and NATIONAL ORGANIZATION FOR STATE COUNTY MUNICIPAL EMPLOYEES 1550 ASSOCIATION

County of Residence of First Listed Defendant: ____________
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [x] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
29 U.S.C. § 501; 18 U.S.C. § 1961 et seq.

Brief description of cause:
Violations of LMRDA by local union and officers, along with civil RICO, embezzlement, conversion, mail fraud, bank fraud, breach of fiduciary duty.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $** $450,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [ ] Yes [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ____________ DOCKET NUMBER ____________

DATE: October 22, 2025

SIGNATURE OF ATTORNEY OF RECORD: /s/ Max Gershenoff, Esq.

**FOR OFFICE USE ONLY**

RECEIPT # ________ AMOUNT ________ APPLYING IFP ________ JUDGE ________ MAG. JUDGE ________

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

GUILLERMO VAZQUEZ in his capacity as Administrator of AFSCME Local 1550, and AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO,

*Plaintiff(s)*

v.

CYNTHIA COLE, KAREN DUGAR, SONJA ROSS, ALVERNISE BOYD, and NATIONAL ORGANIZATION FOR STATE COUNTY MUNICIPAL EMPLOYEES 1550 ASSOCIATION,

*Defendant(s)*

Civil Action No. 4:25-cv-05034

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Cynthia Cole
20119 York Way Drive
Katy, TX 77450

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Max Gershenoff, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, NY 11556
(516) 357-3000

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*Nathan Ochsner, Clerk of Court*

Date: October 23, 2025

*s/ Stephanie Gonzalez*
*Signature of Clerk or Deputy Clerk*

Civil Action No. 4:25-cv-05034

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________________
was received by me on *(date)* ______________ .

❒ I personally served the summons on the individual at *(place)* ______________________________
______________________________ on *(date)* ______________ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* ______________
______________________________ , a person of suitable age and discretion who resides there,
on *(date)* ______________ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* ______________________________ , who is
designated by law to accept service of process on behalf of *(name of organization)* ______________
______________________________ on *(date)* ______________ ; or

❒ I returned the summons unexecuted because ______________________________ ; or

❒ Other *(specify)*:

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc:

RIVKIN RADLER LLP
ATTORNEYS AT LAW
926 RXR Plaza, Uniondale, NY 11556-0926

**TO:**

**C/M 000317-00019 S. WILCHES**
**VIA REGULAR MAIL**
**National Organization for State County**
**Municipal Employees 1550 Association**
**United States Corporation Agents, Inc.**
**10601 Clarence Dr., Suite 250**
**Frisco, TX 75033**

RIVKIN RADLER LLP
ATTORNEYS AT LAW
926 RXR Plaza, Uniondale, NY 11556-0926

**TO:**

**C/M 000317-00019 S. WILCHES**
**VIA REGULAR MAIL**
**Cynthia Cole**
**20119 York Way Drive**
**Katy, TX 77450**

CYNTHIA COLE 20119 YORKWAY DR KATY TX 77450-2233

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL®**

000317-00019 Wilches JE Cert ERR

USPS CERTIFIED MAIL

9214 8901 9403 8379 0357 66

RIVKIN RADLER LLP
ATTORNEYS AT LAW

926 RXR Plaza, Uniondale, NY 11556-0926

**TO:**

**C/M 000317-00019 S. WILCHES**
**VIA CERTIFIED MAIL AND RETURN RECEIPT REQUESTED**
**Cynthia Cole**
**20119 York Way Drive**
**Katy, TX 77450**

NAT'L ORGANIZATION FOR STATE COUNTY MUNICIPAL EMPLOYEES 1550 ASSOCIATION

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS. FOLD AT DOTTED LINE

CERTIFIED MAIL®

000317-00019 Wilches JE

Cert ERR

USPS CERTIFIED MAIL

9214 8901 9403 8379 0358 58

RIVKIN RADLER LLP
ATTORNEYS AT LAW
926 RXR Plaza, Uniondale, NY 11556-0926

**TO:**

**C/M 000317-00019 S. WILCHES**
**VIA CERTIFIED MAIL AND RETURN RECEIPT REQUESTED**
**National Organization for State County Municipal Employees 1550 Association**
**United States Corporation Agents, Inc.**
**10601 Clarence Dr., Suite 250**
Frisco, TX 75033

# EXHIBIT "3"

**UNITED STATES DISTRICT COURT**
**STATE OF TEXAS, COUNTY OF**

GUILLERMO VASQUEZ IN HIS CAPACITY AS ADMINISTRATOR OF AFSCME LOCAL 1550, AND AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO

*Plaintiff*

*vs*

CYNTHIA COLE, ET AL

*Defendant*

COURT DATE & TIME: AT
INDEX #: 4:25-CV-05034
DATE FILED:
Job #: 1803593
Client File# 317-19 SW

RIVKIN RADLER LLP
926 RXR PLAZA
UNIONDALE, NY 11566

CLIENT'S FILE NO.: 317-19 SW

**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK: COUNTY OF HARRIS ss:

I, GREG COX , being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the State of .

That on 5/23/2026 at 10:12 AM at 20119 YORK WAY DR, KATY, TX 77450 deponent served the within Summons in a Civil Action and Complaint.
on CYNTHIA COLE therein named by affixing a true copy thereof to the entry door of said premises, the same being the recipient's actual place of abode within the State of Texas.

Deponent completed service by depositing a copy of the Summons in a Civil Action and Complaint on 5/26/2026 in a postpaid, properly addressed envelope by first class mail, bearing the legend Personal & Confidential and not indicating legal action, in an official depository under the exclusive care and custody of the United States Post Office in the State of New York.

Mailing was made to 20119 YORK WAY DR, KATY, TX 77450
Additional certified mailing was made to the above address under Certified number

THE SUMMONS AND COMPLAINT WERE LEFT ON THE DOOR OF COLE'S LAST KNOWN HOME ADDRESS IN A PLASTIC PROTECTIVE SLEEVE

GREG COX

# EXHIBIT “4”

# LEGAL NOTICES

HoustonChronicle.com/Place-Legals legals@chron.com 713.362.6868

## Notice to Creditors

**NOTICE TO CREDITORS AD**

**$99.00**

Contact our team:
**legals@chron.com**
OR

Visit our 24/7 website to place, anytime:
**HoustonChronicle.com/Place-Legals**

**Includes first 36 lines and 1 Affidavit of Publication. $2.00 each additional line.*

NOTICE TO BIDDERS

The Metropolitan Transit Authority of Harris County, Texas (METRO) is planning to issue the procurement documents listed in this advertisement.

**IFB No. 2026000001:** Articulating Crane Truck. Solicitation will be available on or about 06/08/2026.

**RFP No. 2026000013:** Chemical Release Emergency Response. Solicitation will be available on or about 06/08/2026.

Prospective proposers can view and download these solicitations by visiting METRO's website at ridemetro.org/Open Procurements

If you are unable to download the documents or are having difficulty, please contact 713-615-6125 or email Contracts/Property Services at propertyservices@ridemetro.org.
IPLHOU0145316

You voted
chron.com/best

HOUSTON CHRONICLE
BEST OF THE BEST
HOUSTON

## Legal Bids & Proposals

NOTICE TO BIDDERS

The Metropolitan Transit Authority of Harris County, Texas (METRO) is planning to issue the procurement documents listed in this advertisement.

**IFB No. 2026000010: 87 Octane Unleaded Fuel Transportation Services.** Solicitation will be available on or about 06/15/2026.

Prospective proposers can view and download these solicitations by visiting METRO's website at ridemetro.org/Open Procurements

If you are unable to download the documents or are having difficulty, please contact 713-739-6886 or email Contracts/Property Services at propertyservices@ridemetro.org.
IPLHOU0146813

REQUEST FOR COMPETITIVE SEALED PROPOSALS

**2025 VIRTUAL PATHWAYS CAMPUS**
**CYPRESS-FAIRBANKS INDEPENDENT SCHOOL DISTRICT**
**Cypress-Fairbanks ISD Proposal No. 25-11-5758-R-RFP**

The Cypress-Fairbanks Independent School District will accept Base Competitive Sealed Proposals until 2:00 P.M. and Alternate CompetitiveSealed Proposals until 3:00 P.M. on Tuesday, July 7, 2026, at the Cypress Fairbanks Independent School District Facilities, Planning & Construction Office, 11430-B Perry Road, Houston, Texas 77064 for the 2025 Virtual Pathways Campus project. A Pre-Proposal Conference will be held Wednesday, June 24, 2026, at 10:00 A.M. at the above location. A site walk for the campus will be held immediately following the Pre-Proposal Conference (22602 Hempstead Highway, Cypress, TX 77429). Proposal Evaluation Criteria are published in the "Instructions to Offerors" section of the proposal documents. Plans and specifications will be released Monday, June 22, 2026, and are available to general contractors from the following address upon deposit of $100.00 per set: PBK Architects, Inc., 11 Greenway Plaza, 22nd Floor, Houston, Texas 77046, 713-965-0608. The Owner reserves the right to waive any informalities and to reject any or all proposals.
IPLHOU0144895

REQUEST FOR SEALED PROPOSALS

Housing Alliance HTX is soliciting sealed proposals from qualified firms for the following services:

- Armed Security Services
- Unarmed Security Services

Proposal documents, requirements, and submission instructions are available at: jallenmanagement.com/bid-opportunities

Sealed proposals are due no later than June 22, 2026.
IPLHOU0146306

The BIGGEST audience IN Houston.

Place a digital ad today.
chron.com/advertise
HOUSTON CHRONICLE

## Citation by Publication

**THE STATE OF TEXAS**

To: Defendant Cynthia Cole

United States District Court for the Southern District of Texas
515 Rusk Avenue, Houston, TX 77002

CASE #: 4:25-cv-05034

**Guillermo Vazquez, in his capacity as Administrator of AFSCME Local 1550, and American Federation of State, County & Municipal Employees, AFL-CIO,**

**Plaintiffs,**

**v.**

**Cynthia Cole, Karen Dugar, Sonja Ross, Alvernise Boyd, and National Organization for State County Municipal Employees 1550 Association,**

**Defendants.**

This action seeks to recover more than $450,000.00 that Defendants obtained through repeated acts of embezzlement and conversion of union assets in violation of 29 U.S.C. § 501(c), mail fraud, bank fraud, and breaches of fiduciary duty in violation of 29 U.S.C. § 501(a).

Counsel for Plaintiffs:
Barry I. Levy, Esq. • Max Gershenoff, Esq. • Elan Kirshenbaum, Esq.
RIVKIN RADLER LLP
926 RXR Plaza, Uniondale, NY 11556
(516) 357-3000
Barry.Levy@rivkin.com • Max.Gershenoff@rivkin.com • Elan.Kirshenbaum@rivkin.com

Petition Filed: October 22, 2025
Citation Issued: May 14, 2026 (Court Order Granting Motion for Substituted Service via Publication)

Rhonda Hawkins, Case Manager
United States District Clerk's Office,
United States Courthouse
515 Rusk Street, Room 9110, Houston, TX 77002
(713) 250-5518

**You have been sued. You may retain an attorney. Failure to file a written answer to the petition on or before Monday, August 24, 2026, at 10:00 AM may result in a default judgment entered against you, Cynthia Cole. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.**

**You are commanded to appear in this case and file an answer on or before: Monday, August 24, 2026, at 10:00 AM**
IPLHOU0146910

## Citation by Publication

CAUSE NUMBER: 202625118

PLAINTIFF: FEDERAL HOME LOAN MORTGAGE CORPORATION
VS.
DEFENDANT: APPLEGATE , OLGA

In the 129th
Judicial District
Harris County, Texas

CITATION BY PUBLICATION

THE STATE OF TEXAS County of Harris

NOTICE TO DEFENDANT: "You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of 42 days after the date this citation was issued, a default judgment may be taken against you."

**To: UNKNOWN HEIRS AT LAW OF OLGA APPLEGATE, DECEASSED**

YOU ARE HEREBY COMMANDED to be and appear before the 129th Judicial District Court of Harris County, Texas in the Courthouse in the City of Houston, Texas at or before 10:00 o'clock A.M., Monday, 6th day of July, 2026, being the Monday next after the expiration date of forty-two days after this citation is issued, and you are hereby commanded and required then and there to appear and file written answer to the Petition, filed in said Court on April 15, 2026, in a suit numbered 202625118 on the docket of said court, wherein Federal Home Loan Mortgage Corporation, as Trustee of the Freddie Mac SLST 2025-2 Participation Interest Trust, Plaintiff, v. Olga Applegate and The Heirs at Law of Olga Applegate, Deceased, Defendants.

**The Petition seeks an order to foreclose the lien on the property an assert a claim to the property located at 19111 Atasca Oaks Drive, Kingwood, TX 77346 and legally described as: Lot Seven (7), Block Three (3) Of Parkside At Kingwood Glen, An Addition In Harris County, Texas, According To The Map Or Plat Thereof Recorded In Flim Code No. 453041, Of The Map Records Of Harris County, Texas.**

GIVEN UNDER MY HAND AND SEAL OF SAID COURT at Houston, Texas this 22nd day of May, 2026.

(SEAL)

**Joshua Hall** District Clerk Signature & Seal

Issued at the request of: LOGS Legal Group LLP – Counsel for Plaintiff Address: 13105 Northwest Freeway, Suite 960, Houston, TX 77040 (Clerk info)

Newspaper: HOUSTON CHRONICLE
IPLHOU0145650

## Legals/Public Notices

**Texas Department of Transportation**
**SH 99 Grand Parkway Segment B-1**
**Project Disclosure of Financial Information**

**Disclosure of Financial Information:**

Pursuant to the authority granted under Texas Transportation Code, Chapter 223, Subchapter F, the Texas Department of Transportation (TxDOT) solicited proposals and has recommended a proposer for award of a Design-Build Contract (DBC) and associated Capital Maintenance Contract (CMC) for a portion of the Project described herein.

As required by Texas Transportation Code, Chapter 371, Subchapter D, TxDOT is publishing financial information regarding the Project and providing notice of a public hearing to receive comments concerning such financial disclosure for the Project described herein.

The Project consists of improvements within Segment B-1 of State Highway (SH) 99 (Grand Parkway) in Brazoria and Galveston Counties, including approximately 15 miles of new tolled and non-tolled lanes and operational improvements along SH 35 in Brazoria County. The project is divided into three elements, the "SH 99" portion, the "SH 35 Bypass" portion, and the "SH 99/Interstate 45 (I-45) Interchange" portion.

The SH 99 and the SH 35 Bypass portions of the Project are anticipated to be delivered pursuant to the DBC and CMC and consist of an approximately 14-mile, four-lane toll facility (two lanes in each direction) extending from Farm to Market (FM) 2403 to FM 646, together with approximately 5.9 miles of non-tolled operational improvements along existing SH 35 from south of FM 2403 to Victory Lane. The SH 35 Bypass portion of the Project consists of approximately 1.4 miles of the 5.9 miles of non-tolled operational improvements along SH 35 from Steele Road to Victory Lane. The SH 99/I-45 Interchange portion includes the design and construction of four direct connectors at the SH 99/I-45 Interchange, which are anticipated to be delivered through a separate design-bid-build procurement. Collectively, the foregoing improvements constitute the Project for purposes of this disclosure.

On April 30, 2026, by Minute Order No. 117165, the Texas Transportation Commission (TTC) determined that the proposal submitted by Ferrovial Construction-Webber 99 Joint-Venture (JV) (DB Contractor) provided the apparent best value to TxDOT and authorized TxDOT to commence and complete negotiations necessary to finalize the DBC and CMC.

Construction under the DBC is anticipated to commence in late 2026 and reach substantial completion in winter 2031/2032. TxDOT will be the contracting party to the DBC and CMC and will retain ownership of the Project roadway and associated right of way. The Project includes improvements that are anticipated to be operated and maintained by different entities. TxDOT and the Grand Parkway Transportation Corporation (GPTC), a public nonprofit Texas corporation created by and authorized by the TTC to design, construct, reconstruct, expand, operate, and maintain portions of SH 99, are negotiating a Project Agreement that will establish the respective rights, responsibilities, and obligations of TxDOT and GPTC with respect to the Project, including the operation and maintenance of certain Project facilities and the collection of toll revenues from the tolled portions of the Project.

The SH 35 Bypass improvements are anticipated to remain under TxDOT's responsibility and are not expected to be operated or maintained by GPTC. The direct connectors at the SH 99/I-45 Interchange are anticipated to be delivered through a separate design-bid-build procurement.

Project Financing. GPTC anticipates financing the SH 99 and the SH 99/I-45 Interchange portions of the Project through the issuance of the toll revenue bonds, notes and a loan under the Transportation Infrastructure Finance and Innovation Act (TIFIA). The total amount of debt that has been or will be assumed by GPTC to acquire right of way, design, construct, and finance the GPTC-financed portions of the Project is projected to be approximately $2.2 billion. The projected amount of interest that will be paid on the debt is estimated at $4.2 billion. The debt for the SH 99 and the SH 99/I-45 Interchange is anticipated to be repaid with toll revenues over a 39.5-year term. Any financing by GPTC of the SH 99 and the SH 99/I-45 Interchange will be subject to the covenants, restrictions and conditions of the existing financing documents approved by GPTC in connection with its outstanding debt obligations.

TxDOT intends to fund the SH 35 Bypass portion of the Project through the State Highway Fund.

Duration of Tolling. GPTC will collect tolls on Segment B-1 to offset the acquisition, design, and construction debt cost. Tolling is anticipated to continue after the debt is repaid.

Method for Setting Toll Rates. The initial toll rates and annual escalation policy for Segment B-1 were adopted by the TTC by Minute Order 117182 dated April 30, 2026. The toll rates and escalation policy are in accordance with the Market Valuation Waiver Agreement (MVWA) for the Grand Parkway. The MVWA was entered into by Brazoria County, Chambers County, Fort Bend County, Galveston County, Harris County, Montgomery County, Liberty County and TxDOT and provides the terms and conditions for the development, construction, and operation of the Grand Parkway. In accordance with the MVWA, the toll rates for all segments of the Grand Parkway will not exceed the average per-mile rates set in the current policy of the Harris County toll road system and the toll rate escalation methodology will be as set forth in Harris County's tolling policy in effect at the time.

Competing Facilities. There are no terms in the DBC related to competing facilities and there are no penalties associated with their construction.

Termination for Convenience. TxDOT has the right to terminate the DBC at any time without cause. If TxDOT elects to exercise this right, TxDOT must pay the DB Contractor for the design and construction work already performed under the DBC, the costs of terminating subcontracts, and certain out of pocket costs incurred by the DB Contractor. TxDOT has the right to terminate the CMC for convenience at any time without cause. If TxDOT elects to exercise this right, TxDOT must pay the DB Contractor for services performed under the CMC, plus costs of terminating subcontracts and certain settlement costs. In addition, TxDOT has the right to elect not to implement the second or third five-year CMC term and will not incur any termination costs in the event of such election. TxDOT may also terminate the CMC at the conclusion of the first year of the initial five-year CMC term without financial penalty.

Toll Rates. Based on the demand projections, it is estimated that the two-axle vehicle tag toll rates per mile will be as follows:

**Table 1 - Toll Rates for Grand Parkway Segment B-1**

| Project Status | Year | Estimated $/mile |
|---|---|---|
| Commencement of Traffic | 2032 | $0.279 |
| End of 1st Term CMC | 2037 | $0.308 |
| End of 2nd Term CMC | 2042 | $0.340 |
| End of 3rd Term CMC | 2047 | $0.375 |

Methodology for increasing toll rates. Toll rates will be static (not changing based on traffic conditions) and increase based on the adopted escalation policy. The current policy calls for annual escalation of the toll rates based on the higher of 2% or the most recently published non-revised index of Consumer Prices for Urban Wage Earners and Clerical Workers.

Concession Payments. There will be no concession payments.

Public Hearings. TxDOT will hold two public hearings concerning this disclosure of financial information for the toll project. Hearings will be held at the following dates, times, and locations: Monday, June 22, 2026 from 5:00 p.m. – 7:00 p.m. at Galveston County Courthouse, 722 Moody Avenue (21st Street), Galveston, Texas 77550; Wednesday, June 24, 2026 from 5:00 p.m. – 7:00 p.m. at City of Angleton City Council Chambers, 120 S. Chenango St., Angleton, Texas 77515. Questions and comments concerning the financial information will be accepted by TxDOT at the public hearing.

Questions and comments may also be submitted to the department by U.S. mail addressed to Matthew C. Connelly, P.E., Texas Department of Transportation, 7600 Washington Avenue, Houston, Texas 77007; or by emailing written comments to HOU-PIOWebMail_txdot.gov with subject line "SH 99 Segment B-1". These comments will be accepted until 5 p.m., Thursday, July 2, 2026. Copies of the DBC will be made available for viewing at the public hearing, at TxDOT's Houston District office located at 7600 Washington Avenue, Houston, Texas 77007 and can be accessed on TxDOT's website at https://www.txdot.gov/business/road-bridge-maintenance/alternative-delivery/sh99-grand-parkway-segb1/rfp.html. Copies of the DBC also may be purchased from TxDOT's Houston District office at the cost of reproduction. TxDOT will consider all properly submitted questions and comments and will prepare a summary and analysis of the comments received. The summary and analysis will be posted on TxDOT's website and made available upon request. Persons interested in attending any of the hearings who have special communication or accommodation needs are encouraged to contact Kenneth Shirley at the TxDOT Houston District at (936) 641-7240.

Requests should be made at least 72 hours prior to the public hearing. Because the public hearings will be conducted in English, any requests for language interpreters or other special communication needs should also be made at least 72 hours prior to the public hearing. TxDOT will make every reasonable effort to accommodate these needs.

## Legals/Public Notices

**Departamento de Transporte de Texas**
**SH 99 Grand Parkway, Segmento B-1**
**Divulgación de información financiera del proyecto**

**Divulgación de información financiera:**

Conforme a la autoridad otorgada por el Código de Transporte de Texas, Capítulo 223, Subcapítulo F, el Departamento de Transporte de Texas (TxDOT, por sus siglas en inglés) solicitó propuestas y ha recomendado a un proponente para la adjudicación de un contrato de diseño y construcción (DBC, por sus siglas en inglés) y el contrato de mantenimiento de capital (CMC, por sus siglas en inglés) asociado para una porción del proyecto aquí descrito.

Conforme a los requisitos del Código de Transporte de Texas, Capítulo 371, Subcapítulo D, TxDOT está publicando información financiera relativa al Proyecto y notificando la realización de una audiencia pública para recibir comentarios sobre dicha divulgación financiera del Proyecto aquí descrito.

El proyecto consiste en mejoras en el segmento B-1 de la carretera estatal (SH) 99 (Grand Parkway) en los condados de Brazoria y Galveston, lo que incluye aproximadamente 15 millas de nuevos carriles con y sin peaje, así como mejoras operativas a lo largo de la SH 35 en el condado de Brazoria. El proyecto se divide en tres elementos: la parte de la "SH 99", la parte de la "Circunvalación de la SH 35" y la parte del "Intercambiador de la SH 99/Interestatal 45 (I-45)".

Se anticipa que las partes del proyecto correspondientes a la SH 99 y a la Circunvalación de la SH 35 se realizarán conforme al DBC y al CMC, y consisten en aproximadamente 14 millas de infraestructura de peaje de cuatro carriles (dos carriles en cada sentido) que se extienden desde Farm to Market (FM) 2403 hasta FM 646, junto con aproximadamente 5,9 millas de mejoras operativas sin peaje a lo largo de la SH 35 existente desde el sur de FM 2403 hasta Victory Lane. La parte del Proyecto correspondiente a la circunvalación de la SH 35 consiste en aproximadamente 1,4 millas de las 5,9 millas de mejoras operativas sin peaje a lo largo de la SH 35 desde Steele Road hasta Victory Lane. La parte del intercambio SH 99/I-45 incluye el diseño y la construcción de cuatro conectores directos en el intercambio SH 99/I-45, cuya ejecución se anticipa mediante un proceso de contratación independiente de diseño-licitación-construcción. En conjunto, las mejoras mencionadas constituyen el Proyecto para los fines de esta divulgación.

El 30 de abril de 2026, mediante la Orden Minuta n.º 117165, la Comisión de Transporte de Texas (TTC) determinó que la propuesta presentada por la unión temporal de empresas (UTE) Ferrovial Construction-Webber 99 (contratista del DBC) ofrecía la mejor relación calidad-precio aparente para TxDOT y autorizó a TxDOT a iniciar y llevar a cabo las negociaciones necesarias para formalizar el DBC y el CMC.

Se anticipa que la construcción conforme al DBC comience a finales de 2026 y alcance su finalización sustancial en el invierno de 2031/2032. TxDOT será la parte contratante del DBC y el CMC y conservará la propiedad de la carretera del Proyecto y los derechos de vía asociados. El Proyecto incluye mejoras que se anticipa que serán operadas y mantenidas por diferentes entidades. TxDOT y la Grand Parkway Transportation Corporation (GPTC), una corporación pública sin fines de lucro de Texas creada y autorizada por la TTC para diseñar, construir, reconstruir, ampliar, operar y mantener tramos de la SH 99, están negociando un Acuerdo del Proyecto que establecerá los respectivos derechos, responsabilidades y obligaciones de TxDOT y GPTC con respecto al Proyecto, incluyendo la operación y el mantenimiento de ciertas instalaciones del Proyecto y la recaudación de ingresos por peaje de los segmentos del Proyecto sujetos a peaje.

Se anticipa que las mejoras de la circunvalación SH 35 seguirán siendo responsabilidad del TxDOT y no se espera que la GPTC se encargue de su operación ni de su mantenimiento. Se estima que los enlaces directos en el cruce de la SH 99 y la I-45 se llevarán a cabo mediante un proceso de contratación separado de diseño, licitación y construcción.

Financiamiento del proyecto. GPTC anticipa financiar los segmentos SH 99 y el cruce SH 99/I-45 del proyecto mediante la emisión de bonos y notas de ingresos por peaje, así como un préstamo conforme a la Ley de Financiamiento e Innovación de Infraestructura de Transporte (TIFIA). Se estima que el monto total de la deuda que ha asumido o asumirá GPTC para adquirir los derechos de vía, diseño, construcción y financiamiento de las partes del proyecto financiadas por GPTC será de aproximadamente $2.200 millones. El monto proyectado de los intereses que se pagarán por la deuda se estima en $4.200 millones. Se anticipa que la deuda correspondiente a la SH 99 y al Intercambiador SH 99/I-45 se pagará con los ingresos por peaje durante un plazo de 39,5 años. Cualquier financiamiento por parte de GPTC de la SH 99 y del Intercambiador SH 99/I-45 estará sujeto a los convenios, restricciones y condiciones de los documentos de financiamiento existentes aprobados por GPTC en relación con sus obligaciones de deuda pendientes.

TxDOT tiene la intención de financiar la parte del proyecto correspondiente a la circunvalación de la SH 35 a través del Fondo Estatal de Carreteras.

Duración del peaje. GPTC recaudará peajes en el segmento B-1 para compensar los costos de la deuda incurrida en la adquisición, el diseño y la construcción. Se anticipa que el peaje continuará después de que se haya pagado la deuda.

Método para fijar las tarifas de peaje. Las tarifas iniciales de peaje y la política de ajuste anual para el segmento B-1 fueron aprobadas por la TTC mediante la Orden Minuta n.º 117182, de fecha 30 de abril de 2026. Las tarifas de peaje y la política de ajuste se ajustan al Acuerdo de Exención de Valoración de Mercado (MVWA) para la Grand Parkway. El MVWA fue firmado por los condados de Brazoria, Chambers, Fort Bend, Galveston, Harris, Montgomery y Liberty, y por TxDOT, y establece los términos y condiciones para el desarrollo, la construcción y la operación de la Grand Parkway. Conforme al MVWA, las tarifas de peaje para todos los segmentos de Grand Parkway no excederán las tarifas promedio por milla establecidas en la política actual del sistema de carreteras de peaje del condado de Harris, y la metodología de escalación de tarifas de peaje será la establecida en la política de peaje del condado de Harris vigente en ese momento.

Facilidades competidoras. El DBC no contiene términos relacionados con las facilidades competidoras y no se aplican penalizaciones por su construcción.

Rescisión por conveniencia. TxDOT tiene derecho a rescindir el DBC en cualquier momento sin necesidad de justificación. Si TxDOT decide ejercer este derecho, deberá pagar al contratista DB por los trabajos de diseño y construcción ya realizados conforme al DBC, los costos de rescisión de los subcontratos y ciertos gastos incurridos por el contratista DB. TxDOT tiene derecho a rescindir el CMC por conveniencia en cualquier momento sin causa justificada. Si TxDOT decide ejercer este derecho, deberá pagar al contratista DB por los servicios prestados en virtud del CMC, más los costos de rescisión de los subcontratos y ciertos costos de liquidación. Además, TxDOT tiene derecho a optar por no implementar el segundo o tercer plazo de cinco años del CMC y no incurrirá en ningún costo de rescisión en caso de tal elección. TxDOT también puede rescindir el CMC al término del primer año del plazo inicial de cinco años del CMC sin penalización financiera.

Tarifas de peaje. Con base en las proyecciones de demanda, se estima que las tarifas de peaje por milla para los vehículos de dos ejes serán las siguientes:

**Tabla 1 - Tarifas de peaje del segmento B-1 de la Grand Parkway**

| Estado del proyecto | Año | Costo estimado por milla |
|---|---|---|
| Comienzo del tráfico | 2032 | $0.279 |
| Fin del primer periodo del CMC | 2037 | $0.308 |
| Fin del segundo periodo del CMC | 2042 | $0.340 |
| Fin del tercer periodo del CMC | 2047 | $0.375 |

Metodología para el aumento de las tarifas de peaje. Las tarifas de peaje serán fijas (sin cambios en función de las condiciones del tráfico) y aumentarán según la política de revalorización adoptada. La política actual exige una revalorización anual de las tarifas de peaje basada en el 2% o en el índice de precios al consumo para asalariados urbanos y empleados administrativos más recientemente publicado y no revisado, el que sea más alto.

Pagos de concesión. No habrá pagos de concesión.

Audiencias públicas. TxDOT llevará a cabo dos audiencias públicas en relación con esta divulgación de información financiera sobre el proyecto de peaje. Las audiencias se llevarán a cabo en las siguientes fechas, horas y lugares: lunes, 22 de junio de 2026, de 5:00 p.m. – 7:00 p.m. en el Galveston County Courthouse, 722 Moody Avenue (21st Street), Galveston, Texas 77550; miércoles, 24 de junio de 2026 de 5:00 p.m. – 7:00 p.m. en el City of Angleton City Council Chambers, 120 S. Chenango St., Angleton, Texas 77515. TxDOT aceptará preguntas y comentarios sobre la información financiera durante la audiencia pública.

Las preguntas y comentarios también pueden enviarse al departamento por correo postal a nombre de Matthew C. Connelly, P.E., Departamento de Transporte de Texas, 7600 Washington Avenue, Houston, Texas 77007; o enviando los comentarios por correo electrónico a HOU-PIOWebMail@txdot.gov con el asunto "SH 99 segmento B-1". Estos comentarios se aceptarán hasta las 5 p. m. del jueves 2 de julio de 2026. Copias del DBC estarán disponibles para su consulta en la audiencia pública, en la oficina del Distrito de Houston del TxDOT, situada en 7600 Washington Avenue, Houston, Texas 77007, y se podrá acceder a ellas en el sitio web del TxDOT en https://www.txdot.gov/business/road-bridge-maintenance/alternative-delivery/sh99-grand-parkway-segb1/rfp.html. También se pueden adquirir copias del DBC en la oficina del Distrito de Houston de TxDOT al coste de reproducción. TxDOT considerará todas las preguntas y comentarios presentados debidamente y preparará un resumen y un análisis de los comentarios recibidos. El resumen y el análisis se publicarán en el sitio web de TxDOT y estarán disponibles previa solicitud. Se recomienda a las personas interesadas en asistir a cualquiera de las audiencias que tengan necesidades especiales de comunicación o adaptación que se pongan en contacto con Kenneth Shirley en el Distrito de Houston del TxDOT, llamando al (936) 641-7240.

Las solicitudes deben presentarse al menos 72 horas antes de la audiencia pública. Dado que las audiencias públicas se llevarán a cabo en inglés, cualquier solicitud de intérpretes u otras necesidades especiales de comunicación también deben presentarse al menos 72 horas antes de la audiencia pública. TxDOT realizará todos los esfuerzos razonables para satisfacer estas necesidades.

# LEGAL NOTICES

HoustonChronicle.com/Place-Legals legals@chron.com 713.362.6868

## Notice to Creditors

NOTICE TO CREDITORS
Notice is given that original Letters of Administration for the Estate of Terry Bruce Smith were issued on May 26, 2026, in Docket No. 537201, pending in the Statutory Probate Court Number 3 of Harris County, Texas, to Suay Smith, Administrator of the Estate. All persons having claims against the Estate, which is presently being administered, are required to submit them, within the time and manner prescribed by law, and before the estate is closed, addressed as follows:
Suay Smith
Administrator of the Estate of Terry Bruce Smith
c/o Chris Peterson
422 Tarrow Street, College Station, Texas 77840

Dated the 9 of June, 2026

Chris Peterson
State Bar No. 00797239
979-703-7014
Attorney for Administrator of the Estate of Terry Bruce Smith
IPLHOU0146775


NOTICE TO CREDITORS AD

$99.00

Contact our team:
legals@chron.com
OR
Visit our 24/7 website to place, anytime:
HoustonChronicle.com/Place-Legals

*Includes first 36 lines and 1 Affidavit of Publication. $2.00 each additional line.*


## TABC Notices

**NOTICE OF APPLICATION FOR A MIXED BEVERAGE PERMIT Notice is hereby given that Racks Pool Hall LLC DBA - El Ocho Cafe and Bar, has applied for a Mixed Beverage Permit from the Texas Alcoholic Beverage Commission. The business will be located at: 4826 E. Mt. Houston Road Houston, Harris County, Texas 77093. The members/ own-ers of said business are: Jose Cuevas (owner), Ben DeAnda (owner), Fernando Garza (owner).**
IPLHOU0146564


Chron
Breaking news at Chron.com


## Legal Bids & Proposals

**REQUEST FOR COMPETITIVE SEALED PROPOSALS**

**2025 VIRTUAL PATHWAYS CAMPUS**
**CYPRESS-FAIRBANKS INDEPENDENT SCHOOL DISTRICT**
**Cypress-Fairbanks ISD Proposal No. 25-11-5758-R-RFP**

The Cypress-Fairbanks Independent School District will accept Base Competitive Sealed Proposals until 2:00 P.M. and Alternate CompetitiveSealed Proposals until 3:00 P.M. on Tuesday, July 7, 2026, at the Cypress Fairbanks Independent School District Facilities, Planning & Construction Office, 11430-B Perry Road, Houston, Texas 77064 for the 2025 Virtual Pathways Campus project. A Pre-Proposal Conference will be held Wednesday, June 24, 2026, at 10:00 A.M. at the above location. A site walk for the campus will be held immediately following the Pre-Proposal Conference (22602 Hempstead Highway, Cypress, TX 77429). Proposal Evaluation Criteria are published in the "Instructions to Offerors" section of the proposal documents. Plans and specifications will be released Monday, June 22, 2026, and are available to general contractors from the following address upon deposit of $100.00 per set: PBK Architects, Inc., 11 Greenway Plaza, 22nd Floor, Houston, Texas 77046, 713-965-0608. The Owner reserves the right to waive any informalities and to reject any or all proposals.
IPLHOU0144895

**NOTICE TO BIDDERS**
**The Metropolitan Transit Authority of Harris County, Texas (METRO) is planning to issue the procurement documents listed in this advertisement.**

**IFB No. 2026000010: 87 Octane Unleaded Fuel Transportation Services.** Solicitation will be available on or about 06/15/2026.

Prospective proposers can view and download these solicitations by visiting METRO's website at ridemetro.org/Open Procurements

If you are unable to download the documents or are having difficulty, please contact 713-739-6886 or email Contracts/Property Services at propertyservices@ridemetro.org.
IPLHOU0146813

Galena Park Independent School District ("GPISD" or "the "District") is soliciting proposals for **CSP 26-202 Concrete Work**. Details are more fully set out in the Competitive Sealed Proposals ("CSP"). The submission deadline will be **Monday, July 13, 2026 @ 2:00PM CST** at the GPISD Admin Building, Purchasing Department, located at 14705 Woodforest Blvd., Houston, TX 77015.

Additional information may be obtained at GPISD eBid system https://galenaparkisd.ionwave.net/Login.aspx or by contacting the Purchasing Department at purchasing@galenaparkisd.com.

Galena Park ISD reserves the right to reject any or all proposals.
IPLHOU0147126

AAMA is asking for Request for Proposal on janitorial services. AAMA is a Non profit, we are known for helping the community and for our education services dating back for more than 50 years. We have several sites around Houston and the surrounding areas.

To receive the R.F.P. contact Joe Esquivel at: jeesquivel@aama.org
IPLHOU0147589

Galena Park Independent School District ("GPISD" or "the "District") is soliciting proposals for **RFP 26-011 Telehealth Services**. Details are more fully set out in the Request for Proposals ("RFP"). The submission deadline will be **Tuesday, July 14, 2026 at 2:00 PM CST** at the GPISD Admin Bldg. Purchasing Department, located at 14705 Woodforest Blvd., Houston, TX 77015 and through the GPISD eBid system https://galenaparkisd.ionwave.net/Login.aspx.
IPLHOU0146541

REQUEST FOR SEALED PROPOSALS

Housing Alliance HTX is soliciting sealed proposals from qualified firms for the following services:
- Armed Security Services
- Unarmed Security Services

Proposal documents, requirements, and submission instructions are available at: jallenmanagement.com/bid-opportunities

Sealed proposals are due no later than June 22, 2026.
IPLHOU0146306

## Notice to Creditors

Notice to Creditors
Letters of Testamentary for the Estate of Adolphus Gray, Deceased, were issued on May 5,2026, in Docket number 541085, pending in Probate Court number 2 of Harris County, Texas to Independent Executor, Stacey Wallace.
Claims may be sent to:
Stacey Wallace
Estate Of Adolphus Gray
12214 Brook Meadows Lane
Meadows Place, TX 77477
All persons having claims against this Estate are required to present them within the time and manner prescribed by law.
Dated June 18, 2026
IPLHOU0147827

## Citation by Publication

CAUSE NUMBER: 202625118

PLAINTIFF: FEDERAL HOME LOAN MORTGAGE CORPORATION
VS.
DEFENDANT: APPLEGATE , OLGA

In the 129th
Judicial District
Harris County, Texas

CITATION BY PUBLICATION

THE STATE OF TEXAS County of Harris

NOTICE TO DEFENDANT: "You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of 42 days after the date this citation was issued, a default judgment may be taken against you."

**To: UNKNOWN HEIRS AT LAW OF OLGA APPLEGATE, DECEASED**

YOU ARE HEREBY COMMANDED to be and appear before the 129th Judicial District Court of Harris County, Texas in the Courthouse in the City of Houston, Texas at or before 10:00 o'clock A.M., Monday, 6th day of July, 2026, being the Monday next after the expiration date of forty-two days after this citation is issued, and you are hereby commanded and required then and there to appear and file written answer to the Petition, filed in said Court on April 15, 2026, in a suit numbered 202625118 on the docket of said court, wherein Federal Home Loan Mortgage Corporation, as Trustee of the Freddie Mac SLST 2025-2 Participation Interest Trust, Plaintiff, v. Olga Applegate and The Heirs at Law of Olga Applegate, Deceased, Defendants.

**The Petition seeks an order to foreclose the lien on the property an assert a claim to the property located at 19111 Atasca Oaks Drive, Kingwood, TX 77346 and legally described as: Lot Seven (7), Block Three (3) Of Parkside At Kingwood Glen, An Addition In Harris County, Texas, According To The Map Or Plat Thereof Recorded In Film Code No. 453041, Of The Map Records Of Harris County, Texas.**

GIVEN UNDER MY HAND AND SEAL OF SAID COURT in Houston, Texas this 22nd day of May, 2026.

(SEAL)

**Joshua Hall** District Clerk Signature & Seal

Issued at the request of: LOGS Legal Group LLP – Counsel for Plaintiff Address: 13105 Northwest Freeway, Suite 960, Houston, TX 77040 (Clerk info)

Newspaper: HOUSTON CHRONICLE
IPLHOU0145650

## Citation by Publication

**THE STATE OF TEXAS**

To: Defendant Cynthia Cole

United States District Court for the Southern District of Texas
515 Rusk Avenue, Houston, TX 77002

CASE #: 4:25-cv-05034

**Guillermo Vazquez, in his capacity as Administrator of AFSCME Local 1550, and American Federation of State, County & Municipal Employees, AFL-CIO,**

**Plaintiffs,**

**v.**

**Cynthia Cole, Karen Dugar, Sonja Ross, Alvernise Boyd, and National Organization for State County Municipal Employees 1550 Association,**

**Defendants.**

This action seeks to recover more than $450,000.00 that Defendants obtained through repeated acts of embezzlement and conversion of union assets in violation of 29 U.S.C. § 501(c), mail fraud, bank fraud, and breaches of fiduciary duty in violation of 29 U.S.C. § 501(a).

Counsel for Plaintiffs:
Barry I. Levy, Esq. • Max Gershenoff, Esq. • Elan Kirshenbaum, Esq.
RIVKIN RADLER LLP
926 RXR Plaza, Uniondale, NY 11556
(516) 357-3000
Barry.Levy@rivkin.com • Max.Gershenoff@rivkin.com • Elan.Kirshenbaum@rivkin.com

Petition Filed: October 22, 2025
Citation Issued: May 14, 2026 (Court Order Granting Motion for Substituted Service via Publication)

Rhonda Hawkins, Case Manager
United States District Clerk's Office,
United States Courthouse
515 Rusk Street, Room 9110, Houston, TX 77002
(713) 250-5518

**You have been sued. You may retain an attorney. Failure to file a written answer to the petition on or before Monday, August 24, 2026, at 10:00 AM may result in a default judgment entered against you, Cynthia Cole. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.**

**You are commanded to appear in this case and file an answer on or before: Monday, August 24, 2026, at 10:00 AM**
IPLHOU0146910

## Legals/Public Notices

**Texas Department of Transportation**
**SH 99 Grand Parkway Segment B-1**
**Project Disclosure of Financial Information**

**Disclosure of Financial Information:**

Pursuant to the authority granted under Texas Transportation Code, Chapter 223, Subchapter F, the Texas Department of Transportation (TxDOT) solicited proposals and has recommended a proposer for award of a Design-Build Contract (DBC) and associated Capital Maintenance Contract (CMC) for a portion of the Project described herein.

As required by Texas Transportation Code, Chapter 371, Subchapter D, TxDOT is publishing financial information regarding the Project and providing notice of a public hearing to receive comments concerning such financial disclosure for the Project described herein.

The Project consists of improvements within Segment B-1 of State Highway (SH) 99 (Grand Parkway) in Brazoria and Galveston Counties, including approximately 15 miles of new tolled and non-tolled lanes and operational improvements along SH 35 in Brazoria County. The project is divided into three elements, the "SH 99" portion, the "SH 35 Bypass" portion, and the "SH 99/Interstate 45 (I-45) Interchange" portion.

The SH 99 and the SH 35 Bypass portions of the Project are anticipated to be delivered pursuant to the DBC and CMC and consist of an approximately 14-mile, four-lane toll facility (two lanes in each direction) extending from Farm to Market (FM) 2403 to FM 646, together with approximately 5.9 miles of non-tolled operational improvements along existing SH 35 from south of FM 2403 to Victory Lane. The SH 35 Bypass portion of the Project consists of approximately 1.4 miles of the 5.9 miles of non-tolled operational improvements along SH 35 from Steele Road to Victory Lane. The SH 99/I-45 Interchange portion includes the design and construction of four direct connectors at the SH 99/I-45 Interchange, which are anticipated to be delivered through a separate design-bid-build procurement. Collectively, the foregoing improvements constitute the Project for purposes of this disclosure.

On April 30, 2026, by Minute Order No. 117165, the Texas Transportation Commission (TTC) determined that the proposal submitted by Ferrovial Construction-Webber 99 Joint-Venture (JV) (DB Contractor) provided the apparent best value to TxDOT and authorized TxDOT to commence and complete negotiations necessary to finalize the DBC and CMC.

Construction under the DBC is anticipated to commence in late 2026 and reach substantial completion in winter 2031/2032. TxDOT will be the contracting party to the DBC and CMC and will retain ownership of the Project roadway and associated right of way. The Project includes improvements that are anticipated to be operated and maintained by different entities. TxDOT and the Grand Parkway Transportation Corporation (GPTC), a public nonprofit Texas corporation created by and authorized by the TTC to design, construct, reconstruct, expand, operate, and maintain portions of SH 99, are negotiating a Project Agreement that will establish the respective rights, responsibilities, and obligations of TxDOT and GPTC with respect to the Project, including the operation and maintenance of certain Project facilities and the collection of toll revenues from the tolled portions of the Project.

The SH 35 Bypass improvements are anticipated to remain under TxDOT's responsibility and are not expected to be operated or maintained by GPTC. The direct connectors at the SH 99/I-45 Interchange are anticipated to be delivered through a separate design-bid-build procurement.

Project Financing. GPTC anticipates financing the SH 99 and the SH 99/I-45 Interchange portions of the Project through the issuance of the toll revenue bonds, notes and a loan under the Transportation Infrastructure Finance and Innovation Act (TIFIA). The total amount of debt that has been or will be incurred by GPTC to acquire right of way, design, construct, and finance the GPTC-financed portions of the Project is projected to be approximately $2.2 billion. The projected amount of interest that will be paid on the debt is estimated at $4.2 billion. The debt for the SH 99 and the SH 99/I-45 Interchange is anticipated to be repaid with toll revenues over a 39.5-year term. Any financing by GPTC of the SH 99 and the SH 99/I-45 Interchange will be subject to the covenants, restrictions and conditions of the existing financing documents approved by GPTC in connection with its outstanding debt obligations.

TxDOT intends to fund the SH 35 Bypass portion of the Project through the State Highway Fund.

Duration of Tolling. GPTC will collect tolls on Segment B-1 to offset the acquisition, design, and construction debt cost. Tolling is anticipated to continue after the debt is repaid.

Method for Setting Toll Rates. The initial toll rates and annual escalation policy for Segment B-1 were adopted by the TTC by Minute Order 117182 dated April 30, 2026. The toll rates and escalation policy are in accordance with the Market Valuation Waiver Agreement (MVWA) for the Grand Parkway. The MVWA was entered into by Brazoria County, Chambers County, Fort Bend County, Galveston County, Harris County, Montgomery County, Liberty County and TxDOT and provides the terms and conditions for the development, construction, and operation of the Grand Parkway. In accordance with the MVWA, the toll rates for all segments of the Grand Parkway will not exceed the average per-mile rates set in the current policy of the Harris County toll road system and the toll rate escalation methodology will be as set forth in Harris County's tolling policy in effect at the time.

Competing Facilities. There are no terms in the DBC related to competing facilities and there are no penalties associated with their construction.

Termination for Convenience. TxDOT has the right to terminate the DBC at any time without cause. If TxDOT elects to exercise this right, TxDOT must pay the DB Contractor for the design and construction work already performed under the DBC, the costs of terminating subcontracts, and certain out of pocket costs incurred by the DB Contractor. TxDOT has the right to terminate the CMC for convenience at any time without cause. If TxDOT elects to exercise this right, TxDOT must pay the DB Contractor for services performed under the CMC, plus costs of terminating subcontracts and certain settlement costs. In addition, TxDOT has the right to elect not to implement the second or third five-year CMC term and will not incur any termination costs in the event of such election. TxDOT may also terminate the CMC at the conclusion of the first year of the initial five-year CMC term without financial penalty.

Toll Rates. Based on the demand projections, it is estimated that the two-axle vehicle tag toll rates per mile will be as follows:

**Table 1 - Toll Rates for Grand Parkway Segment B-1**

| Project Status | Year | Estimated $/mile |
|---|---|---|
| Commencement of Traffic | 2032 | $0.279 |
| End of 1st Term CMC | 2037 | $0.308 |
| End of 2nd Term CMC | 2042 | $0.340 |
| End of 3rd Term CMC | 2047 | $0.375 |

Methodology for increasing toll rates. Toll rates will be static (not changing based on traffic conditions) and increase based on the adopted escalation policy. The current policy calls for annual escalation of the toll rates based on the higher of 2% or the most recently published non-revised index of Consumer Prices for Urban Wage Earners and Clerical Workers.

Concession Payments. There will be no concession payments.

Public Hearings. TxDOT will hold two public hearings concerning this disclosure of financial information for the toll project. Hearings will be held at the following dates, times, and locations: Monday, June 22, 2026 from 5:00 p.m. – 7:00 p.m. at Galveston County Courthouse, 722 Moody Avenue (21st Street), Galveston, Texas 77550; Wednesday, June 24, 2026 from 5:00 p.m. – 7:00 p.m. at City of Angleton City Council Chambers, 120 S. Chenango St., Angleton, Texas 77515. Questions and comments concerning the financial information will be accepted by TxDOT at the public hearing.

Questions and comments may also be submitted to the department by U.S. mail addressed to Matthew C. Connelly, P.E., Texas Department of Transportation, 7600 Washington Avenue, Houston, Texas 77007; or by emailing written comments to HOU-PIOWebMail_txdot.gov with subject line "SH 99 Segment B-1". These comments will be accepted until 5 p.m., Thursday, July 2, 2026. Copies of the DBC will be made available for viewing at the public hearing, at TxDOT's Houston District office located at 7600 Washington Avenue, Houston, Texas 77007 and can be accessed on TxDOT's website at https://www.txdot.gov/business/road-bridge-maintenance/alternative-delivery/sh99-grand-parkway-segb1/rfp.html. Copies of the DBC also may be purchased from TxDOT's Houston District office at the cost of reproduction. TxDOT will consider all properly submitted questions and comments and will prepare a summary and analysis of the comments received. The summary and analysis will be posted on TxDOT's website and made available upon request. Persons interested in attending any of the hearings who have special communication or accommodation needs are encouraged to contact Kenneth Shirley at the TxDOT Houston District at (936) 641-7240.

Requests should be made at least 72 hours prior to the public hearing. Because the public hearings will be conducted in English, any requests for language interpreters or other special communication needs should also be made at least 72 hours prior to the public hearing. TxDOT will make every reasonable effort to accommodate these needs.

## Legals/Public Notices

**Departamento de Transporte de Texas**
**SH 99 Grand Parkway, Segmento B-1**
**Divulgación de información financiera del proyecto**

**Divulgación de información financiera:**

Conforme a la autoridad otorgada por el Código de Transporte de Texas, Capítulo 223, Subcapítulo F, el Departamento de Transporte de Texas (TxDOT, por sus siglas en inglés) solicitó propuestas y ha recomendado a un proponente para la adjudicación de un contrato de diseño y construcción (DBC, por sus siglas en inglés) y el contrato de mantenimiento de capital (CMC, por sus siglas en inglés) asociado para una porción del proyecto aquí descrito.

Conforme a los requisitos del Código de Transporte de Texas, Capítulo 371, Subcapítulo D, TxDOT está publicando información financiera relativa al Proyecto y notificando la realización de una audiencia pública para recibir comentarios sobre dicha divulgación financiera del Proyecto aquí descrito.

El proyecto consiste en mejoras en el segmento B-1 de la carretera estatal (SH) 99 (Grand Parkway) en los condados de Brazoria y Galveston, lo que incluye aproximadamente 15 millas de nuevos carriles con y sin peaje, así como mejoras operativas a lo largo de la SH 35 en el condado de Brazoria. El proyecto se divide en tres elementos: la parte de la "SH 99", la parte de la "Circunvalación de la SH 35" y la parte del "Intercambiador de la SH 99/Interestatal 45 (I-45)".

Se anticipa que las partes del proyecto correspondientes a la SH 99 y a la Circunvalación de la SH 35 se realizarán conforme al DBC y al CMC, y consisten en aproximadamente 14 millas de infraestructura de peaje de cuatro carriles (dos carriles en cada sentido) que se extienden desde Farm to Market (FM) 2403 hasta FM 646, junto con aproximadamente 5,9 millas de mejoras operativas sin peaje a lo largo de la SH 35 existente desde el sur de FM 2403 hasta Victory Lane. La parte del Proyecto correspondiente a la circunvalación de la SH 35 consiste en aproximadamente 1,4 millas de las 5,9 millas de mejoras operativas sin peaje a lo largo de la SH 35 desde Steele Road hasta Victory Lane. La parte del intercambio SH 99/I-45 incluye el diseño y la construcción de cuatro conectores directos en el intercambio SH 99/I-45, cuya ejecución se anticipa mediante un proceso de contratación independiente de diseño-licitación-construcción. En conjunto, las mejoras mencionadas constituyen el Proyecto para los fines de esta divulgación.

El 30 de abril de 2026, mediante la Orden Minuta n.º 117165, la Comisión de Transporte de Texas (TTC) determinó que la propuesta presentada por la unión temporal de empresas (UTE) Ferrovial Construction-Webber 99 (contratista del DBC) ofrecía la mejor relación calidad-precio aparente para TxDOT y autorizó a TxDOT a iniciar y llevar a cabo las negociaciones necesarias para formalizar el DBC y el CMC.

Se anticipa que la construcción conforme al DBC comience a finales de 2026 y alcance su finalización sustancial en el invierno de 2031/2032. TxDOT será la parte contratante del DBC y el CMC y conservará la propiedad de la carretera del Proyecto y los derechos de vía asociados. El Proyecto incluye mejoras que se anticipa que serán operadas y mantenidas por diferentes entidades. TxDOT y la Grand Parkway Transportation Corporation (GPTC), una corporación pública sin fines de lucro de Texas creada y autorizada por la TTC para diseñar, construir, reconstruir, ampliar, operar y mantener tramos de la SH 99, están negociando un Acuerdo del Proyecto que establecerá los respectivos derechos, responsabilidades y obligaciones de TxDOT y GPTC con respecto al Proyecto, incluyendo la operación y el mantenimiento de ciertas instalaciones del Proyecto y la recaudación de ingresos por peaje de los segmentos del Proyecto sujetos a peaje.

Se anticipa que las mejoras de la circunvalación SH 35 seguirán siendo responsabilidad del TxDOT y no se espera que la GPTC se encargue de su operación ni de su mantenimiento. Se estima que los enlaces directos en el cruce de la SH 99 y la I-45 se llevarán a cabo mediante un proceso de contratación separado de diseño, licitación y construcción.

Financiamiento del proyecto. GPTC anticipa financiar los segmentos SH 99 y el cruce SH 99/I-45 del proyecto mediante la emisión de bonos y notas de ingresos por peaje, así como un préstamo conforme a la Ley de Financiamiento e Innovación de Infraestructura de Transporte (TIFIA). Se estima que el monto total de la deuda que ha asumido o asumirá GPTC para adquirir los derechos de vía, diseño, construcción y financiamiento de las partes del proyecto financiadas por GPTC será de aproximadamente $2.200 millones. El monto proyectado de los intereses que se pagarán por la deuda se estima en $4.200 millones. Se anticipa que la deuda correspondiente a la SH 99 y al Intercambiador SH 99/I-45 se pagará con los ingresos por peaje durante un plazo de 39,5 años. Cualquier financiamiento por parte de GPTC de la SH 99 y del Intercambiador SH 99/I-45 estará sujeto a los convenios, restricciones y condiciones de los documentos de financiamiento existentes aprobados por GPTC en relación con sus obligaciones de deuda pendientes.

TxDOT tiene la intención de financiar la parte del proyecto correspondiente a la circunvalación de la SH 35 a través del Fondo Estatal de Carreteras.

Duración del peaje. GPTC recaudará peajes en el segmento B-1 para compensar los costos de la deuda incurrida en la adquisición, el diseño y la construcción. Se anticipa que el peaje continuará después de que se haya pagado la deuda.

Método para fijar las tarifas de peaje. Las tarifas iniciales de peaje y la política de ajuste anual para el segmento B-1 fueron aprobadas por la TTC mediante la Orden Minuta n.º 117182, de fecha 30 de abril de 2026. Las tarifas de peaje y la política de ajuste se ajustan al Acuerdo de Exención de Valoración de Mercado (MVWA) para la Grand Parkway. El MVWA fue firmado por los condados de Brazoria, Chambers, Fort Bend, Galveston, Harris, Montgomery y Liberty, y por TxDOT, y establece los términos y condiciones para el desarrollo, la construcción y la operación de la Grand Parkway. Conforme al MVWA, las tarifas de peaje para todos los segmentos de Grand Parkway no excederán las tarifas promedio por milla establecidas en la política actual del sistema de carreteras de peaje del condado de Harris, y la metodología de escalación de tarifas de peaje será la establecida en la política de peaje del condado de Harris vigente en ese momento.

Facilidades competidoras. El DBC no contiene términos relacionados con las facilidades competidoras y no se aplican penalizaciones por su construcción.

Rescisión por conveniencia. TxDOT tiene derecho a rescindir el DBC en cualquier momento sin necesidad de justificación. Si TxDOT decide ejercer este derecho, deberá pagar al contratista DB por los trabajos de diseño y construcción ya realizados conforme al DBC, los costos de rescisión de los subcontratos y ciertos gastos incurridos por el contratista DB. TxDOT tiene derecho a rescindir el CMC por conveniencia en cualquier momento sin causa justificada. Si TxDOT decide ejercer este derecho, deberá pagar al contratista DB por los servicios prestados en virtud del CMC, más los costos de rescisión de los subcontratos y ciertos costos de liquidación. Además, TxDOT tiene derecho a optar por no implementar el segundo o tercer plazo de cinco años del CMC y no incurrirá en ningún costo de rescisión en caso de tal elección. TxDOT también puede rescindir el CMC al término del primer año del plazo inicial de cinco años del CMC sin penalización financiera.

Tarifas de peaje. Con base en las proyecciones de demanda, se estima que las tarifas de peaje por milla para los vehículos de dos ejes serán las siguientes:

**Tabla 1 - Tarifas de peaje del segmento B-1 de la Grand Parkway**

| Estado del proyecto | Año | Costo estimado por milla |
|---|---|---|
| Comienzo del tráfico | 2032 | $0.279 |
| Fin del primer periodo del CMC | 2037 | $0.308 |
| Fin del segundo periodo del CMC | 2042 | $0.340 |
| Fin del tercer periodo del CMC | 2047 | $0.375 |

Metodología para el aumento de las tarifas de peaje. Las tarifas de peaje serán fijas (sin cambios en función de las condiciones del tráfico) y aumentarán según la política de revalorización adoptada. La política actual exige una revalorización anual de las tarifas de peaje basada en el 2% o en el índice de precios al consumo para asalariados urbanos y empleados administrativos más recientemente publicado y no revisado, el que sea más alto.

Pagos de concesión. No habrá pagos de concesión.

Audiencias públicas. TxDOT llevará a cabo dos audiencias públicas en relación con esta divulgación de información financiera sobre el proyecto de peaje. Las audiencias se llevarán a cabo en las siguientes fechas, horas y lugares: lunes, 22 de junio de 2026, de 5:00 p.m. – 7:00 p.m. en el Galveston County Courthouse, 722 Moody Avenue (21st Street), Galveston, Texas 77550; miércoles, 24 de junio de 2026 de 5:00 p.m. – 7:00 p.m. en el City of Angleton City Council Chambers, 120 S. Chenango St., Angleton, Texas 77515. TxDOT aceptará preguntas y comentarios sobre la información financiera durante la audiencia pública.

Las preguntas y comentarios también pueden enviarse al departamento por correo postal a nombre de Matthew C. Connelly, P.E., Departamento de Transporte de Texas, 7600 Washington Avenue, Houston, Texas 77007; o enviando los comentarios por correo electrónico a HOU-PIOWebMail@txdot.gov con el asunto "SH 99 segmento B-1". Estos comentarios se aceptarán hasta las 5 p. m. del jueves 2 de julio de 2026. Copias del DBC estarán disponibles para su consulta en la audiencia pública, en la oficina del Distrito de Houston del TxDOT, situada en 7600 Washington Avenue, Houston, Texas 77007, y se podrá acceder a ellas en el sitio web del TxDOT en https://www.txdot.gov/business/road-bridge-maintenance/alternative-delivery/sh99-grand-parkway-segb1/rfp.html. También se pueden adquirir copias del DBC en la oficina del Distrito de Houston de TxDOT al coste de reproducción. TxDOT considerará todas las preguntas y comentarios presentados debidamente y preparará un resumen y un análisis de los comentarios recibidos. El resumen y el análisis se publicarán en el sitio web de TxDOT y estarán disponibles mediante solicitud. Se recomienda a las personas interesadas en asistir a cualquiera de las audiencias que tengan necesidades especiales de comunicación o adaptación que se pongan en contacto con Kenneth Shirley en el Distrito de Houston del TxDOT, llamando al (936) 641-7240.

Las solicitudes deben presentarse al menos 72 horas antes de la audiencia pública. Dado que las audiencias públicas se llevarán a cabo en inglés, cualquier solicitud de intérpretes u otras necesidades especiales de comunicación también deben presentarse al menos 72 horas antes de la audiencia pública. TxDOT realizará todos los esfuerzos razonables para satisfacer estas necesidades.

# PLANE

*From page A13*

what he encountered that night.

Having arrived near the scene in a tow truck, Franco grabbed tools, including a sledgehammer, and ran toward the aircraft.

"I can't say what motivated me to help, but smoke was rising and I saw people rushing in to help," he said.

When he reached the wreckage, Franco said the smoke was so thick that breathing became painful.

"I didn't know if it would explode or not," he said. "I felt a lot of anxiety to get them out because in any moment anything can happen."

After discovering the sledgehammer would not break through the aircraft's double-pane window, Franco returned to his truck and grabbed a fire extinguisher. He joined others in trying to suppress the flames while passengers were being removed from the aircraft.

"I feel proud — *orgulloso*, to be able to help," he said. "The little we had, we used to help."

Another rescuer was 23-year-old Matthew Amaro, who was captured in video footage helping hold open the aircraft's door while others assisted passengers out of the wreckage.

"I don't have much to say about it, but I'm glad we helped everyone out," Amaro said. "Prayers for the family and the one who passed."

Damian Garza and his wife, Zayra Garza, were also among the civilians who rushed to the scene.

Driving through south Laredo on Tuesday night, the couple initially believed they were approaching a traffic accident.

Smoke in the distance often points to a traffic accident. In a city where collisions involving passenger vehicles and tractor-trailers are not uncommon, the couple initially assumed that was exactly what they were approaching.

Instead, they found themselves at the scene of a small aircraft that had crashed and split apart near Loop 20.

Damian Garza helped others lift and hold open the aircraft's door while passengers were evacuated.

"My husband did tell me because he assisting on lifting the door that it was super heavy," Zayra Garza said.

As flames continued to grow, Garza said her husband joined others working to keep the door open, at one point using a fire extinguisher to help prevent it from closing while people inside were being rescued.

"We didn't know if the airplane was going to explode because the fire was getting bigger and there was a lot of people helping," Garza said.

She recorded much of the rescue effort as it unfolded, providing a first-hand look at the actions of these individuals who rushed toward the burning aircraft. The footage became a window into the scene not only for Laredoans but for people across the country.

Others who responded included off-duty U.S. Border Patrol Agent Alex Medellin, who was seen assisting with rescue efforts and attempting to help access portions of the aircraft near the cockpit.

"Agent Medellin's quick actions and coordination with emergency responders exemplify the U.S. Border Patrol's commitment to protecting our community, even off duty," the U.S. Border Patrol Laredo Sector said. "We are proud of Agent Medellin's heroism. Honor First."

These are just some of the Good Samaritans who acted without hesitation when lives were on the line.

As stories and videos from the rescue circulated online, additional names emerged through social media posts and public recognition from local leaders. City officials are also working to identify and thank other individuals who may have assisted at the scene, although they admit it may be impossible to identify and personally thank everyone who assisted that night.

Looking back, Garza said what she remembers most is not the fire or the wreckage, but the way strangers came together in a matter of moments.

"I want to thank the community, law enforcement — everybody worked together," she said. "Something I didn't think I was going to see was everybody coming together and helping each other out."



The wreckage of a private aircraft rests on Loop 20 in Laredo on June 16. Authorities said the plane was carrying six people when it crashed, killing one.

Jose De La Rosa/Laredo Morning Times

# SHELTER

*From page A13*

uncertainty around the future of existing grants, extremely stressed staff. And then you were already dealing with shortages started during COVID that never righted themselves."

Organizations in Harris County offered more days in a shelter in 2025 than they did in 2024, the study found — demand simply outpaced growth, said Molly Voyles, director of public policy for the statewide council, which conducted the survey.

"What you have in Harris County is an impressive system of advocates that are strained resource-wise," Voyles said.

A third of those denied a shelter bed last year returned to their violent homes, researchers found. Another quarter opted to live in an unsafe place, such as a car or on the streets.

### Call for resources

Local advocates against domestic violence for years have tried to raise awareness about the lack of resources for victims in the face of rising numbers of family violence-related homicides in Harris County.

"It's like drinking from a fire hydrant," Brashear said. "Demand for these services is really, really high. If you're tracking the numbers, you're seeing it."

A 2022 report from the University of Houston found the region has significantly fewer shelter beds per capita than other major cities. Authors of the report recommended giving local organizations an additional $1 million per year for five years.

Yet local nonprofits have found themselves trimming staff in the wake of funding cuts. And leaders at the Houston Police Department have been noncommittal about the future of some of their domestic violence-related programs, such as the Domestic Abuse Response Team, which was expanded using pandemic-era federal funds that are running out.

The outlook for groups providing shelter hasn't been universally negative, Brashear said.

Harris County Commissioners Court recently committed to continue providing $1.5 million in aid for victims to cover whatever needs they might have, such as a deposit on an apartment or funds for a hotel stay.

Simply adding shelter beds isn't the only key to improving conditions on the ground, Voyles added — an overall lack of housing is worsening the situation.

"This means people are staying longer in the shelters," she said. "If you're not safe at home, you're more likely to stay in the shelters, especially if you can't find a way to transition to a safer home."

## LEGAL NOTICES HoustonChronicle.com/Place-Legals legals@chron.com 713.362.6868

### Notice to Creditors


**NOTICE TO CREDITORS AD**

**$99.00**

Contact our team:
**legals@chron.com**
OR

Visit our 24/7 website to place, anytime:
**HoustonChronicle.com/Place-Legals**

**Includes first 36 lines and 1 Affidavit of Publication. $2.00 each additional line.*


**NOTICE TO CREDITORS**

CAUSE NO. 543491

Notice is hereby given that Letters Testamentary for the Estate of Mary Karkella, Deceased, were issued on or about the 17th day of June, 2026, in Cause No. 543491, pending in the Probate Court Number 1 of Harris County Texas, to Kara Ann Burrous, Independent Executor. All persons having claims against this estate are required to present them within the time and in the manner prescribed by law.

Claims may be presented to James W. McCalla, Attorney for the Independent Executor Kara Ann Burrous, LAW OFFICE OF JAMES MCCALLA, P.O. Box 2108, Bellaire, Texas, 77402-2108.

If you have a secured claim against the estate, you must present your claim to the Independent Executor at the address listed above.

Dated this the 25th day of June, 2026
/s/ James W. McCalla
James W. McCalla
Attorney for Kara Ann Burrous,
Independent Executor of the Estate of Mary Karkella, Deceased
IPLHOU0149380

Notice to Creditors
Notice is hereby given that Letters of Testamentary were granted to Raymond Scott Gibson on the 21st day of May, 2026, by the Probate Court of Harris County, Texas in Cause No. 543246; In the Estate of Raymond C. Gibson, Deceased. All persons having claims against said estate are hereby required to present the same to Raymond Scott Gibson, Independent Executor, within the time prescribed by law.
Mailing address is:
c/o Raymond Scott Gibson, 62 N. Wooded Brood Circle, Spring, Texas 77382.
CAUSE NO. 543246
IPLHOU0149116


WE DELIVER YOUR MESSAGE

HoustonChronicle.com/Advertise

HoustonChronicle.com


### Legals/Public Notices

The Houston Planning Commission has received an application to allow the the partial replatting of **MELBOURNE PLACE SECTION 2, AMENDING PLAT NO 1** being all of lot TWO HUNDRED TWENTY EIGHT (228) and TWO HUNDRED TWENTY NINE (229) in Block NINETEEN (19), as recorded in FILMCODE NUMBER 693650 of the Harris County Map Records for the purpose of creating four (4) lots.

The new subdivision name is CHARLESMONT CORNER.

A variance is being requested to allow a reduced building line of 0 feet along the western
boundary of the plat instead of the required 10 feet building line.
The City will send out written notice of a public hearing to all owners of property within 250' of the boundary of the plat and all parcels along or across from a blockface that abuts any street or private roadway extending 500 feet from the plat as measured along the centerline of any street or private roadway that abuts the boundary of the plat.

The Houston Planning Commission will hold a public hearing on this replat on **Thursday, July 23, 2026 at 2:30 PM** City Hall Annex Building, 900 Bagby Street City Council Chamber, Public Level, Houston, Texas

For information on how to join the meeting or submit comments as a speaker, visit our website: www.houstonplanning.com or Call: 832-393-6624. Contact the applicant at (832) 208-7706) or the City of Houston Planning Department at (832)393-6600 for any additional information
IPLHOU0149340

### Legal Bids & Proposals

G.T.T. Construction, Inc. acting as Design-Build Contractor on behalf of Bay City Community Development Corporation, is requesting competitive subcontractor proposals for the construction of The Aquatics Center of Matagorda County.

The Project is located within the City Limits of Bay City with the address of 230 12th Street, Bay City, Texas 77414. This is a 5.5-acre undisturbed site. The project consists of a new 19,338 square foot multi-use building including an interior 8 lane lap pool. The second building is a free-standing restroom facility servicing a leisure pool, splash pads and water slides.

Proposals will be accepted by email until 2:00 P.M. local times on Thursday July 16th, 2026. Proposals shall be submitted electronically to estimating@gttconstruction.com. Potential award to subcontractors will be to the responsive and responsible proposer whose proposal is determined to be most advantageous to the owner as determined by the Design-Build Contractor. Successful subcontractors shall be issued a standard G.T.T. Construction Subcontract agreement without modifications.

Interested parties may access drawings via ISQFT, ABC Plan Room Victoria, Tx. And upon request to estimating@gttconstruction.com. For ISQFT there is no cost to view or download documents.

G.T.T. Construction on behalf of
Bay City Community Development Corporation
IPLHOU0149301

**Request for Qualifications**
**RFQ 26-01**
**Affordable Housing Development Partners**

Harris County Housing Authority (HCHA) is seeking submissions from qualified Respondents interested in partnering on affordable housing development services, including but not limited to development, financing, construction, preservation, and related real estate development activities for current and future housing initiatives. This RFQ is being issued as a continuously open solicitation. **Proposals shall be emailed to:** dominique.king@hchatexas.org. RFQ 26-01 will be posted on HCHA's website at www.hchatexas.org and can be downloaded there.
IPLHOU0149303

**NOTICE TO BIDDERS**
**The Metropolitan Transit Authority of Harris County, Texas (METRO) is planning to issue the procurement documents listed in this advertisement.**

**IFB No. Doc2282570456: Purchase and Delivery of H4 LRV Brake Overhaul Kits.** Solicitation will be available on or about 06/29/2026.

Prospective bidders/proposers can view and download these solicitations by visiting METRO's website at ridemetro.org/Open Procurements

If you are unable to download the documents or are having difficulty, please contact 713-615-6125 or email Contracts/Property Services at propertyservices@ridemetro.org.
IPLHOU0149568

NOTICE OF REQUEST FOR PROPOSALS Southwest Public Schools is soliciting sealed proposals from qualified and experienced food service vendors to provide vended meal services for the District's Child Nutrition Program for the 26-27 school year. Interested vendors may obtain the complete RFP package and detailed specifications by contacting Melissa Nowicki, Chief Financial Officer at Phone: (713) 784-6345 Email: mnowicki@swschools.org or by download from the District website at: https://www.swschools.org. Sealed proposals must be received no later than Friday, July 17, 2026 2:00 PM CT.
IPLHOU0148391

Galena Park Independent School District ("GPISD" or "the "District") is soliciting proposals for **RFP 26-011 Telehealth Services**. Details are more fully set out in the Request for Proposals ("RFP"). The submission deadline will be **Tuesday, July 14, 2026 at 2:00 PM CST** at the GPISD Admin Bldg. Purchasing Department, located at 14705 Woodforest Blvd., Houston, TX 77015 and through the GPISD eBid system https://galenaparkisd.ionwave.net/Login.aspx.
IPLHOU0146541

### Legal Bids & Proposals

Galena Park Independent School District ("GPISD" or "the "District") is soliciting proposals for **CSP 26-202 Concrete Work.** Details are more fully set out in the Competitive Sealed Proposals ("CSP"). The submission deadline will be **Monday, July 13, 2026** @ **2:00PM CST** at the GPISD Admin Building, Purchasing Department, located at 14705 Woodforest Blvd., Houston, TX 77015.

Additional information may be obtained at GPISD eBid system https://galenaparkisd.ionwave.net/Login.aspx or by contacting the Purchasing Department at purchasing@galenaparkisd.com.

Galena Park ISD reserves the right to reject any or all proposals.
IPLHOU0147126

### Citation by Publication

CAUSE NUMBER: 202625118

PLAINTIFF: FEDERAL HOME LOAN MORTGAGE CORPORATION
VS.
DEFENDANT: APPLEGATE , OLGA

In the 129th
Judicial District
Harris County, Texas

CITATION BY PUBLICATION

THE STATE OF TEXAS County of Harris

NOTICE TO DEFENDANT: "You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of 42 days after the date this citation was issued, a default judgment may be taken against you."

**To: UNKNOWN HEIRS AT LAW OF OLGA APPLEGATE, DECEASSED**

YOU ARE HEREBY COMMANDED to be and appear before the 129th Judicial District Court of Harris County, Texas in the Courthouse in the City of Houston, Texas at or before 10:00 o'clock A.M., Monday, 6th day of July, 2026, being the Monday next after the expiration date of forty-two days after this citation is issued, and you are hereby commanded and required then and there to appear and file written answer to the Petition, filed in said Court on April 15, 2026, in a suit numbered 202625118 on the docket of said court, wherein Federal Home Loan Mortgage Corporation, as Trustee of the Freddie Mac SLST 2025-2 Participation Interest Trust, Plaintiff, v. Olga Applegate and The Heirs at Law of Olga Applegate, Deceased, Defendants.

**The Petition seeks an order to foreclose the lien on the property an assert a claim to the property located at 19111 Atasca Oaks Drive, Kingwood, TX 77346 and legally described as: Lot Seven (7), Block Three (3) Of Parkside At Kingwood Glen, An Addition In Harris County, Texas, According To The Map Or Plat Thereof Recorded In Flim Code No. 453041, Of The Map Records Of Harris County, Texas.**

GIVEN UNDER MY HAND AND SEAL OF SAID COURT at Houston, Texas this 22nd day of May, 2026.

(SEAL)

**Joshua Hall** District Clerk Signature & Seal

Issued at the request of: LOGS Legal Group LLP – Counsel for Plaintiff Address: 13105 Northwest Freeway, Suite 960, Houston, TX 77040 (Clerk info)

Newspaper: HOUSTON CHRONICLE
IPLHOU0145650

**THE STATE OF TEXAS**

To: Defendant Cynthia Cole

United States District Court for the Southern District of Texas
515 Rusk Avenue, Houston, TX 77002

CASE #: 4:25-cv-05034

**Guillermo Vazquez, in his capacity as Administrator of AFSCME Local 1550, and American Federation of State, County & Municipal Employees, AFL-CIO,**

**Plaintiffs,**

**v.**

**Cynthia Cole, Karen Dugar, Sonja Ross, Alvernise Boyd, and National Organization for State County Municipal Employees 1550 Association,**

**Defendants.**

This action seeks to recover more than $450,000.00 that Defendants obtained through repeated acts of embezzlement and conversion of union assets in violation of 29 U.S.C. § 501(c), mail fraud, bank fraud, and breaches of fiduciary duty in violation of 29 U.S.C. § 501(a).

Counsel for Plaintiffs:
Barry I. Levy, Esq. • Max Gershenoff, Esq. • Elan Kirshenbaum, Esq.
RIVKIN RADLER LLP
926 RXR Plaza, Uniondale, NY 11556
(516) 357-3000
Barry.Levy@rivkin.com • Max.Gershenoff@rivkin.com • Elan.Kirshenbaum@rivkin.com

Petition Filed: October 22, 2025
Citation Issued: May 14, 2026 (Court Order Granting Motion for Substituted Service via Publication)

Rhonda Hawkins, Case Manager
United States District Clerk's Office,
United States Courthouse
515 Rusk Street, Room 9110, Houston, TX 77002
(713) 250-5518

**You have been sued. You may retain an attorney. Failure to file a written answer to the petition on or before Monday, August 24, 2026, at 10:00 AM may result in a default judgment entered against you, Cynthia Cole. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk.**
**Find out more at TexasLawHelp.org.**

**You are commanded to appear in this case and file an answer on or before: Monday, August 24, 2026, at 10:00 AM**
IPLHOU0146910

### Citation by Publication

**CAUSE NUMBER: 202578056**

**Plaintiff: HEARD, SHANNON**

**vs.**

**Defendant: CEAZER, ALVESTER**

**IN THE 055TH JUDICIAL DISTRICT COURT OF HARRIS COUNTY, TEXAS**

**CITATION BY PUBLICATION**

**THE STATE OF TEXAS**
**County of Harris**

**NOTICE TO DEFENDANT:** "You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of forty-two days after the date of issuance of this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org"

**To: CEAZER, ALVESTER (WHOSE WHEREABOUTS ARE UNKNOWN)**

**YOU ARE HEREBY COMMANDED** to be and appear before the 055th Judicial District Court of Harris County, Texas in the Courthouse in the city of Houston, Texas at or before 10:00 o'clock A.M., Monday, JUNE 29, 2026, being the Monday next after the expiration date of forty-two days after this citation is issued, and you are hereby commanded and required then and there to appear and file written answer to the PLAINTIFF'S ORIGINAL PETITION RULE 193.7 NOTICE AND JURY DEMAND filed in said Court on October 13, 2025, in a suit numbered 202578056 on the docket of said court, wherein HEARD, SHANNON Plaintiff(s) and CEAZAR, ALVESTER, Defendant(s), the nature of plaintiff's demand being and the said petition alleging:

**Plaintiff: Shannon Heard**
**Defendant: Alvester Ceazar**
**Date of Accident: December 24, 2023**
**Time: 9:50 p.m.**
**Location: Intersection of Ella Blvd. and Barren Springs Dr.**
**Incident: Defendant failed to yield the right of way and collided with Plaintiff.**

Notice hereof shall be given by publishing this Citation once a week for four consecutive weeks previous to the day of JUNE 29, 2026, in some newspaper published in the County of HARRIS, if there be a newspaper published therein, but if not, then the nearest county where a newspaper is published, and this Citation shall be returned on JUNE 23, 2026, which is forty two days after the date it is issued, and the first publication shall be at least twenty-eight days before said return day.

**HEREIN FAIL NOT,** but have before said court on said return day this Writ with your return thereon, showing how you have executed same.

**WITNESS: Marilyn Burgess**, District Clerk of Harris County, Texas

**GIVEN UNDER MY HAND AND SEAL OF SAID COURT** at Houston, Texas on May 12, 2026.

(SEAL)

Newspaper: HOUSTON CHRONICLE

Issued at request of:
GHAZNAVI, FAIZAN U.
3 SUGAR CREEK CENTER BLVD, SUITE
SUGARLAND, TX 77478
516-702-2462

Bar Number: 24127475

/s/ Marilyn Burgess
**Marilyn Burgess, District Clerk of** Harris County, Texas
201 Caroline, Houston, Texas 77002
P.O. Box 4651, Houston, Texas 77210

Generated By: TAYLER HATCHER
IPLHOU0144421




# Iranian Christian detained amid visa issues

**By Julián Aguilar**
STAFF WRITER

Zahra Razavinik, an Iranian immigrant who has lived in the United States for nearly three decades, is part of a team of teachers at Memorial Drive Presbyterian Church who encourage preschool children to develop their "God-given gifts."

Federal immigration officials have deemed her a threat to national security and sent her to the El Valle detention center in Raymondville. She's been detained since January, despite her lack of criminal history and efforts to relocate to a country that will grant her a visa.

"She cannot go back to Iran. Keep in mind the country conditions over there," Razavinik's attorney, Misbah Chaudhry, said. "Right now, it's open war between Iran and USA."

What's just as concerning, Chaudhry added, is that Razavinik, 66, is a Christian.

"It's a fundamentalist government over there, very conservative," she said. "She is a liberal, and because of her religious activities, she has no option to go back."

It's unclear how the current conflict between the U.S. and Iran could affect Razavinik's fate. The U.S. and Iran came to an agreement last month to cease hostilities. Chaudhry doubts conditions for people such as Razavinik will improve.

Christians in Iran continue to be arrested and imprisoned in the aftermath of the 12-day war with Israel in June 2025, human rights groups have reported.

Last year, authorities in Iran arrested more than 250 Christians on charges related to their religious beliefs, an increase of more than 80%, according to Article 18, a London-based nonprofit that advocates for religious freedom in Iran.

More than 40 Christians were still serving sentences at the end of 2025, and at least 16 others remained in pretrial detention, the nonprofit states.

Razavinik has been in the United States since 1997 after she entered the country from Germany, where she was previously granted asylum. In 2006, an immigration judge granted her withholding of removal, a relief from deportation to an immigrant's home country due to a fear of persecution. She was granted that relief because she was a Christian in a majority Muslim nation, according to a court filing.

She was ordered to return to Germany or apply for a visa to enter another country but had no luck, Chaudhry said.

"She repeatedly applied to go to Holland, Norway, Canada, France, Denmark, Sweden, Switzerland and Germany," she said.

For the last two decades, her friends and family said, Razavinik has led a quiet but productive life and worked as a preschool teacher at Memorial Drive Presbyterian Church. She has a valid work permit until 2030, her attorney said. Razavinik was also the chief caretaker for her husband, who has a heart condition.

During a routine check-in with Immigration and Customs Enforcement agents in January, Razavinik was detained despite showing proof that she had applied for visas elsewhere. A pastor from the church accompanied her to her appointment, but Razavinik never emerged from the building.

The ICE field office in Houston did not respond to a request for more information about Razavinik's detention.

"We applied for parole, we applied for a bond request with the judge, we



Razavinik

presented everything in front of the judge to show that she has been continuously trying," Chaudhry said.

Mohammad Reza Modaresi, Razavinik's husband, said his wife's time in detention is taking its toll. Last week, Razavinik was almost mistakenly sent to Mexico without explanation, Modaresi said. If not for a last-minute call to the transport agents after officials realized their mistake, Ravazinik could have been sent to a country she's never known.

"Zahra called me as soon as she returned to her dorm," he said. "She is deeply shaken. She told me that the stress of those few hours was much worse than her entire six months in detention."

## 'Part of the family'

Karen and Kyle Wittenbraker, whose children Razavinik taught at Memorial Drive Presbyterian Church, told the Houston Chronicle that Razavinik




Associated Press file photo

**Zahra Razavinik has been held since January in the El Valle detention center in Raymondville.**

was an easy target for the Trump administration as it looks to ramp up its immigration detention and deportation numbers.

"They're the ones who come in and check in and are trying to do the right thing, and then you just catch them at their check-in appointment and detain them," Kyle Wittenbraker said.

Razavinik cared for the Wittenbrakers' children, including a son with autism, after preschool. The family considers her more than a babysitter.

"She would help drive him to his appointments and therapy, because that's a lot of extra work," Wittenbraker said. "I don't really like calling her a nanny because she's sort of more than that. She almost became — or did become — sort of part of the family."

Wittenbraker, a Marine Corps veteran who deployed to combat three times, said Razavinik's detention and the Trump administration's immigration crackdown has stained the country's reputation.

"This isn't the country that I served. I'm embarrassed by the Gestapo tactics," he said. "It's cowardly, and it's incredibly disappointing."

Razavinik's legal team is seeking her release from detention. She has a pending petition for release before a federal court in Brownsville.

## 'Not deportable'

Brian Green, a Colorado-based attorney handling Razavinik's habeas corpus petition, said her prolonged detention goes against U.S. Supreme Court precedent.

"It's been 20 years since the end of her immigration court litigation," he said, citing Razavinik's order to return to Germany in 2006. The government is "supposed to remove someone within six months. Putting her back into detention now is unfair unless they have a third country that's going to take her back now."

In a court filing, Green argues that ICE has not presented evidence that Germany or any other country will grant Razavinik's application for a visa.

"She is stateless and thus not deportable," the filing states.

Green also argues that keeping Razavinik locked up would "create a regime of shadow detention authority.

"ICE could maintain lists of individuals with decades-old removal orders and strategically detain them whenever politically expedient or when seeking to bolster removal statistics, regardless of whether removal is actually possible," the petition states.

Modaresi said foreign governments have denied Razavinik's applications for a visa for different reasons. Some require a person to be in the country where they are seeking refuge, others have told her she is currently in a "free country" and she does not face a viable threat, and others have simply not provided the travel documents necessary to apply.

Modaresi hasn't visited his wife because she's worried about the toll the 300-mile trip to Raymondville might have on her husband's health as he battles a heart condition. But Modaresi said that's not the only concern.

What's stopping ICE from detaining him, too?

"I have a work permit, I have a judge's order, I have a withholding of removal," he said. "But why would I think I am safe?"

## LEGAL NOTICES

HoustonChronicle.com/Place-Legals legals@chron.com 713.362.6868

### Notice to Creditors

**NOTICE TO CREDITORS AD**

**$99.00**

Contact our team:
**legals@chron.com**
OR

Visit our 24/7 website to place, anytime:
**HoustonChronicle.com/Place-Legals**

***Includes first 36 lines and 1 Affidavit of Publication. $2.00 each additional line.***

### Legal Bids & Proposals

NOTICE OF REQUEST FOR PROPOSALS Southwest Public Schools is soliciting sealed proposals from qualified and experienced food service vendors to provide vended meal services for the District's Child Nutrition Program for the 26-27 school year. Interested vendors may obtain the complete RFP package and detailed specifications by contacting Melissa Nowicki, Chief Financial Officer at Phone: (713) 784-6345 Email: mnowicki@swschools.org or by download from the District website at: https://www.swschools.org. Sealed proposals must be received no later than Friday, July 17, 2026 2:00 PM CT.
IPLHOU0148391

SER-Niños Inc.
Request for Proposal
Notice is hereby that SER-Niños Inc is requesting sealed proposal to provide vended meal service for the federally funded school child nutrition program. Sealed proposal are due to SER-Niños Inc. CN Department Att: Denis Juarez, 5815 Alder Dr. Houston, TX 77081 on or before August 5, 2026 by 12:00 p.m. This procurement is being conducted using an RFP method. Price will be the primary evaluation factor. Copies of the RFP are available by emailing djuarez@serninos.org.SER-Niños Inc. reserves the right to reject any or all proposal and to waive minor informalities when action is determined to be in the best interest of the school. SER-Niños Inc. Institution is an equal opportunity provider.

IPLHOU0149024

### Citation by Publication

**THE STATE OF TEXAS**

To: Defendant Cynthia Cole

United States District Court for the Southern District of Texas
515 Rusk Avenue, Houston, TX 77002

CASE #: 4:25-cv-05034

**Guillermo Vazquez, in his capacity as Administrator of AFSCME Local 1550, and American Federation of State, County & Municipal Employees, AFL-CIO,**

**Plaintiffs,**

**v.**

**Cynthia Cole, Karen Dugar, Sonja Ross, Alvernise Boyd, and National Organization for State County Municipal Employees 1550 Association,**

**Defendants.**

This action seeks to recover more than $450,000.00 that Defendants obtained through repeated acts of embezzlement and conversion of union assets in violation of 29 U.S.C. § 501(c), mail fraud, bank fraud, and breaches of fiduciary duty in violation of 29 U.S.C. § 501(a).

Counsel for Plaintiffs:
Barry I. Levy, Esq. • Max Gershenoff, Esq. • Elan Kirshenbaum, Esq.
RIVKIN RADLER LLP
926 RXR Plaza, Uniondale, NY 11556
(516) 357-3000
Barry.Levy@rivkin.com • Max.Gershenoff@rivkin.com • Elan.Kirshenbaum@rivkin.com

Petition Filed: October 22, 2025
Citation Issued: May 14, 2026 (Court Order Granting Motion for Substituted Service via Publication)

Rhonda Hawkins, Case Manager
United States District Clerk's Office,
United States Courthouse
515 Rusk Street, Room 9110, Houston, TX 77002
(713) 250-5518

**You have been sued. You may retain an attorney. Failure to file a written answer to the petition on or before Monday, August 24, 2026, at 10:00 AM may result in a default judgment entered against you, Cynthia Cole. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.**

**You are commanded to appear in this case and file an answer on or before: Monday, August 24, 2026, at 10:00 AM**
IPLHOU0146910

### Citation by Publication

CAUSE NUMBER: 202625118

PLAINTIFF: FEDERAL HOME LOAN MORTGAGE CORPORATION
VS.
DEFENDANT: APPLEGATE , OLGA

In the 129th
Judicial District
Harris County, Texas

CITATION BY PUBLICATION

THE STATE OF TEXAS County of Harris

NOTICE TO DEFENDANT: "You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of 42 days after the date this citation was issued, a default judgment may be taken against you."

**To: UNKNOWN HEIRS AT LAW OF OLGA APPLEGATE, DECEASSED**

YOU ARE HEREBY COMMANDED to be and appear before the 129th Judicial District Court of Harris County, Texas in the Courthouse in the City of Houston, Texas at or before 10:00 o'clock A.M., Monday, 6th day of July, 2026, being the Monday next after the expiration date of forty-two days after this citation is issued, and you are hereby commanded and required then and there to appear and file written answer to the Petition, filed in said Court on April 15, 2026, in a suit numbered 202625118 on the docket of said court, wherein Federal Home Loan Mortgage Corporation, as Trustee of the Freddie Mac SLST 2025-2 Participation Interest Trust, Plaintiff, v. Olga Applegate and The Heirs at Law of Olga Applegate, Deceased, Defendants.

**The Petition seeks an order to foreclose the lien on the property an assert a claim to the property located at 19111 Atasca Oaks Drive, Kingwood, TX 77346 and legally described as: Lot Seven (7), Block Three (3) Of Parkside At Kingwood Glen, An Addition In Harris County, Texas, According To The Map Or Plat Thereof Recorded In Flim Code No. 453041, Of The Map Records Of Harris County, Texas.**

GIVEN UNDER MY HAND AND SEAL OF SAID COURT at Houston, Texas this 22nd day of May, 2026.

(SEAL)

**Joshua Hall** District Clerk Signature & Seal

Issued at the request of: LOGS Legal Group LLP – Counsel for Plaintiff Address: 13105 Northwest Freeway, Suite 960, Houston, TX 77040 (Clerk info)

Newspaper: HOUSTON CHRONICLE
IPLHOU0145650

### Legals/Public Notices

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | § | CASE NO. 26-10678 |
| | § | (JOINTLY ADMINISTERED) |
| CROSBY MARINE TRANSPORTATION, LLC, | § | CHAPTER 11 |
| | § | COMPLEX CASE |
| Debtors. | § | |
| | § | SECTION: A |

NOTICE OF BAR DATES
FOR FILING PROOFS OF CLAIM

**NOTICE: Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. If you do not have an attorney, you may wish to consult one.**

**PLEASE TAKE NOTICE** on March 23, 2026 ("***Petition Date***"), Crosby Marine Transportation, LLC ("***Transportation***"), Crosby Tugs, LLC ("***Tugs***"), Crosby Dredging, LLC ("***Dredging***"), and Bertucci Contracting Company, L.L.C. ("***Bertucci***" and collectively, "***Debtors***"), as Debtors in Possession, each filed for relief under Chapter 11 of the Bankruptcy Code thereby commencing these cases (the "***Chapter 11 Case(s)***").

**PLEASE TAKE NOTICE** the Court has set ***July 30, 2026***, as the deadline for any person or entity that holds a claim against the Debtors as of the Petition Date (referred to as "***Creditor***" or "***Creditors***") to file a Proof of Claim as modified by the Order establishing the Bar Date. This Bar Date applies only to those Creditors who are not listed in the Debtors' Schedules, unless such Creditor asserts a lien (other than preferred ship mortgage) under the Commercial Instrument and Maritime Lien Act (46 U.S.C. §§ 13101–13143 ("***CIMLA***") against a Debtor, or whose claim is scheduled as contingent, disputed, or unliquidated. See below for more information about how to determine the listing of your claim and what happens if the Debtors later amend the Schedules.

**PLEASE TAKE NOTICE** the deadline for any governmental unit to file a claim is ***September 21, 2026***, for any governmental unit to file a claim pursuant to 11 U.S.C. § 502(b)(9).

**PLEASE TAKE NOTICE that if you are asserting a lien (other than a preferred ship mortgage) under the Commercial Instrument and Maritime Lien Act (46 U.S.C. §§ 13101–13143) [known as a Maritime Lien], or other lien against any vessel owned by any debtor, you must include the attached addendum to your proof of claim providing the following information:**

**(a) The name of each Debtor against whom you are asserting a lien, including the vessel against which you are asserting a lien;**
**(b) The nature of the maritime lien under 46 U.S.C. § 13101(5);**
**(c) The date the lien was established;**
**(d) The amount of the lien claimed;**

**A Maritime Lien can arise from a maritime tort or the provision of "necessaries" to a vessel. Necessaries can include any essential goods, supplies, or services provided to a vessel to keep it operating safely, efficiently, and in navigation.**

**ADDITIONALLY, if you are asserting a maritime lien against any of the Debtors or the Debtors' vessels, you must also attach documentation supporting your claim (e.g. invoices, receipts, charter agreements, bills of lading, supply or repair contracts, vessel logs, time-and-material logs and/or ledger entries, any notices of claims of lien filed with National Vessel Documentation Center).**

**If you assert more than one maritime lien (e.g. for services provided to multiple vessels), you will need to submit a separate proof of claim and addendum for each claim/lien asserted.**

**PLEASE TAKE NOTICE** the deadline for any Creditor with a claim that arises from the rejection of an executory contract or lease is on or before the later of (a) the General Bar Date; or (b) thirty (30) days after the effective date of such rejection as ordered by the Court.

**PLEASE TAKE NOTICE** You can file a Proof of Claim using one of three methods:

1. By using the Court's Electronic Proof of Claim ("***ePOC***") process on the Court's website, https://ecf.laeb.uscourts.gov/cgi-bin/autoFilingClaims.pl;
2. If the person or entity is represented by an attorney, by filing electronically through the Court's CM/ECF system a Proof of Claim conforming substantially to **Official Form B410**, a copy of which accompanies this notice; or
3. By delivering a Proof of Claim conforming substantially to Official Form B410 (attached hereto) to the Court, either in person or by mail to the U.S. Bankruptcy Court, 500 Poydras Street, Suite B-601, New Orleans LA 70130, subject to Covid-19 protocols. If you mail your Proof of Claim to the Court, you must mail it early enough so the Court will receive it on or before the deadline in this notice and enclose a second copy of the Proof of Claim with a self-addressed stamped envelope to receive confirmation the claim was filed.

**PLEASE TAKE NOTICE** to determine if you are listed on the Schedules in a way that would excuse you from filing a Proof of Claim, you may review the Schedules at the U.S. Bankruptcy Court, 500 Poydras Street, Suite B-601, New Orleans LA 70130 – subject to Covid-19 protocols, online at www.pacer.gov, or by contacting Michael Landis, with Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, PLC 601 Poydras Street, Suite 2775, New Orleans, LA 70130 by email at mlandis@lawla.com

**PLEASE TAKE NOTICE** if you do not file a Proof of Claim because you agree with the amount, priority and asserted status listed on the Schedules, and later the Debtors amend the Schedules to change the information about you, then the Debtors shall give notice of such amendment to you, and you may file a Claim by the later of the General Bar Date or thirty (30) days from the date of the notice telling you about the amendment.

**PLEASE TAKE NOTICE** if you are required to file a Proof of Claim and you or your attorney do not take these steps, the Court may decide that you are not entitled to be paid in this case.

**ADDENDUM TO PROOF OF CLAIM**

**CREDITOR:** ____________________

**IS ASSERTING A LIEN (OTHER THAN A PREFERRED SHIP MORTGAGE) UNDER THE COMMERCIAL INSTRUMENT AND MARITIME LIEN ACT (46 U.S.C. §§ 13101–13143) [KNOWN AS A MARITIME LIEN] OR OTHER LIEN AGAINST ANY PROPERTY OF ANY DEBTOR AND PROVIDES THE FOLLOWING INFORMATION AS AN ADDENDUM TO THE PROOF OF CLAIM:**

**(a) Creditor is asserting a lien against:**

| | | |
|---|---|---|
| CROSBY MARINE TRANSPORTATION, LLC | Yes ☐ | No ☐ |
| CROSBY TUGS, LLC | Yes ☐ | No ☐ |
| CROSBY DREDGING, LLC | Yes ☐ | No ☐ |
| BERTUCCI CONTRACTING COMPANY, L.L.C. | Yes ☐ | No ☐ |
| VESSEL SUBJECT TO LIEN | ____________ | |
| OFFICIAL VESSEL NUMBER | ____________ | |

**(b) The nature of the maritime lien:**

| | |
|---|---|
| Damages arising out of maritime tort: | ☐ |
| Wages of a stevedore when employed directly by a person listed in 46 U.S.C. § 13141 | ☐ |
| Wages of the crew of a vessel | ☐ |
| General averages | ☐ |
| Salvage, including contract salvage | ☐ |

**(c) The date the maritime lien was established:** ____________

**(d) Documentation attached**

CC-44290591

Katy Family Eye Care Office Closure

1313 N Fry Road
Houston, Texas 77449
Practice will close July 31st, 2026

Authorized Patient Record Release
veritrust.net/client-support/medical-records-request/
Phone: 713-263-9000 Fax: 281-758-8316
Email: medicalrecords@veritrust.net
Mail: P.O. Box 550748, Houston, TX 77255
IPLHOU0150614



### Legal Bids & Proposals

**Request for Qualifications**
**RFQ 26-01**
**Affordable Housing Development Partners**

Harris County Housing Authority (HCHA) is seeking submissions from qualified Respondents interested in partnering on affordable housing development services, including but not limited to development, financing, construction, preservation, and related real estate development activities for current and future housing initiatives. This RFQ is being issued as a continuously open solicitation. **Proposals shall be emailed to:** dominique.king@hchatexas.org. RFQ 26-01 will be posted on HCHA's website at www.hchatexas.org and can be downloaded there.
IPLHOU0149303

**NOTICE TO BIDDERS**
**The Metropolitan Transit Authority of Harris County, Texas (METRO) is planning to issue the procurement documents listed in this advertisement.**

**IFB No. Doc2282570456: Purchase and Delivery of H4 LRV Brake Overhaul Kits.** Solicitation will be available on or about 06/29/2026.

Prospective bidders/proposers can view and download these solicitations by visiting METRO's website at ridemetro.org/Open Procurements

If you are unable to download the documents or are having difficulty, please contact 713-615-6125 or email Contracts/Property Services at propertyservices@ridemetro.org.
IPLHOU0149568

**HOUSTON CHRONICLE**

**AFFIDAVIT OF PUBLICATION**

**STATE OF TEXAS:**

Before me, the undersigned authority, a Notary Public in and for the State of Texas, on this day personally appeared, a Newspaper Representative for the Hearst Newspapers, LLC – dba HOUSTON CHRONICLE, a newspaper published in Harris County, Texas, and generally circulated in the Counties of HARRIS, TRINITY, WALKER, GRIMES, POLK, SAN JACINTO, WASHINGTON, MONTGOMERY, LIBERTY, AUSTIN, WALLER, CHAMBERS, COLORADO, BRAZORIA, FORT BEND, GALVESTON, WHARTON, JACKSON, and MATAGORDIA and that the publication, of which the annexed herein, or attached to, is a true and correct copy, was published to wit.

---

**RIVKIN RADLER ATTORNEYS AT LAW** **SIZE BEING : 1.51" x 7.08"**

**06/14/2026 Houston Chronicle**
**06/21/2026 Houston Chronicle**
**06/28/2026 Houston Chronicle**
**07/05/2026 Houston Chronicle**

Victoria Bond
NEWSPAPER REPRESENTATIVE (signature)

Victoria Bond
NEWSPAPER REPRESENTATIVE (printed)

Sworn and subscribed to before me, the 6th Day of July A.D. 2026

TAMIKA PERRY
Notary Public, State of Texas
Comm. Expires 05-05-2027
Notary ID 134344618

Notary Public in and for the State of Texas

**THE STATE OF TEXAS**

To: Defendant Cynthia Cole

United States District Court for the Southern District of Texas
515 Rusk Avenue, Houston, TX 77002

CASE #: 4:25-cv-05034

**Guillermo Vazquez, in his capacity as Administrator of AFSCME Local 1550, and American Federation of State, County & Municipal Employees, AFL-CIO,**

**Plaintiffs,**

**v.**

**Cynthia Cole, Karen Dugar, Sonja Ross, Alvernise Boyd, and National Organization for State County Municipal Employees 1550 Association,**

**Defendants.**

This action seeks to recover more than $450,000.00 that Defendants obtained through repeated acts of embezzlement and conversion of union assets in violation of 29 U.S.C. § 501(c), mail fraud, bank fraud, and breaches of fiduciary duty in violation of 29 U.S.C. § 501(a).

Counsel for Plaintiffs:
Barry I. Levy, Esq. • Max Gershenoff, Esq. • Elan Kirshenbaum, Esq.
RIVKIN RADLER LLP
926 RXR Plaza, Uniondale, NY 11556
(516) 357-3000
Barry.Levy@rivkin.com • Max.Gershenoff@rivkin.com • Elan.Kirshenbaum@rivkin.com

Petition Filed: October 22, 2025
Citation Issued: May 14, 2026 (Court Order Granting Motion for Substituted Service via Publication)

Rhonda Hawkins, Case Manager
United States District Clerk's Office,
United States Courthouse
515 Rusk Street, Room 9110, Houston, TX 77002
(713) 250-5518

**You have been sued. You may retain an attorney. Failure to file a written answer to the petition on or before Monday, August 24, 2026, at 10:00 AM may result in a default judgment entered against you, Cynthia Cole.**
**In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk.**
**Find out more at TexasLawHelp.org.**

**You are commanded to appear in this case and file an answer on or before: Monday, August 24, 2026, at 10:00 AM**

IPLHOU0146910